IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

RECEIVED

2007 MAY -3  P 2: 38

DEBRA P. HACKETT, CLK
U.S. DISTRICT COURT
MIDDLE DISTRICT ALA

RENA D. STINSON,                    )
                                    )
    PETITIONER,                     )
                                    )
v.                                  )    NO. 2:07-CV-225-WHA
                                    )
STATE OF ALABAMA, *et. al.*,        )
                                    )
    RESPONDENTS.                    )

**RESPONDENTS' ANSWER**

Come now the Respondents in the above-styled cause, by and through the

Attorney General of the State of Alabama, and, in response to this Honorable

Court's order to show cause why a writ of habeas corpus should not be granted,

state as follows:

1. Rena Dorsey Stinson challenges her August 23, 2005, Montgomery

County conviction for two counts of first-degree theft of property and one count of

second-degree theft of property and her twenty-five year sentence for each count

on the following grounds:

    a. Stinson was denied effective assistance of trial counsel because
trial counsel;

        i.    failed to adequately investigate;

ii.    did not "allow[]" witnesses to testify on Stinson's behalf;

iii.    did not allow Stinson to testify on her own behalf;

iv.    did not present the available defense of alibi;

v.    failed to move for the suppression of evidence;

vi.    failed to "file appropriate motions" including motions to obtain discovery;

vii.    did not make appropriate objections including failing to object to:

(1).  hearsay testimony;

(2).  leading questions regarding the photographic lineup; and,

(3).  the admission of evidence including the photographic lineup;

viii.    was not adequately prepared for trial;

ix.    failed to keep Stinson informed of the status of her case;

x.    failed to obtain the "still shot photo" used by Detective Roberts during interrogation which could have vindicated Stinson;

xi.    erred by questioning Detective Roberts about the photographic lineup, video tapes, and DNA;

xii.    failed to ensure that Stinson was properly informed of the charges against her;

xiii.    did not allow Stinson an opportunity to review the presentence report; and,

xiv.    failed to timely file appropriate post-trial motions

b. Stinson was denied effective assistance of appellate counsel because appellate counsel;

    i.    failed to raise ineffectiveness of trial counsel claims;

    ii.    "filed a fraudulent motion to the court" requesting indigent status for Stinson's appeal when she had paid him "$4,000 to file the appeal"; and,

    iii.    "intentionally left out valid grounds in the appeal";

c. Stinson was denied the opportunity to enter a plea;

d. Stinson was not notified of "court appearance[s]" such as arraignment or trial;

e. she was not properly arraigned;

f. she was denied a preliminary hearing;

g. Stinson was unable to participate or help with her trial because she was threatened with contempt charges;

h. one of the victim's in-court identification of Stinson was tainted because the prosecution previously identified Stinson to the victim;

i. the State withheld potentially exculpatory evidence such as the surveillance video, original complaints, a still shot photograph, and DNA evidence;

j. Stinson's conviction and resulting sentence is "unlawful, unconstitutional, and void" because it violates her due process rights;

k. admission of Stinson's "mug shot" was erroneous because it impermissibly suggested she had a criminal record; and,

l. a witness's in-court identification should have been suppressed because the prosecution failed to establish it was based on an independent basis.

2.  The Respondents acknowledge that Stinson is presently incarcerated in Birmingham Work Release Center pursuant to her lawful conviction, but deny that she is in custody in violation of the laws or Constitution of the United States.

3.  The Respondents aver that Stinson's petition must be dismissed without prejudice because she failed to properly exhaust all of her claims.  Additionally, at this point, Stinson still has state remedies available.

4.  Respondents aver that, by asserting the defense of exhaustion, they do not waive the future assertion of other applicable defenses such as statute of limitation, procedural default, lack of federal question, and lack of merit.

## PROCEDURAL HISTORY

### A.  Trial Proceedings and Direct Appeal

Stinson was indicted by a Montgomery County Grand Jury on July 9, 2004, and charged with three counts of first-degree theft of property in violation of Section 13A-8-3 of the Code of Alabama (1975) and one count of second-degree theft of property in violation of Section 13A-8-4 of the Code of Alabama (1975). (Exhibit A)  On August 22, 2005, the trial court granted the State's motion to nol pros count three of Stinson's indictment (charging first-degree theft of property) and trial commenced on the remaining three counts.  (Exhibit A)  The following

day, the jury found Stinson guilty of two counts of first-degree theft of property

and one count of second-degree theft of property. (Exhibit A)

On October 24, 2005, the trial court sentenced Stinson to twenty-five years'

imprisonment on each count. (Exhibit A)  Immediately after sentencing, Stinson

gave oral notice of appeal. (Exhibit A)  On November 21, 2005, Stinson filed a

motion for judgment of acquittal alleging that the State had failed to present

sufficient evidence to sustain her convictions.[1]  (Exhibit A)  Judge Truman M.

Hobbs Jr. denied Stinson's post-trial motion on January 9, 2006. (Exhibit A)

On March 15, 2006, Stinson's retained appellate counsel, Mr. Richard K.

Keith, filed a brief with the Alabama Court of Criminal Appeals raising two

claims:

> (1) that the trial court abused its discretion when it denied Stinson's
> right to an arraignment; and,
>
> (2) the trial court erred when it denied Stinson's motion for judgment
> of acquittal because the State failed to present sufficient evidence.

(Exhibit B)

The Alabama Court of Criminal Appeals issued a memorandum opinion on

September 22, 2006, denying the claims, finding: (1) Stinson waived her claim that

she was not properly arraigned because it was not timely raised; and, (2) the State

presented legally sufficient evidence to submit the case to the jury. (Exhibit D)

---

[1] For purposes of expediency, the undersigned consolidated similar allegations
contained in Stinson's motion for judgment of acquittal.

5

On October 2, 2006, the court granted Mr. Keith's motion to withdraw as appellate counsel.  (Exhibit E)

Stinson's pro se application for rehearing was overruled by the Alabama Court of Criminal Appeals on November 3, 2006.  (Exhibit F)  The Supreme Court of Alabama dismissed Stinson's pro se petition for writ of certiorari as untimely on December 1, 2006. (Exhibit H)

### B.  Federal Habeas Petition

Stinson filed the present federal habeas petition, her first, on January 28, 2007.[2]  (Stinson's petition, attached)

### STATUTE OF LIMITATION

A one-year limitation period applies to federal habeas petitions under the Antiterrorism and Effective Death Penalty Act (AEDPA).  *See* Title 28 U.S.C. § 2244(d)(1); *Ford v. Moore*, 296 F.3d 1035, 1035 (11th Cir. 2002) ("AEDPA sets forth a one-year statute of limitation for a prisoner to apply for federal habeas relief from the judgment of a state court.").  Stinson had one year from December 11, 2006, the date her conviction became final in state court, to file the present petition.  Because she filed the present petition on January 28, 2007, this petition is not barred by the statute of limitation.

---

[2] This is the date Stinson's petition is signed.  *See Houston v. Lack*, 487 U.S. 266, 108 S. Ct. 2379 (1988).

## ARGUMENT

A petitioner must exhaust all state remedies available in state court before

seeking relief in federal court. *See* 28 U.S.C. § 2254(b)(1)(A). *See also Rhines v.*

*Weber*, 544 U.S. 269, 274, 125 S. Ct. 1528, 1533 (2005); *O'Sullivan v. Boerckel*,

526 U.S. 838, 842, 119 S. Ct. 1728, 1731 (1999); *Henderson v. Campbell*, 353

F.3d 880, 897 (11th Cir. 2003). Thus, until a petitioner's claims have been fully

and fairly presented to the state courts for consideration, the federal habeas

exhaustion requirement has not been satisfied. *See Thomas v. Crosby*, 371 F.3d

782, 813-14 (11th Cir. 2004). To properly exhaust state remedies, a petitioner

must present her issues in a "petition for discretionary review in the state's highest

court" even if "the state supreme court rarely grants such petitions and usually

confines itself to answering questions of broad significance." *Smith v. Jones*, 256

F.3d 1135, 1138 (11th Cir. 2001). Moreover, when the "petitioner has failed to

exhaust state remedies that are no longer available, that failure is a procedural

default which will bar federal habeas relief, unless either the cause and prejudice or

the fundamental miscarriage of justice exception is established." *Id.*

Because Stinson's petition contains both exhausted and nonexhausted

claims, it is deemed a "mixed" petition. *See Kelley v. Secretary for Dept. of Corr.*,

377 F.3d 1317, 1351 (11th Cir. 2004). One of Stinson's claims – she was not

7

properly arraigned – was raised on direct appeal. (Exhibit B) Though she sought

discretionary review by filing a petition for writ of certiorari in the Supreme Court

of Alabama, it was dismissed as untimely. (Exhibit H) Thus, this issue is

procedurally defaulted. *See Boerckel*, 526 U.S. at 842, 119 S. Ct. at 1731; *Smith*,

256 F.3d at 1138. Her remaining claims are raised for the first time in this Court.

Until these claims are fully and fairly presented to the state courts for

consideration, the federal habeas exhaustion requirement has not been satisfied.

*See* 28 U.S.C. § 2254(c); *Thomas*, 371 F.3d at 813-14.

Furthermore, Stinson still has an available state remedy. She has one year

after the issuance of the certificate of judgment in her case – until November 21,

2007 – to file a postconviction petition under the Alabama Rules of Criminal

Procedure. *See* Ala. R. Crim. P. 32.2(c). Thus, Stinson is not without recourse in

the state courts. Moreover, dismissing Stinson's petition and requiring her to

present these unexhausted claims to the state courts first is not futile because "the

limitations period is tolled during the pendency of a 'properly filed application for

State post-conviction or other collateral relief.'" *Rhines*, 544 U.S. at 274-75, 125

S. Ct. at 1533. Therefore, once her claims are exhausted, Stinson may then seek

federal review. Because she has failed to afford the state courts a fair opportunity

to resolve these issues, and dismissal of Stinson's mixed petition will not prevent

her from seeking federal review, Stinson's petition should be dismissed without prejudice.

## CONCLUSION

For the above-stated reasons, this Court should dismiss Stinson's petition without prejudice.

Respectfully submitted,

Troy King
Attorney General
By

Audrey Jordan
Assistant Attorney General

9

# EXHIBIT LIST

Exhibit A  -  Copy of the record on direct appeal (165 pages).  CC-04-1694;
CR-05-0182

Exhibit B  -  Copy of Stinson's brief on direct appeal. CC-04-1694; CR-05-0182;

Exhibit C  -  Copy of the State's brief on appeal. CC-04-1694; CR-05-0182;

Exhibit D  -  Copy of the Alabama Court of Criminal Appeals's memorandum
opinion issued on September 22, 2006. CC-04-1694; CR-05-0182;

Exhibit E  -  Copy of the Alabama Court of Criminal Appeals's order granting
Mr. Keith's motion to withdraw. CC-04-1694; CR-05-0182;

Exhibit F  -  Copy of the Alabama Court of Criminal Appeals's order overruling
Stinson's application for rehearing. CC-04-1694; CR-05-0182;

Exhibit G  -  Copy of the certificate of final judgment. CC-04-1694; CR-05-0182;

Exhibit H  -  Copy of the Alabama Supreme Court's order dismissing Stinson's
petition for certiorari as untimely. CC-04-1694; CR-05-0182;
No. 1060338;

Exhibit I  -  Copy of the Alabama Supreme Court's order denying Stinson's
motion to reinstate her petition for writ of certiorari. CC-04-1694;
CR-05-0182; No. 1060338

Exhibit J  -  Copy of Stinson's petition.

## CERTIFICATE OF SERVICE

I hereby certify that on this <u>3rd</u> day of May, 2007, I served a copy of the

foregoing (including all exhibits) on Stinson, by placing the same in the United

States Mail, first class, postage prepaid and addressed as follows:

> Rena Dorsey Stinson
> AIS #234171
> Birmingham WR/CWC
> 1216 25th Street North
> Birmingham, Alabama 35234-3196

Audrey Jordan
Assistant Attorney General

ADDRESS OF COUNSEL:

Office of the Attorney General
Criminal Appeals Division
11 South Union Street
Montgomery, AL  36130
(334) 242-7300

262252/106979

11

COURT OF CRIMINAL APPEALS NO. _____ CR 05-0182 _____

# APPEAL TO ALABAMA COURT OF CRIMINAL APPEALS

**FROM**

CIRCUIT COURT OF ___MONTGOEMRY___ COUNTY, ALABAMA

CIRCUIT COURT NO _____CC 04-1694_____

CIRCUIT JUDGE _____TRUMAN HOBBS_____

Type of Conviction/ Order Appealed From: _____TOP1 (2 cts) & TOP2_____

Sentence Imposed: _____20 YRS SPLIT TO SERVE 5 YRS EA CT (CTS TO RUN CONCURRENT)_____

Defendant Indigent: ☑ YES ☐ NO

**RENA STINSON**

NAME OF APPELLANT

THOMAS M. GOGGANS _____834-2511_____
(Appellant's Attorney)                                    (Telephone No.)

2030 EAST SECOND STREET
(Address)

MONTGOMERY       AL          36106
(City)                    (State)            (Zip Code)

**v.**

**STATE OF ALABAMA**

NAME OF APPELLEE

(State represented by Attorney General)

NOTE: If municipal appeal, indicate above, and enter

name and address of municipal attorney below.

df _____

_____

(For Court of Criminal Appeals Use Only)



EXHIBIT

A

PENGAD 800-631-6989

## INDEX
## <u>CLERK'S RECORD</u>

CASE ACTION SUMMARY...................................................................    1-3

COMPLAINT & AFFIDAVIT.............................................................    4-5

INDICTMENT...............................................................................    6-8

NOTICE OF DISCOVERY TO DEFENDANT, INTENT TO USE PRIOR
CONVICTIONS. INTENT TO INVOKE SENTENCING ENHANCEMENTS,
INTENT TO OFFER PROOF BY A CERTIFICATE OF ANALYSIS AND
MOTION FOR DISCOVERY BY THE STATE..........................................    9-10

MOTION FOR A SPEEDY TRIAL.......................................................    11

MOTION TO CONTINUE................................................................    12-13

JURY VERDICT............................................................................    14

MOTION TO WITHDRAW................................................................    15-16

REPORT FROM CARMICHAEL IMAGING..............................................    17-23

CONVICTION REPORT...................................................................    24

CLERK'S NOTICE OF APPEAL.........................................................    25

MOTION TO WITHDRAW................................................................    26-27

MOTION FOR JUDGMENT OF ACQUITTAL............................................    28-29

CERTIFICATE OF COMPLETION........................................................    30

```
ACRO372              ALABAMA JUDICIAL INFORMATION SYSTEM     CASE: CC 2004 001694.00
PER: REG                      CASE ACTION SUMMARY
AGE:  1                        CIRCUIT  CRIMINAL              RUN DATE: 12/14/2004
IN THE CIRCUIT COURT OF MONTGOMERY                                     JUDGE: TMH

STATE  OF  ALABAMA                   VS      STINSON RENA
                                             2265 EAST ABERDEEN DRIVE
CASE: CC 2004 001694.00
                                             MONTGOMERY, AL  36116 0000

DOB: 10/15/1953          SEX: F  RACE: B  HT: 5 05  WT: 165   HR: BLK EYES: BRO
SSN: 424782955  ALIAS NAMES: RENA DORSEY
CHARGE01: THEFT OF PROP 1ST      CODE01: TOP1  LIT: THEFT OF PROP  TYP: F #: 001
CHARGE02: THEFT OF PROP 1ST      CODE02: TOP1                      TYP: F #: 001
CHARGE03: THEFT OF PROP 1ST      CODE03: TOP1                      TYP: F #: 001
CHARGE04: THEFT OF PROP 2ND      CODE04: TOP2                      TYP: F #: 001
OFFENSE DATE:                             AGENCY/OFFICER: 0030100

DATE WAR/CAP ISS:
DATE      INDICTED: 07/09/2004     DATE ARRESTED:
DATE      RELEASED:                DATE      FILED: 12/14/2004
BOND      AMOUNT:      $80,000.00  DATE   HEARING:
                                   SURETIES:
DATE 1:            DESC:           TIME: 0000
DATE 2: 12/20/2004  DESC: ARRG     TIME: 0830 A

TRACKING NOS: GJ 2004 070062 00
```

DEF/ATY: Winston Durant   TYPE: A          / AIS 234171

C. May          00000 Jaggans         TYPE:

PROSECUTOR: B. Hughes                                  Aug 15
                                                       May 2

```
OTH CSE: GJ200407006200 CHK/TICKET NO: S          GRAND JURY: 62
COURT REPORTER:              SID NO:      001361646
DEF STATUS: JAIL             DEMAND:                        OPER: REG
DATE        ACTIONS, JUDGEMENTS, AND NOTES
```

| DATE | ACTIONS, JUDGEMENTS, AND NOTES |
|---|---|
| 12-20-04 | W. Durant appointed; A's presence waived |
|  | TMH |
| 4-26-05 | Still at DOC due to illness |
|  | TMH |
| 5-2-05 | Cynthia Ann May, notice of of appearance, counsel of record |

JUDGEMENT IS HEREBY ENTERED IN ACCORDANCE WITH THE VERDICT OF THE JURY, guilty of TOP1 x3, TOP2;

Sentencing set 9-19-05 @ 8:30

Circuit Judge

| State of Alabama Unified Judicial System | CASE ACTION SUMMARY | Case Number |
|---|---|---|
| Form C-7      Rev 2/79 | CONTINUATION | CC 04-1694 TMH |

Style: _Reba Stinson_

Page Number _____ of _____ Pages

| DATE | ACTIONS, JUDGMENTS, CASE NOTES |
|---|---|
| 10-24-05 | Defendant & attorney appeared for sentencing. Court asked if he/she had anything to say why sentence should not now be pronounced and Defendant had his/her say. |

HOA Enhancements Applicable     Yes/No
Defendant Admits __3__ State Proves _____ priors

**IT IS ORDERED:**

Sentenced to _20_ yrs./split to serve _5_ yrs.
_____ reverse split postpone _____ mo./year Review _____
Concurrent _All county_ _____ Consecutive _____

Suspended YES/NO, Supervised/P.O/Court, Probation _X_ _____ years
End of Split Sentence __5__ years supervised probation
_____ DOC to give 60 day notice prior to E.O.S.

ENHANCEMENTS     $1000/2000 Enhancement Fine
_____ Remit portion completion of SAP
_____ Driver License suspended/revoked
_____ $100 DFS fee _____
_____ years School/ _____ years Public Housing
_____ years Sale under 18

Boot Camp___ SAP___ Review upon completion-YES ____ GED_____
Work Release ____ Community Service ____ hrs. Trash Pickup ____ hr
Maintain Employment_____ Aftercare_____ AA/NA_____
**OTHER:** _____

Restitution $ _22,000.16_ Co-Defendant(s) _____
Jointly and Severally liable   Crime Victim $25.00/$50.00
Court Costs ✓ Attorney Fees $150.00/ 0 ✓ Fine $ _____
Payment $_____ Mo/Week Begin _____/04 or 1/2 monies earned ____
 _Retained_ While at DOC

Review/Other _____

Defendant advised right to appeal. Defendant did/did not reserve
issue for appeal or to withdraw the plea. Defendant to be given
credit for time served.   Appeal Bond set $_____

| 10-24-05 | Def given Noticed of Appeal, Appeal Bond denied. TMH |

TRUMAN M. HOBBS, JR.
CIRCUIT JUDGE

ACR0369  A L A B A M A   J U D I C I A L   I N F O R M A T I O N   C E N T E R

CASE ACTION SUMMARY
CONTINUATION

CASE: CC 2004 001694.00
JUDGE ID:  TMH

STATE  OF  ALABAMA                    VS    STINSON RENA

DATE                    ACTION, JUDGMENTS, CASE NOTES

10-26-05  Clerk's Notice of Appeal to Crm App, AG, DA, C. May, + J. Shelton — No forms

11/01/05  Crm Appls # CR 05-0182

11/16/05  Cert of Final Judgment of Dismissal

12/14/05  Docketing Fee Paid — Appeal Reinstated

| State of Alabama<br>Unified Judicial System | **COMPLAINT** | Warrant Number<br>2004F00659 |
|---|---|---|
| | (Felonies, Misdemeanors, or Violations - | Case Number |
| Form CR-6        Rev. 8/98 | District or Municipal Court) | |

IN THE ___**DISTRICT**___ **COURT OF** ___**MONTGOMERY**___, **ALABAMA**
(Circuit, District, or Municipal)                    (Name of Municipality or County)

☒ STATE OF ALABAMA

☐ MUNICIPALITY OF MONTGOMERY v. ___RENA DORSEY STINSON  (000156065A)___
Defendant (NWS Jacket Number)

Before me, the undersigned authority, personally appeared this day the undersigned complainant who, upon first being duly sworn, states on oath that he/she has probable cause for believing, and does believe that ___RENA DORSEY STINSON___, Defendant, whose name is otherwise unknown to the complainant, did, prior to the commencement of this action, on or about ___04/28/2003___ (date of occurrence) commit the offense of ___**THEFT OF PROPERTY, FIRST DEGREE**___ within the

☒ County of ___**MONTGOMERY**___

☐ City/Town of ___ or in the police jurisdiction thereof, in that he/she did: (State specific facts here. Continue on a separate sheet of paper if needed.) (select as appropriate):

(a) ☐ knowingly obtain or exert unauthorized control over the follow property, to wit: ___,

the property of, to wit: ___,
and having a value in excess of $2,500.00 dollars, with the intent to deprive the owner of the said property; ,

(a) ☒ knowingly obtain, by deception, control over the follow property, to wit: ___ASSPRTED U.S. CURRENCY DOLLARS___ ,

the property of, to wit: ___EMMA JEAN ANDERSON___ ,
and having a value in excess of $2,500.00 dollars, with the intent to deprive the owner of the said property; ,

(a) ☐ knowingly obtain or exert unauthorized control over the following property, to wit: ___,

from the person of, to wit: ___,
with the intent to deprive the owner of the said property;

(a) ☐ knowingly obtain, by deception, control over the following property, to wit: ___,

from the person of, to wit: ___,
with the intent to deprive the owner of the said property;

(b) ☐ knowingly obtain or exert unauthorized control over a motor vehicle, to wit: ___,

the property of, to wit: ___,
with the intent to deprive the owner of the said property;

(b) ☐ knowingly obtain, by deception, control over a motor vehicle, to wit: ___,

the property of, to wit: ___,
with the intent to deprive the owner of the said property;
in violation of

☐ Section ___, Alabama Code 1975.

☐ Municipal Ordinance Number ___ which embraces Section ___ Alabama Code 1975, previously adopted, effective and in force at the time the offense was committed.

☒ Other ___**ACT 2003-355, ALABAMA LEGISLATURE, 2003 REGULAR SESSION**___

Sworn to and Subscribed before me this

___15TH___ day of ___

Complainant _N_ _Robert_

___APRIL___, ___2004___      MPD
Address ___

Judge/Magistrate/Warrant Clerk      Telephone Number ___

| WITNESSES | | |
|---|---|---|
| Name | Address | Telephone Number |
| | | |

Additional Witnesses on Reverse Side.

Case # _03-10571_    ●    Warrant # _2005-659_

**AFFIDAVIT**
**DISTRICT COURT OF MONTGOMERY ALABAMA**

**INSTRUCTIONS:** Complete the following information on OFFENSE/OFFENDER

**Offense:** _Theft of Property 1st Degree by Deception_

**Defendant's Name:** _B/F Rena Dorsey Stinson_    **D.O.B.** _10/15/53_

**Defendant's SSN:** _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_    **Height:** _5'5"_    **Weight:** _165_

**Defendant's Address:** _2265 E. Aberdeen Dr. Montgomery, AL. 36116_

**Date & Time of Offense:** _Monday 04/28/03 @ 1245 Hours_

**Place of Occurrence:** _320 Eastdale Cir. Montgomery, AL. 36117 (Regions Bank)_

**Person or Property Attacked:** _Emma Jean Anderson_

**How Attacked:** _____

**Damage Done or Property Attacked:** _Assorted U.S. Currency Dollars_

**Value of Property:** _$3,500.00_

**Details of Offense:**

_On the listed date and time the defendant did knowingly obtain by deception control over the complainant's listed property. The defendant was positively identified through a photographic lineup._

This offense did occur in the City of Montgomery, Montgomery County, and is in violation of Title _13A-8-3_ against the peace and dignity of the State of Alabama.

I make this affidavit for the purpose of securing a warrant against the said _B/F Rena Dorsey Stinson_ . I understand that I am instituting a criminal proceeding and cannot drop this case. I further understand that if any of the facts are untrue, I may, in addition to any other punishment provided by law, be taxed with court costs in this proceeding.

Sworn to and subscribed before me
this _15_ day of _April_ 20 _04_ .

_____
Judge - Clerk - Magistrate

_____
**Complainant**

**WITNESSES:** (Name, Address, Telephone Number)

1) _Emma Jean Anderson, 1185 Hall Ln. Montgomery, AL. 36117, 334-215-7256_

2) _Det. W.J. Roberts #1398, MPD, 334-241-2963_

3)

GJ NO. _0062_

THE STATE OF ALABAMA

Rena Dorsey Stinson
B/F HT:5'5" WT:165 DOB:10/15/53

2265 East Aberdeen Drive

SID. NO. _01361646_ ARREST DATE _____

FOR

TOP I (3 cts)

TOP II

A TRUE BILL

_Jesse J. White_
Foreperson of Grand Jury

BAIL IN THIS CASE IS FIXED AT

$ 80,000

_Judge, Circuit Court of Montgomery County_

CC NO. _____

TMH

Graves

Presented in open Court by the Foreperson of
the Montgomery County Grand Jury in the pres-
ence of _IV_ other members of
the Grand Jury and filed this _9th_
day of _July, 04_

_Melissa Rittenour_

Clerk of the Circuit Court of Montgomery County

WITNESSES

1 Emma Jean Anderson
  1185 Hall Ln 36117

2 Dhavireddy Devi
  6531 E Woodglenn Dr

3 Carol Ray
  6021 Arbor Glenn Dr

4 W.J. Roberts
  WK:MPD

5 Avaceal Williams
  205 Sylvest Dr Apt 225

# THE STATE OF ALABAMA

## MONTGOMERY COUNTY

Circuit Court of Montgomery County, _____ July _____ Term, A.D. 2004

COUNT I: The Grand Jury of said County charge that, before the finding of this indictment,

RENA DORSEY STINSON, alias
RENA D. STINSON, alias
RENA DORSEY,

whose name is otherwise unknown to the Grand Jury, did knowingly obtain or exert unauthorized control over, or did knowingly obtain by deception control over lawful currency and/or coinage of the United States of America, a better description of which is unknown to the Grand Jury, of some value greater than $2,500.00, the property of Emma Anderson, with intent to deprive the owner of the property, in violation of Section 13A-8-3 of the Code of Alabama, against the peace and dignity of the State \of Alabama.

COUNT II:  The Grand Jury of said County further charge that, before the finding of this indictment,

RENA DORSEY STINSON, alias
RENA D. STINSON, alias
RENA DORSEY,

whose name is otherwise unknown to the Grand Jury, did knowingly obtain or exert unauthorized control over, or did knowingly obtain by deception control over lawful currency and/or coinage of the United States of America, a better description of which is unknown to the Grand Jury, of some value greater than $2,500.00, the property of Carol Ray, with intent to deprive the owner of the property, in violation of Section 13A-8-3 of the Code of Alabama, against the peace and dignity of the State of Alabama.

COUNT III:   The Grand Jury of said County further charge that, before the
             finding of this indictment,

                        RENA DORSEY STINSON, alias
                        RENA D. STINSON, alias
                        RENA DORSEY,

whose name is otherwise unknown to the Grand Jury, did knowingly obtain or

exert unauthorized control over, or did knowingly obtain by deception

control over lawful currency and/or coinage of the United States of

America, a better description of which is unknown to the Grand Jury, of

some value greater than $2,500.00, the property of Dhawireddy Devi, with

intent to deprive the owner of the property, in violation of Section

13A-8-3 of the Code of Alabama, against the peace and dignity of the State

of Alabama.


COUNT  IV:   The Grand Jury of said County further charge that, before the
             finding of this indictment,

                        RENA DORSEY STINSON, alias
                        RENA D. STINSON, alias
                        RENA DORSEY,

whose name is otherwise unknown to the Grand Jury, did knowingly obtain or

exert unauthorized control over, or did knowingly obtain by deception

control over lawful currency and/or coinage of the United States of

America, a better description of which is unknown to the Grand Jury, of

some value greater than $500.00, the property of Avaceal Williams, with

intent to deprive the owner of the property, in violation of Section

13A-8-4 of the Code of Alabama,

against the peace and dignity of the State of Alabama.


_Eleanor d. Brooks_
District Attorney, Fifteenth Judicial Circuit of Alabama

IN THE CIRCUIT COURT FOR THE FIFTEENTH JUDICIAL CIRCUIT

MONTGOMERY COUNTY, ALABAMA

STATE OF ALABAMA,                )
    Plaintiff,               )
                             )
                             )
V                             )    CC _04 - 1694_ TMH
                             )
*Stinson, Rena Dorsey*     )
      Defendant.             )

**NOTICE OF**
DISCOVERY TO DEFENDANT,
INTENT TO USE PRIOR CONVICTIONS,
INTENT TO INVOKE SENTENCING ENHANCEMENTS,
INTENT TO OFFER PROOF BY A CERTIFICATE OF ANALYSIS, and
MOTION FOR DISCOVERY BY THE STATE

      COMES NOW the State of Alabama, by and through its District Attorney for the Fifteenth Judicial Circuit, Eleanor I. Brooks, and gives notice as to the following:

[ ✓ ] 1.    Pursuant to Rule 16.1, <u>A.R.Cr.P.</u>, and as otherwise required by law, all available discovery has been provided or made available to the Defendant's counsel of record. Physical evidence, if any, is in the custody of the investigating law enforcement agency or the Alabama Department of Forensic Sciences. Arrangements to inspect physical evidence may be made by contacting the undersigned.

      The State has furnished a copy of the discovery to Defense Counsel. This material is page numbered sequentially from 000001 to ___ 12 9 _____. (Pages_____ have not been provided as they are either work product and/or NCIC, which cannot be provided pursuant to state law, unless ordered by the Court.) The State of Alabama considers this discovery material to have been received in its entirety by Defense Counsel unless promptly notified in writing of any discrepancies.

[ ✓ ] 2.    The State intends to use at trial any and all prior convictions, crimes, wrongs, or acts of the Defendant for those uses permitted by Rules 404(b) and 609 of the <u>A.R.E.</u>, and as otherwise allowed by law. The State is presently aware of, and intends to use, the following:

| TOP I | 1945 |
|-------|------|
| TOP I | 1997 |
| TOP I | 2003 |
|       |      |
|       |      |

FILED
JAN 2005
Melissa Rittenour
Circuit Clerk

1

[ ✓ ] 3.    The State intends to invoke all sentencing enhancements required or permitted by law, including, the Habitual Felony Offender Act based on any applicable felony convictions, known and/or any convictions which may subsequently be discovered and/or disclosed. And, if applicable, the following:

(___)   Enhancement for use of firearm or deadly weapon.  Minimum term of imprisonment of _____ years.

(___)   Five Year Enhancement for Sale of Drugs within three (3) miles of a school, 13A-12-250.

(___)   Five Year Enhancement for Sale of Drugs within three (3) miles of housing project, 13A-12-270.

(___)   $1,000.00 Fine, 13A-12-281.

(___)   $2,000.00 Fine, 13A-12-281.

(___)   Suspension of Driver's License, 13A-12-290.

(___)   Five Year Enhancement for Possession of Firearm, 13A-12-231(13).

[___] 4.    Pursuant to Sections 12-21-300 through 303, Code of Alabama, written notice is hereby given of the State's intent to offer proof by a certificate of analysis in lieu of direct testimony.    The certificate of analysis is from the Alabama Department of Forensic Sciences and is included in the provided discovery material.

[ ✓ ] 5.    Pursuant to rules 16.2 and 16.4(c), A.R.Cr.P., and as otherwise required by law, the State requests a copy of all discovery to which it is entitled and hereby moves this Honorable Court for an order granting same to the State.

Respectfully submitted, this __7__ day of __January__, 2004.

ELEANOR I. BROOKS
District Attorney

by:    _____
MIKE GRAVES (GRA110)
Deputy District Attorney

CERTIFICATE OF SERVICE

I hereby certify that a true copy of the above and foregoing was served upon the Honorable __W. Durant__, Counsel for the Defendant, by hand delivery; or by placing same in the appropriate Courthouse Box; or by posting same in the United States mail, postage prepaid and properly addressed to said Counsel; on this the __7__ day of __January__, 2004.

by:    _____
MIKE GRAVES (GRA110)
Deputy District Attorney

2

STATE OF ALABAMA      IN THE CIRCUIT COURT OF    95-1125

VS       00-557

*Rena D. Stinson*     *Montgomery*    03-1574

County, Alabama    03-5021

04-1694

## MOTION FOR A SPEEDY TRIAL

     Comes now, *Rena D. Stinson*, defendant in the above styled case and would move this Honorable Court for a trial at the earliest date possible date.

     I have been notified by the Alabama Department of Corrections that a detainer has been placed in my institutional file and I make this motion in order to expeditiously dissolve said detainer.

Respectfully submitted this _19_ day of _January_, 2005.

_____
Defendant signature

AIS # 234171     Dorm # 9
Julia Tutwiler Prison for Women
8966 U.S. Highway 231 North
Wetumpka, Alabama 36092-5343

JAN 2005
Filed
Melissa Rittenour
Circuit Clerk

Also, Please let me know what charges are pending Against me. The victims And Amounts And Any other information you can send me.

                 Thanks

CC- 2004-1694 - Arraignment Date was 12/20/04
Case Action Summary enclosed



## IN THE CIRCUIT COURT OF MONTGOMERY COUNTY, ALABAMA

STATE OF ALABAMA      *
     Plaintiff,      *

     *

v.      *      CASE NO. CC 2004-1694

     *

RENA STINSON      *
     Defendant.      *

### MOTION TO CONTINUE

COMES NOW, the Plaintiff, **RENA STINSON**, by and through her attorney of

record, **CYNTHIANTHER L. MAY** and files this *Motion to Continue* in the above-

referenced matter and will show unto the Court the following:

1.  This matter is set for trial on August 15, 2005.

2.  Counsel has relocated to Mobile County, Alabama ; in June 2005, prior to

    counsel's relocation, said counsel notified the Court of her relocation via

    U. S. mail.

3.  On July 7, 2005 or thereabout, counsel contacted the Court via telephone and

    received verification of the Court's receipt of counsel's relocation letter.

4.  Counsel was not notified by the Court, of Mrs. Stinson's status or trial date.

5.  Counsel became aware of Mrs. Stinson's court dates after receiving a return

    phone call from Brandon Hughes, the prosecutor.

WHEREFORE, the premises considered, the Defendant prays that this Honorable

Court will set this matter to a later date, which will allow time for defendants transport and

counsel preparation for trial.

Respectfully submitted this the 10th day of August, 2005.

                                     **CYNTHIANTHER L. MAY (MAY039)**
                                     **Attorney for Defendant**

OF COUNSEL:
**COCHRAN LAW FIRM P.C.**
401 Church Street
Mobile, Alabama 36602
Telephone: (251) 433-6500
Facsimile: (251) 434-9995

## CERTIFICATE OF SERVICE

I hereby certify that I have served a copy of the foregoing on the following by placing a copy of the same in the United States mail, postage prepaid and affixed on this, 10th day of August 2005.

**Montgomery County District Attorney Office**
**Attention: Brandon Hughes**
**251 South Lawrence Street**
**Post Office Box 1667**
**Montgomery, Alabama 36102-1667**

CYNTHIANTHER L. MAY

OF COUNSEL:

**COCHRAN LAW FIRM P.C.**
401 Church Street
Mobile, Alabama 36602
Telephone: (251) 433-6500
Facsimile: (251) 434-9995

State of Alabama
Unified Judicial System

**JURY VERDICT**

Case Number

**CC-04-1694 TMH**

Form C-50      Rev 6/88

# IN THE CIRCUIT COURT OF MONTGOMERY COUNTY, ALABAMA

Plaintiff:  State of Alabama      v.  Defendant: RENA STINSON

COUNT I:

_____✓_____  We, the Jury, find the Defendant GUILTY of Theft of Property

in the First Degree, as to Emma Anderson, as charged in the

indictment.

**OR**

_____  We, the Jury, find the Defendant NOT GUILTY.

COUNT II:

_____✓_____  We, the Jury, find the Defendant GUILTY of Theft of Property

in the First Degree, Carol Ray, as charged in the indictment.

**OR**

_____  We, the Jury, find the Defendant NOT GUILTY.

COUNT IV:

_____✓_____  We, the Jury, find the Defendant GUILTY of Theft of Property

in the Second Degree, as to Avaceal Williams,  as charged in

the indictment.

**OR**

_____  We, the Jury find the Defendant NOT GUILTY.

RECEIVED
8-03-05
CIRCUIT COURT CLERK

MICHAEL T. MAYER
Name of Foreperson (please print)

Foreperson Signature

Date filed   8-23-05




IN THE CIRCUIT COURT OF MONTGOMERY COUNTY, ALABAMA

| | | |
|---|---|---|
| STATE OF ALABAMA | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | CASE NO. CC 2004-1694 |
| | * | |
| RENA STINSON | * | |
| Defendant. | * | |

## MOTION TO WITHDRAW

    **COMES NOW** Cynthianther L. May and respectfully moves this Honorable Court for leave to withdraw as counsel for Defendant, **RENA STINSON,** and as grounds therefore would show the following:

    1. Counsel has been notified that the above-named defendant has retained alternative legal representation.

    **WHEREFORE,** the premises considered, counsel prays that the Court will grant this motion.

    Respectfully submitted this 21st day of September 2005.


                      CYNTHIANTHER L. MAY (MAY 039)

OF COUNSEL:
COCHRAN LAW FIRM
401 Church Street
Mobile, Alabama 36604
Telephone (251) 433-6500
Facsimile (251) 434-9995


GRANTED 1|9|06

TRUMAN M. HOBBS, JR.
CIRCUIT JUDGE



SEP 2005
Filed
Melissa Rittenour
Circuit Clerk



## CERTIFICATE OF SERVICE

I do hereby certify that I have on this the 21st day of September, 2005, served a copy of the foregoing notice on the following by United States Mail , first class, postage prepaid, to the following:

Montgomery County District Attorney Office
Attention: Brandon Hughes
251 South Lawrence Street
Post Office Box 1667
Montgomery, Alabama 36102-1667

Mrs. Rena Stinson
6624 Stable Gate Court
Montgomery, Alabama 36116

Attorney Thomas Goggans
2030 East 2nd Street
Montgomery, Alabama 36106-1617

CYNTHIANTHER L. MAY



PATIENT NAME                 ACCOUNT N0          AGE/SEX           MPI NUMBER
STINSON,RENA                 74102               51/F              19583

REFERRING PHYSICIAN:
HARRY BARNES MD                                  DATE OF BIRTH     DATE OF SERVICE
4145 CARMICHAEL ROAD                             10/15/53          10/04/05
MONTGOMERY AL 36106

10/04/05: CT CERVICAL W/O CONTRAST


ELECTRONICALLY VERIFIED BY:
GARY W. SCOTT, MD  10/04/2005


GWS/HS


**\*\*\* _APPENDED REPORT_ \*\*\***


ADDENDUM:

On sagittal reconstructed images vertebral heights and alignment are maintained with slight reversal of the usual lordotic curvature. Also noted on these reconstructed images is some sclerosis in the T5 vertebra. This may represent a second metastatic lesion.

CONCLUSION:
THERE IS AN ADDITIONAL SCLEROTIC FOCUS AT T5 WHICH MAY REPRESENT AN ADDITIONAL METASTATIC LESION.


REVIEWED AND INTERPRETED BY:
GARY W. SCOTT, MD

ELECTRONICALLY VERIFIED BY:
GARY W. SCOTT, MD  10/04/2005


GWS/HS


Dictation Date/Time:10/04/05 10:23
Ordered Date: 09/27/05 12:00

**RECEIVED**
10-24-05
**CIRCUIT COURT CLERK** STINSON, RENA D
                       00111963
                       Page 2



**Carmichael Imaging**

4147 Carmichael Road Montgomery, AL 36106-2801  334-387-1100

**Carmichael Imaging**

4147 Carmichael Road Montgomery, AL 36106-2801  334-387-1100

| PATIENT NAME | ACCOUNT NO | AGE/SEX | MPI NUMBER |
|---|---|---|---|
| STINSON,RENA | 74102 | 51/F | 19583 |

REFERRING PHYSICIAN:
HARRY BARNES MD
4145 CARMICHAEL ROAD
MONTGOMERY AL 36106

DATE OF BIRTH
10/15/53

DATE OF SERVICE
10/04/05

COPY TO:

**10/04/05: CT STERNUM W/O CONTRAST**

**EXAM INDICATIONS:**

CLINICAL HISTORY:  Breast cancer.

COMPARISON:   Correlation is made with PET scan report from September 26  which described some activity in the sternum.

FINDINGS:  There is a mottled heterogeneous appearance of the lower sternum with patchy areas of both lysis and sclerosis noted on 06/10 on image #44 through 63 and suggests metastatic involvement throughout most of the lower sternum.  The upper aspect of the sternum is intact.  Visualized portions of the clavicles and anterior ribs are also intact.  Pericardial effusion is also noted.  If not previously performed chest CT may be of benefit.  Best visualized on the sagittal reconstructions of the sternum is what appears to be complete lysis of the lower 25% with complete destruction of the bone in this area.

CONCLUSION:
EXTENSIVE LYTIC AND SCLEROTIC LESION THROUGHOUT THE STERNUM WITH BONY DESTRUCTION IN THE LOWER 25% OF THE BONE.  FINDINGS CONSISTENT WITH METASTATIC DISEASE.

REVIEWED AND INTERPRETED BY:
GARY W. SCOTT. MD

ELECTRONICALLY VERIFIED BY:
GARY W. SCOTT, MD  10/04/2005

GWS/HS

Dictation Date/Time:10/04/05 10:34
Ordered Date: 06/27/05 12:55

STINSON, RENA D
Exam #: 15-00111958
Page 1



**PATIENT NAME**
STINSON,RENA

**ACCOUNT NO**
74102

**AGE/SEX**
51/F

**MPI NUMBER**
19583

**REFERRING PHYSICIAN:**
HARRY BARNES MD
4145 CARMICHAEL ROAD
MONTGOMERY AL 36106

**DATE OF BIRTH**
10/15/53

**DATE OF SERVICE**
10/04/05

**10/04/05: CT CERVICAL W/O CONTRAST**


**ELECTRONICALLY VERIFIED BY:**
GARY W. SCOTT, MD  10/04/2005

GWS/HS


*** *APPENDED REPORT* ***


ADDENDUM:

On sagittal reconstructed images vertebral heights and alignment are maintained with slight reversal of the usual lordotic curvature. Also noted on these reconstructed images is some sclerosis in the T5 vertebra. This may represent a second metastatic lesion.

CONCLUSION:
THERE IS AN ADDITIONAL SCLEROTIC FOCUS AT T5 WHICH MAY REPRESENT AN ADDITIONAL METASTATIC LESION.


**REVIEWED AND INTERPRETED BY:**
GARY W. SCOTT, MD

*Dictation Date/Time: 10/04/05 10:23*
*Ordered Date: 09/27/05 12:00*

*STINSON, RENA D*
*Exam #: E-00111563*
*Page 2*



# Carmichael Imaging

4147 Carmichael Road Montgomery, AL 36106-2801   334-387-1100

| PATIENT NAME | ACCOUNT NO | AGE/SEX | MPI NUMBER |
|---|---|---|---|
| STINSON,RENA | 74155 | 51/F | 19583 |

REFERRING PHYSICIAN:                    DATE OF BIRTH      DATE OF SERVICE
HARRY BARNES MD                   10/15/53            10/04/05
4145 CARMICHAEL ROAD
MONTGOMERY AL 36106

COPY TO:

**10/04/05: CT BRAIN W/WO CONTRAST**

**EXAM INDICATIONS:**

**CLINICAL HISTORY:** Breast cancer.

**PROCEDURE:** 4.5 mm axial scans were obtained through the brain before and after the administration of 50 cc of Omnipaque.

**FINDINGS:** The brain has normal structure and density without evidence of mass, hemorrhage, or abnormal enhancement. The ventricles are normal size and configuration. The surrounding bony and soft tissue structures are unremarkable.

**IMPRESSION:**
NEGATIVE UNENHANCED AND ENHANCED HEAD CT.

**REVIEWED AND INTERPRETED BY**
GARY W. SCOTT, MD

**ELECTRONICALLY VERIFIED BY:**
GARY W. SCOTT MD 10/04/2005

GWS/HS

Dictation Date/Time: 10/04/05 10:22
Ordered Date: 09/27/05 15:21

STINSON, RENA D
Exam #: E-00112054
Page 1

10-5-05 ob



**Carmichael Imaging**

4147 Carmichael Road Montgomery, AL 36106-2801   334-387-1100

| | | | |
|---|---|---|---|
| PATIENT NAME<br>STINSON,RENA | ACCOUNT N0<br>74102 | AGE/SEX<br>51/F | MPI NUMBER<br>19583 |

REFERRING PHYSICIAN:
HARRY BARNES MD
4145 CARMICHAEL ROAD
MONTGOMERY AL 36106

DATE OF BIRTH
10/15/53

DATE OF SERVICE
10/04/05

COPY TO:

10/04/05: CT CERVICAL W/O CONTRAST

EXAM INDICATIONS:

*** *SEE APPENDED REPORT.  IMPRESSIONS MAY HAVE CHANGED.* ***

CLINICAL HISTORY:  Breast cancer

COMPARISON:  Correlation is made with PET scan report from September 26.  PET scan described activity in the lower cervical spine and looked suspicious for metastatic disease.

TECHNIQUE:  3 mm axial scans are obtained through the cervical spine.

FINDINGS: There is a lytic lesion in the left lamina of T1 seen on image #45.  This is consistent with the activity described on PET scan and suspicious for metastatic lesion.  No other destructive lesions are identified within the cervical spine.  There is spondylotic change present throughout with some osteophyte formation and facet hypertrophy at several levels.  There is some encroachment of the left lateral recess at C4-5 due to focal spur and what appears to be a disc bulge.  Mild spinal stenosis is also noted at C5-6 due to disc bulge and osteophyte formation.  No other significant areas of encroachment are identified.

CONCLUSION:
1. FOCAL LYTIC LESION IN THE LEFT LAMINA OF T1.  THIS IS SUSPICIOUS FOR METASTATIC LESION.
2. DEGENERATIVE CHANGES THROUGHOUT THE CERVICAL SPINE WITH A DISC BULGE AND OSTEOPHYTE COMPLEX.  THERE IS SOME ENCROACHMENT IN THE LEFT LATERAL RECESS AT C4-5 AND CENTRALLY AT C5-6.

REVIEWED AND INTERPRETED BY:
GARY W. SCOTT, MD

Dictation Date/Time:10/04/05 10:23
Ordered Date: 09/27/05 12:00

STINSON, RENA D
Exam #: E-0011963
Page 1



**Carmichael Imaging**

| | | | |
|---|---|---|---|
| PATIENT NAME | ACCOUNT NO | AGE/SEX | MPI NUMBER |
| STINSON,RENA | 73732 | 51/F | 19583 |

REFERRING PHYSICIAN:
HARRY BARNES MD
4145 CARMICHAEL ROAD
MONTGOMERY AL 36106

DATE OF BIRTH
10/15/53

DATE OF SERVICE
09/26/05

09/26/05: PET SKULL BASE TO MID-THIGH (78812)

**IMPRESSION:**
1. FINDINGS CONSISTENT WITH DEVELOPMENT OF METASTATIC DISEASE IN THE RIGHT AXILLA, HILAR REGIONS AND MEDIASTINUM. THERE IS A SUSPICIOUS LEFT SUPRACLAVICULAR NODE AS WELL.
2. FINDINGS VERY WORRISOME FOR A MALIGNANT LEFT PLEURAL EFFUSION.
3. FINDINGS VERY WORRISOME FOR DEVELOPMENT OF BONY METASTATIC DISEASE IN THE LOWER CERVICAL SPINE AND IN THE STERNUM.

REVIEWED AND INTERPRETED BY:
CYNTHIA LORINO, MD

ELECTRONICALLY VERIFIED BY:
CYNTHIA LORINO, MD 09/27/2005

CL/jb

Dictation Date/Time:09/27/05 09:03
Ordered Date: 09/22/05 08:08

STINSON, RENA D
Exam #: E-00111403
Page 2



## Carmichael Imaging

| | | | |
|---|---|---|---|
| **PATIENT NAME** | **ACCOUNT NO** | **AGE/SEX** | **MPI NUMBER** |
| STINSON,RENA | 73732 | 51/F | 19583 |

**REFERRING PHYSICIAN:**          **DATE OF BIRTH**        **DATE OF SERVICE**
HARRY BARNES MD                   10/15/53                09/26/05
4145 CARMICHAEL ROAD
MONTGOMERY AL 36106

**09/26/05: PET SKULL BASE TO MID-THIGH  (78812)**

**IMPRESSION:**
1.  FINDINGS CONSISTENT WITH DEVELOPMENT OF METASTATIC DISEASE IN THE RIGHT AXILLA, HILAR REGIONS AND MEDIASTINUM. THERE IS SUSPICIOUS LEFT SUPRACLAVICULAR NODE AS WELL.
2.  FINDINGS VERY WORRISOME FOR A MALIGNANT LEFT PLEURAL EFFUSION.
3.  FINDINGS VERY WORRISOME FOR DEVELOPMENT OF BONY METASTATIC DISEASE IN THE LOWER CERVICAL SPINE AND IN THE STERNUM.

**REVIEWED AND INTERPRETED BY:**
CYNTHIA  LORINO, MD

ACR359

**ALABAMA JUDICIAL DATA CENTER**
**MONTGOMERY COUNTY**
**TRANSCRIPT OF RECORD**
**CONVICTION REPORT**

CC 2004 001694.00 01
TRUMAN M HOBBS

---

| CIRCUIT COURT OF MONTGOMERY COUNTY | COURT ORI: 003045 J |
|---|---|

STATE OF ALABAMA      VS.
STINSON RENA DORSEY          ALIAS: RENA DORSEY
6624 STABLE GATE COURT       ALIAS:
MONTGOMERY  AL  36116

DC NO: GJ 2004 070062.00
G J:      62
SSN:    424782955
SID:    001361646
AIS:    234171

---

DOB:  10/15/1953   SEX: F   HT: 5 05      WT: 165   HAIR: BLK    EYE: BRO
RACE: ( )W (X)B ( )O   COMPLEXION: _____   AGE: _____   FEATURES: _____

---

DATE OFFENSE: 00/00/0000   ARREST DATE: 00/00/0000   ARREST ORI: 0030100

---

CHARGES @ CONV      CITES                  CT CL COURT ACTION           CA DATE
THEFT OF PROP 1ST   13A-008-003            01 B  CONVICTED             08/23/2005
THEFT OF PROP 1ST   13A-008-003            01 B  CONVICTED             08/23/2005
THEFT OF PROP 1ST   13A-008-003            01 B  CONVICTED             08/23/2005

---

JUDGE: TRUMAN M HOBBS                    PROSECUTOR:

---

PROBATION APPLIED   GRANTED   DATE       REARRESTED DATE   REVOKED   DATE
(X)Y( )N 08232005 ( )Y( )N _____   ( )Y( )N _____ ( )Y( )N _____

---

15-18-8, CODE OF ALA 1975   IMPOSED    SUSPENDED     TOTAL      JAIL CREDIT
(X)Y ( )N   CONFINEMENT:   05 00 000   15 00 000   20 00 000   00 00 337
            PROBATION  :   05 00 000               05 00 000
DATE SENTENCED: 10/24/2005    SENTENCE BEGINS: 10/24/2005

---

PROVISIONS                         COSTS/RESTITUTION         DUE        ORDERED

   PENITENTIARY                    RESTITUTION              $0.00        $0.00
   SPLIT SENTENC                   ATTORNEY FEE             $0.00        $0.00
                                   CRIME VICTIMS            $0.00        $0.00
                                   COST                     $0.00        $0.00
                                   FINE                     $0.00        $0.00
                                   MUNICIPAL FEES           $0.00        $0.00
                                   DRUG FEES                $0.00        $0.00
                                   ADDTL DEFENDANT          $0.00        $0.00
                                   DA FEES                  $0.00        $0.00
                                   COLLECTION ACCT          $0.00        $0.00
                                   JAIL FEES                $0.00        $0.00

                                   TOTAL                    $0.00        $0.00

---

APPEAL DATE          SUSPENDED            AFFIRMED          REARREST

( )Y( )N _____   ( )Y( )N _____   ( )Y( )N _____   ( )Y( )N _____

---

REMARKS:                            THIS IS TO CERTIFY THAT THE
                                    ABOVE INFORMATION WAS EXTRACTED
                                    FROM OFFICIAL COURT RECORDS
                                    AND IS TRUE AND CORRECT.



                                    _____
                                    MELISSA RITTENOUR(CC)

                                    10/26/2005

---

OPERATOR: REW
PREPARED: 10/26/2005

```
ACR371                    ALABAMA JUDICIAL DATA CENTER
          NOTICE OF APPEAL TO THE ALABAMA COURT OF CRIMINAL APPEALS
                        BY THE TRIAL COURT CLERK
              IN THE CIRCUIT COURT  OF MONTGOMERY COUNTY
STATE OF ALABAMA VS STINSON RENA DORSEY          JUDGE: TRUMAN M HOBBS
```

---

```
| APPEAL DATE: 10/24/2005
```

```
| INDIGENCY STATUS:
|    GRANTED INDIGENCY STATUS AT TRIAL COURT:      _____ YES  __X__ NO
|    APP. TRIAL COUNSEL PERMITTED TO W/D ON APPEAL: _____ YES  __X__ NO
|    INDIGENT STATUS REVOKED ON APPEAL:            _____ YES  __X__ NO
|    INDIGENT STATUS GRANTED ON APPEAL:            __→__ YES  __X__ NO

| DEATH PENALTY: NO

| APPEAL TYPE: STATE CONVICTION
```

---

```
| THIS IS AN APPEAL FROM A CONVICTION.

| DATE OF CONVICTION: 08/23/2005          DATE OF SENTENCE: 10/24/2005

| YOUTHFUL OFFENDER STATUS: DENIED

| CO/CASE NUMBER: 03/CC 2004 001694.00
| CODE: TOP1    CONVICTION: THEFT OF PROP 1S    ACTION: CONVICTED
|                                               STATUTE: 13A-008-003
| CODE: TOP1    CONVICTION: THEFT OF PROP 1S    ACTION: CONVICTED
|                                               STATUTE: 13A-008-003
| CODE: TOP1    CONVICTION: THEFT OF PROP 1S    ACTION: CONVICTED
|                                               STATUTE: 13A-008-003
| SENTENCE:    CONF: 20 YRS 00 MOS 000 DAYS
| SENTENCE:    PROB: 05 YRS 00 MOS 000 DAYS     LIFE: NO   LIFEWO: NO
```

| POST-JUDGMENT MOTIONS FILED: | DT FILED | DT DENIED | CON BY AGREE |
|---|---|---|---|
| ___ MOTION FOR NEW TRIAL | _____ | _____ | _____ |
| ___ MOTION FOR JUDG. OF ACQUIT | _____ | _____ | _____ |
| ___ MOTION TO W/D GUILTY PLEA | _____ | _____ | _____ |
| ___ MOTION FOR ATTY TO W/DRAW | _____ | _____ | _____ |
| ___ OTHER _____ | _____ | _____ | _____ |

```
| COURT REPORTER(S):
| ADDRESS:                      SHELTON, JUDY
|                               JUDGE TURMAN M HOBBS JR
|                               MONTGOMERY     ,  AL  36104
| APPELLATE COUNSEL #1:
| ADDRESS:                      MAY CYNTHIANTHER LASHON
|                               207 MONTGOMERY STREET
|                               SUITE 609
| PHONE NUMBER:                 MONTGOMERY     ,  AL  36104
|                               334-262-8051
| APPELLATE COUNSEL #2:
| ADDRESS:                      _____
|                               _____
|                               _____
| PHONE NUMBER:                 _____

| APPELLANT (PRO SE):
| ADDRESS:                      STINSON RENA DORSEY
|                               6624 STABLE GATE COURT
|                               MONTGOMERY     ,  AL  361160000
| AIS #:                        234171

| APPELLEE (IF CITY APPEAL):
| ADDRESS:                      _____
|                               _____
|                               _____
```

```
| I CERTIFY THAT THE INFORMATION PROVIDED              OPERATOR: REW
ABOVE IS ACCURATE TO THE BEST OF MY               PREPARED: 10/26/2005
KNOWLEDGE AND I HAVE SERVED A COPY OF
THIS NOTICE OF APPEAL ON ALL PARTIES TO
THIS ACTION ON THIS 26 DAY OF Oct    ,2005    _____
                                               CIRCUIT COURT CLERK
```

FROM CARTER LAW FIRM    (WED)SEP 21 2005 23:11/ST. 23:10/No. 6818361773 P  3

IN THE CIRCUIT COURT OF MONTGOMERY COUNTY, ALABAMA

| | | |
|---|---|---|
| STATE OF ALABAMA | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | CASE NO. CC 2004-1694 |
| | * | |
| RENA STINSON | * | |
| Defendant. | * | |

## MOTION TO WITHDRAW

COMES NOW Cynthianther L. May and respectfully moves this Honorable Court for leave to withdraw as counsel for Defendant, RENA STINSON, and as grounds therefore would show the following:

1. Counsel has been notified that the above-named defendant has retained alternative legal representation.

WHEREFORE, the premises considered, counsel prays that the Court will grant this motion.

Respectfully submitted this 21st day of September 2005.

CYNTHIANTHER L. MAY (MAY039)

OF COUNSEL:
COCHRAN LAW FIRM
401 Church Street
Mobile, Alabama 36604
Telephone (251) 433-6500
Facsimile  (251) 434-9995

FROM CARTER LAW FIRM    (WED)SEP 21 2005 23:12/ST. 23:10/No. 6818361773 P 4

## CERTIFICATE OF SERVICE

  I do hereby certify that I have on this the 21st day of September, 2005, served a copy of the foregoing notice on the following by United States Mail , first class, postage prepaid, to the following:

Montgomery County District Attorney Office
Attention: Brandon Hughes
251 South Lawrence Street
Post Office Box 1667
Montgomery, Alabama 36102-1667

Mrs. Rena Stinson
6624 Stable Gate Court
Montgomery, Alabama 36116

Attorney Thomas Goggans
2030 East 2nd Street
Montgomery, Alabama 36106-1617

CYNTHIANTHER L. MAY

DENIED 1/9/06 DATE

TRUMAN M. HOBBS, JR.
CIRCUIT JUDGE

IN THE CIRCUIT COURT OF
MONTGOMERY COUNTY, ALABAMA

STATE OF ALABAMA )
)
VS. ) CASE NO. CC-2004-1694-TMH
)
RENA DORSEY STINSON )

## MOTION FOR JUDGMENT OF ACQUITTAL

Comes now Defendant Rena Dorsey Stinson, by and through counsel, moves this

Court to grant a judgment of acquittal on each count of conviction on the following

separate and several grounds:

    1.  The State of Alabama failed to prove a *prima facie* case.

    2.  The State of Alabama failed to elicit sufficient evidence to sustain

convictions.

    3.  The evidence was insufficient to support a findings of guilt.

    4.  There was insufficient evidence from which a jury could by fair inference find

Defendant Rena Dorsey Stinson guilty.

    5.  "The United States Constitution prohibits conviction of any person except

upon proof beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781,

61 L.Ed.2d 560 (1979), citing, In re Winship, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d

368 (1970). Winship, 397 U.S. 358 presupposes as an essential element of due process

guaranteed by the Fourteenth Amendment to the United States Constitution that no

person shall be made to suffer the onus of a criminal conviction except upon sufficient

proof – defined as evidence necessary to convince a trier of fact beyond a reasonable

doubt of the existence of every element of the offense. Jackson, 443 U.S. at 316. If a

1

rational fact finder could not have concluded beyond a reasonable doubt the existence of every element of the offense, a conviction must be deemed violative of due process guaranteed by the Fourteenth Amendment to the United States Constitution. Jackson, 443 U.S. at 317. In this case, a rational fact finder could not have concluded beyond a reasonable doubt the existence of every element of the offense. Thus, a conviction in this case violates due process guaranteed by the Fourteenth Amendment to the United States Constitution.

Thomas M. Goggans
Ala. S.J.I.S. GOG001
2030 East Second Street
Montgomery AL 36106
PH: 334.834.2511
FX: 334.834.2512

Attorney for Defendant
Rena Dorsey Strickland

## CERTIFICATE OF SERVICE

I hereby certify that I have served a copy of the foregoing upon:

Eleanor I. Brooks
Office of the District Attorney
P.O. Box 1667
Montgomery AL 36102

by placing the same in the United States mail, first class postage prepaid and properly addressed on this the 21st day of November, 2005.

Thomas M. Goggans

2

| State of Alabama<br>Unified Judicial System<br><br>From ARAP - 14  Rev. 11 / 91 | CERTIFICATE OF COMPLETION AND<br>TRANSMITTAL OF RECORD ON<br>APPEAL BY TRIAL CLERK | Appellate Case Number |
|---|---|---|

| TO: THE CLERK OF<br>    THE COURT OF CRIMINAL APPEALS OF ALABAMA | DATE OF<br>NOTICE OF APPEAL: | 10-24-05 |
|---|---|---|

**APPELLANT**                                    RENA STINSON

**v. STATE OF ALABAMA**

I certify that I have this date completed and transmitted herewith to the appellate court the record on appeal by assembling in ( a single volume of ___30___ pages) (_____ volumes of 200 pages each and one volume of _____ pages) the clerk's record and the reporter's transcript and that one copy each of the record on appeal has been served on the defendant and the Attorney General of the State of Alabama for the preparation of brief.

I certify that a copy of this certificate has this date been served on counsel for each party to the appeal.

DATED this____17th____ day of ___JANUARY___ , __2006__ .


_____
Circuit Clerk

1          IN THE FIFTEENTH JUDICIAL CIRCUIT
              IN AND FOR MONTGOMERY COUNTY
2                  MONTGOMERY, ALABAMA
   RENA STINSON,
3              APPELLANT,

4    vs.                              CRIMINAL ACTION

5                              CASE NO. CC-04-1694
   STATE OF ALABAMA,
6              APPELLEE.
   _____/
7      INDEX TO REPORTER'S TRANSCRIPT ON APPEAL

8
   8-22-05
9          JURY VOIR DIRE---------------------- 3
           OPENING STATEMENTS BY MR. HUGHES---- 22
10         OPENING STATEMENTS BY MS. MAY------- 29
                     CAROL RAY
11         DIRECT EXAMINATION BY MR. FOREMAN--- 32
           CROSS EXAMINATION BY MS. MAY-------- 45
12         REDIRECT EXAMINATION BY MR. FOREMAN- 49
           RECROSS EXAMINATION BY MS. MAY------ 50
13                 EMMA JEAN ANDERSON
           DIRECT EXAMINATION BY MR. HUGHES---- 51
14         CROSS EXAMINATION BY MS. MAY-------- 59
                     EVA WILLIAMS
15         DIRECT EXAMINATION BY MR. HUGHES---- 63
           CROSS EXAMINATION BY MS. MAY-------- 72
16         REDIRECT EXAMINATION BY MR. HUGHES-- 74
                     JASON ROBERTS
17         DIRECT EXAMINATION BY MR. FOREMAN--- 76
           CROSS EXAMINATION BY MS. MAY-------- 85
18
           CLOSING ARGUMENTS BY MR. FOREMAN---- 89
19         CLOSING ARGUMENTS BY MS. MAY-------- 95
           CLOSING ARGUMENTS BY MR. HUGHES----- 99
20
           COURT'S ORAL CHARGE TO THE JURY-----103
21
           JURY QUESTIONS----------------------118
22
   8-23-05
23         JURY'S VERDICT----------------------121

24         CERTIFICATE OF REPORTER-------------123

25

2

```
 1              IN THE FIFTEENTH JUDICIAL CIRCUIT
                IN AND FOR MONTGOMERY COUNTY
 2                  MONTGOMERY, ALABAMA

 3    RENA STINSON,

 4
                    APPELLANT,
 5
      vs.                    CRIMINAL ACTION
 6                           CASE NO. CC-04-1694

 7    STATE OF ALABAMA,

 8
                    APPELLEE.
 9
      _____/
10        COURT REPORTER'S TRANSCRIPT OF PROCEEDINGS
                    AUGUST 22, 2005
11                  AUGUST 23, 2005
              MONTGOMERY COUNTY COURTHOUSE
12                  COURTROOM 3-A

13

14    BEFORE:   THE HONORABLE TRUMAN HOBBS
                CIRCUIT JUDGE
15
                            APPEARANCES
16    FOR THE APPELLANT:
      CYNTHIANTHER LASHON MAY, ESQUIRE
17    MONTGOMERY, ALABAMA

18

19    FOR THE APPELLEE:
      BRANDON HUGHES, ESQUIRE
20    RICHARD FOREMAN, ESQUIRE
      DEPUTY DISTRICT ATTORNEYS
21    FIFTEENTH JUDICIAL CIRCUIT
      MONTGOMERY, ALABAMA
22

23                  JAN GOSS
              OFFICIAL COURT REPORTER
24

25
```

3

```
 1                    PROCEEDINGS
 2          (In the presence of the jury venire:)
 3          THE COURT:  If I could just get the folks
 4     on the venire to raise your right hand for me,
 5     please.
 6          (The jury venire was sworn by the
 7          Court.)
 8          THE COURT:  I appreciate y'all being here
 9     this morning.  My name is Truman Hobbs.  I am
10     the judge presiding over this case which is
11     the State of Alabama versus Rena Stinson.  She
12     is charged with theft of property.  I tell you
13     that because in a minute I will ask you if you
14     know anything about the facts and
15     circumstances surrounding this case.
16          Before we get started, I want to tell
17     y'all how much all the judges here in this
18     courthouse appreciate you being here this
19     week.  The best system anyone has devised in
20     the history of the world, as far as I am
21     concerned, is to put twelve folks in the jury
22     box and let them decide someone's guilt or
23     innocence.  Obviously, that system can't work
24     unless folks like yourselves are willing to
25     come down here and take time away from your
```

4

1  families and your jobs and do your civic

2  duties as jurors.  All of us very much

3  appreciate your willingness to serve.

4      I am going to ask you some questions.

5  The lawyers will ask you some questions.  We

6  are not trying to pry into your personal

7  business.  We are just trying to get some

8  information that may help these lawyers when

9  it comes time to select a jury --

10     I have introduced myself.  Let me

11 introduce the other folks on this side of the

12 room.  Ms. Stinson is seated here at the table

13 with her attorney Ms. May.  The District

14 Attorneys that will be trying this case are

15 Brandon Hughes and Richard Foreman.

16     Now that you have sort of met everybody

17 on this side of the room, if you would please

18 -- the clerk is going to call your name.  When

19 your name is called, if you would stand up and

20 tell us what you do for a living and tell us

21 what your spouse does for a living.  If you or

22 your spouse is retired, please tell us what

23 you did before you retired.

24     (The roll of the venire was called.)

25     THE COURT:  Okay.  Thank y'all.  I am

5

1    going to ask you some questions first.  If I
2    ask you a question dealing with your family
3    members, I am talking about your spouse,
4    children, grand children, parents,
5    grandparents, brothers, sisters, that sort of
6    thing.  As I indicated, Ms. Stinson is seated
7    here at the table.  Anybody related by blood
8    or marriage to Ms. Stinson or acquainted with
9    her for any reason?
10        Her attorney Ms. May is seated next to
11    her and I am not even going to try to
12    pronounce your first name, Ms. May.  Don't
13    take it personally, please.  It's more than I
14    can handle.  Anybody here related by blood or
15    marriage to Ms. May or acquainted with her or
16    ever been to her law office for any reason?
17        The district attorneys here are Richard
18    Foreman and Brandon Hughes.  Anybody here
19    related by blood or marriage to either one of
20    those gentlemen or acquainted with them for
21    any reason?
22        The district attorney here in Montgomery
23    County is Ellen Brooks.  Anybody personally
24    acquainted with her or related to her by blood
25    or marriage?  Are y'all out there?  Anybody

6

1    here have anybody in your family that works in

2    with the Montgomery Police Department or any

3    other law enforcement agency?  Thank goodness.

4        If you need to share some information

5    with me, if you would please stand up, give us

6    your name and then give us that information

7    because she needs to take it all down.  Okay?

8        JUROR:  My name is Earnestine Johnson.

9    My granddaughter works for Department of

10   Public Safety.

11       THE COURT:  Okay.  Thank you, Ms.

12   Johnson.  Yes, ma'am?

13       JUROR:  Hattie Macon.  My sister works at

14   the police department and my brother-in-law.

15       THE COURT:  Okay.  Thank you, ma'am.

16   Yes, sir?

17       JUROR:  Jerald Martin.  My sister-in-law

18   retired from the Montgomery Sheriff's

19   Department roughly about seven or eight years

20   ago.  She was a deputy with the Montgomery

21   Sheriff's Department.

22       THE COURT:  Thank you, sir.

23       JUROR:  Angela Motley.  I work with the

24   Alabama Securities Commission.  I don't know

25   if that --

7

1      THE COURT:  That's close enough I guess.
2   Anybody else?  Anybody here --
3      JUROR:  I have got a nephew that works at
4   County Law.  Oliver.
5      THE COURT:  Mr. Oliver.  Works at County
6   Law?
7      JUROR:  Yes.
8      THE COURT:  Okay.  Anybody here in your
9   immediate family work for the district
10  attorney's office?  Anybody have an interest
11  in the outcome of this case either for a
12  conviction or for an acquittal?  Anybody given
13  a promise that they are going to vote a
14  certain way in this case?  Anybody here that,
15  for whatever reason, you just don't think you
16  can call this case?  For whatever reason you
17  just don't think you can be fair to one side
18  or the other, for whatever reason?  I will ask
19  you one more question.  And this is a question
20  that we are not trying to embarrass anybody.
21  If you don't feel comfortable standing up in
22  front of a room with total strangers and
23  giving us this information, we will let you
24  stay behind when everybody else goes back to
25  jury assembly room.

8

1           Has anyone here or anybody in your

2      immediate family been charged of the offense

3      involving theft in the last twelve months?

4           Okay.  I will let the lawyers ask some

5      questions.

6           MR. HUGHES:  Good morning.  The judge

7      told you my name is Brandon Hughes.  I work

8      with the district attorney's office

9      prosecuting this case on behalf of the State

10     of Alabama.  I just ask for your patience.

11     Bear with me.  I woke up with a little head

12     cold this morning.  We will do the best we

13     can.

14          The first thing I will ask you is -- I

15     will just run through who I expect the

16     witnesses to be and just ask if you know them,

17     related to them in any way as the judge asked

18     you before or even think you might know them,

19     raise your hand.  At this point it is very

20     important you answer it honestly and as freely

21     and openly as possible.  It's important to the

22     Defendant that everybody answers truthfully.

23     It's also important to the State of Alabama

24     and the citizens of Alabama that you answer as

25     openly and honestly as you can.

1          The first witness is -- and I am not
2    calling them in any particular order -- Emma
3    Jean Anderson.  Does anyone know Ms. Emma Jean
4    Anderson?  How about Ms. Carol Ray.  Each of
5    these women are elderly women, if that gives
6    you any point of reference.  Eva Williams,
7    also goes by Evaceal Williams.  And the last
8    victim in this case and I apologize for the
9    pronunciation of her name, but it's Dhawireddy
10   Devi.  Does that ring any bells?  The case
11   agent is with Montgomery Police Department
12   Detective W. J. Roberts, a Jason Roberts.
13   Does anyone know Detective Roberts?  Detective
14   Roberts works with the Montgomery Police
15   Department.

16          This case was investigated by Montgomery
17   Police Department.  Is there anyone here for
18   any reason that just does not like the
19   Montgomery Police Department, don't like cops,
20   don't like law enforcement, just say, hey, I
21   don't trust them?  I am not trying to insult
22   your intelligence, believe me.  The feedback
23   we have gotten in the past and the results we
24   have gotten in the past dictates that we ask
25   these questions.  I apologize.  I am not

10

1    trying to talk down to you by any means.

2        Anyone here who feels you have a problem

3    sitting in judgment of someone?  If you're

4    picked for the jury, you are, in essence,

5    going to be judging the guilt or the innocence

6    of Ms. Stinson.  Anyone here for moral or

7    religious reasons that when it gets down to

8    the question where you just say, you know

9    what, I just don't feel comfortable deciding

10   the guilt or the innocence of Ms. Stinson?

11   Anyone here feels that way?

12       The standard the State has to overcome is

13   reasonable doubt.  It's not easy to define

14   reasonable doubt.  The judge will tell you

15   what the law says reasonable doubt is.  But

16   essentially it is not beyond all doubt.  It's

17   not to a one hundred percent certainty.  I

18   think that all of us would agree that to know

19   one hundred percent what happened that day, we

20   all would have been there on each location at

21   the time of the offense to know beyond all

22   doubt one hundred percent what happened.

23   Therefore, the standard is reasonable doubt.

24   Anyone here have a problem with that.  Say,

25   you know what, that's too low, I think you

11

1    should have to go beyond that.  If you get

2    down and examine yourself deep down and you

3    say, you know what, I don't think it's right,

4    reasonable doubt is too low of a standard and

5    it must be beyond all doubt.  Anyone feel that

6    way?  It's okay if you do.  We just need to

7    know now instead of when you get back there.

8         The final thing I will ask you and again

9    I am not trying to insult your intelligence.

10   Anybody watch C.S.I. and Law and Order, all

11   that stuff?  Everybody watches it.  I do.

12   It's great shows.  Anybody here realize that

13   that's Hollywood or New York City or Miami or

14   Vagas or wherever, right?  C.S.I. has got some

15   really cool equipment.  Does everybody

16   realize, a, a lot of it doesn't exist, b, if

17   it did exist, the State of Alabama probably

18   can't afford it and don't have it.  There are

19   no satellites you dial up on a date and time

20   and will show you camera work of what

21   happened.  There is no music here.  I don't

22   know if there is going to be any Law and Order

23   moments.  Everybody is not going to hold

24   either Ms. May or us to the standard of

25   something they saw on Law and Order?

12

1          If you look back and say you know there
2     was a death case two weeks ago and they
3     handled differently or or they did something
4     else.  Everybody can make that
5     differentiation?  Okay.  I appreciate your
6     time.  Ms. May may have a few questions for
7     you.  Thank you.
8          THE COURT:  Ms. May.
9          MS. MAY:  Mr. Hughes has given you an
10    idea of this standard of reasonable doubt.
11    And all of you -- assuming that all of you are
12    okay with that standard.  That you're okay
13    with the fact that it may not be proven beyond
14    a shadow of a doubt but there may exist some
15    reasonable doubt.  Anybody here watch
16    Matlock?  Remember Matlock and understand like
17    C.S.I. it's fictional.  And that things that
18    happen in Matlock may not necessarily happen
19    in this courtroom today.  I take it that
20    everyone is okay with that?  That's all I
21    have.
22         THE COURT:  Okay.  Ladies and gentlemen,
23    we are going to let y'all go back to the jury
24    assembly room while we select a jury.  If
25    there is anything that you think you need to

13

1    stay behind and share with us, please do so.

2    In addition, Ms. Joyce, Mr. Loucks and Ms.

3    Latimore-Bray could stay behind.  Those three

4    folks can stay behind.  The rest of y'all go

5    back to the jury assembly room unless you

6    think there is something we need to know.

7         (Outside jury venire's presence.)

8         THE COURT:  Mr. Loucks, if you would come

9    up here, sir, just for a second.  Mr.

10   Loucks, we are not trying to embarrass you or

11   pry into your personal business.  On the

12   questionnaire you indicated that someone in

13   your family had been convicted of a crime.

14        MR. HUGHES:  I'm sorry, it was actually

15   just left blank.

16        PROSPECTIVE JUROR:  No.

17        THE COURT:  Nobody?

18        PROSPECTIVE JUROR:  No.

19        MR. HUGHES:  It was just the only

20   question left blank.

21        PROSPECTIVE JUROR:  No, no.

22        THE COURT:  Sorry to bother with you.

23   You can go back to the jury assembly room.

24        Ms. Johnson, I will ask you the same

25   thing.  I don't want to pry.  Apparently, on

14

1   the questionnaire there is a question about
2   anybody in your family ever been convicted of
3   something and you left it blank.
4        PROSPECTIVE JUROR:  No, sir.
5        THE COURT:  Okay.  That's all we need to
6   know.  Thank you, ma'am.
7        Ms. Latimore-Bray.  Come on up.  Same
8   question asks about if anybody in your family
9   has been convicted of a crime.  Apparently,
10  you left it blank.
11       PROSPECTIVE JUROR:  No, I didn't.  I
12  didn't think I did anyway.
13       THE COURT:  Somebody thinks you did.  Let
14  me just ask you, anybody in your family --
15       PROSPECTIVE JUROR:  I listed my son and I
16  said narcotics.
17       THE COURT:  Okay.  Didn't mean to pry.
18  Anybody got any further questions?  That's
19  it.  Thank you, ma'am.
20       Yes, ma'am?  Come on up.
21       PROSPECTIVE JUROR:  I have a question.  I
22  put on there my brother-in-law, but I wasn't
23  for sure about immediate family.  My
24  brother-in-law was arrested.  I don't know if
25  it was theft property one.  I know he was

15

1    arrested.  I don't know what the count was

2    for.

3         MS. MAY:  You're Ms. Motley?

4         JUROR:  Yes.

5         THE COURT:  Thank you, Ms. Motley.

6         (Short recess.)

7         MR. HUGHES:  State's first strike will be

8    299.

9         MS. MAY:  Defense strikes Earnestine

10   Johnson.

11        THE COURT:  If you could use the numbers

12        MS. MAY:  257.

13        THE COURT:  Okay.  257.

14        MR. HUGHES:  State strikes 331.

15        MS. MAY:  Defense for 319.

16        MR. HUGHES:  353.

17        MS. MAY:  356.

18        MR. HUGHES:  280.

19        MS. MAY:  323.

20        MR. HUGHES:  288.

21        MS. MAY:  316.

22        MR. HUGHES:  276.

23        MS. MAY:  286.

24        MR. HUGHES:  278.

25        MS. MAY:  265.

16

1          THE COURT:  This will be the alternate.

2          MS. MAY:  302.

3          (In the presence of the jury:)

4          THE COURT:  Let me give y'all one more

5      oath.  Raise your right hands, please.

6                  (The jury was given the oath by the

7                  Court.)

8          THE COURT:  We are starting to have to

9      give all those oaths repeatedly.  Sometimes

10     when they get over to the penitentiary, they

11     want to claim that the jury wasn't sworn

12     properly.  So now we swear y'all in about ten

13     different times to make sure it gets done

14     right.

15         I don't know if congratulations are in

16     order or not, but y'all have been selected for

17     this jury.  Your first order of business will

18     be to go to lunch.  I hope y'all can handle

19     that without too much strain.  If y'all would

20     be back in the jury assembly room at 1:15, we

21     will get started.  We will start and I will

22     just give y'all kind of a breakdown on what my

23     role is, your role is and the procedure we are

24     going to follow.  After that, we will get

25     started with the lawyers presenting their case

17

1    to you.  So if y'all will be back at 1:15.

2    Let me tell you this before you go, just

3    some general rules to govern yourselves when

4    you're not in the jury box.  The safest thing

5    is don't discuss the case with anybody.  Don't

6    let anybody discuss the case with you.  Don't

7    even talk about it among yourselves.  I know

8    you don't know much about it.  When you go

9    home for lunch or get around some buddies or

10   something and they say, oh, have you been

11   selected for a jury, just say, yes, I got

12   selected for a case.  I don't know anything

13   about it, but it involves a theft.  As soon as

14   you say that, they are going to start talking

15   to you about the case, what they think about

16   theft in general.  We don't want you to decide

17   the case based on anything other than what you

18   hear in this courtroom.  The safest course of

19   action is just tell your family or your

20   friends I have been selected for a jury.  I

21   can't even tell you what it's about.  I'm just

22   not supposed to talk about it.  Okay?  Don't

23   get on the Internet and start looking up theft

24   or, you know, don't call your brother-in-law's

25   first cousin who is a lawyer asking them about

18

1  theft or criminal law or anything like that.

2  Again, we want you to decide the case based on

3  what you hear in this courtroom.  Okay?  See

4  y'all at 1:15.

5      (Lunch break.)

6      (Outside jury's presence.)

7      MR. HUGHES:  I had a victim not show up.

8  It's D-h-a-w-i-r-e-d-d-y, last name D-e-v-i.

9      THE COURT:  Are you dismissing that

10  count?

11      MR. HUGHES:  Yes, sir, this is in case

12  number 04-1694, Rena Stinson.  State will make

13  a motion to nolle pros count three of the

14  indictment which is theft of property first

15  degree based on the victim's failure to

16  appear.

17      THE COURT:  Okay.

18      MR. HUGHES:  Just make sure we don't

19  mention that.

20      THE COURT:  Okay.  Let's go.

21      (In the presence of the jury:)

22      THE COURT:  Good afternoon.  Let me kind

23  of tell y'all what everybody's role is in this

24  and what the procedure is going to be.  First

25  off, please turn off your cell phones.  That's

19

the first point of procedure. As far as what
everybody is supposed to do, I will start with
myself. I see the judge as kind of like a
referee in a football game. My role is to
make sure this is a fair trial, fair to
everybody. I do not have a dog in the fight.
So please don't sit there and concern yourself
why did the judge rule this, why did he let
this piece of evidence in. If you are going
off on those sort of rabbit trails, we are
going to have a problem. I will rule on
points of evidence in the case. If somebody
objects, I will make a ruling. If somebody
offers an exhibit into evidence, I will make a
ruling. Please again don't worry about why I
did it or don't sit there and worry about if
the witness was allowed to answer if he had
said this or something like that. Let me
address your role in the case.

The jury's role is that y'all are the
sole and exclusive judges of the evidence. It
is your job to listen to the evidence, to
determine what the true facts in the case
are. At the end of the case I will give you
the law that governs this case. You go back

20

1    to the jury room and you determine what the
2    true facts are in the case, apply those facts
3    to the law and reach a verdict.
4        Let's talk about evidence and what is
5    evidence. We start off with what is not
6    evidence. Anything I tell you, that's not
7    evidence. Anything I say is not evidence.
8    The rulings I make, those aren't evidence.
9    What the attorneys say to you, that's not
10   evidence. What is evidence is what you hear
11   from witnesses sworn to tell the truth who are
12   on the witness stand. That's evidence. What
13   is also evidence are any exhibits that are
14   allowed into evidence.
15       Finally, the presumption of innocence is
16   evidence in the case. Ms. Stinson is presumed
17   innocent. That is evidence in the case. She
18   is presumed innocent until such time as y'all
19   go back in the jury deliberation room, sift
20   through the evidence and you determine, if you
21   should determine, that she is guilty of the
22   offenses charged against her beyond a
23   reasonable doubt. Until you make that
24   determination, she is presumed innocent. That
25   innocence stays with her throughout the trial.

21

1   What's the procedure that we are going to

2 follow?  The first thing that happens is the

3 lawyers get up and give what's known as an

4 opening statement to you.  It's simply an

5 opportunity for them to review the evidence

6 with you.  The State goes first because they

7 have the burden of proof.  They must prove Ms.

8 Stinson's guilt beyond a reasonable doubt.

9   Following the opening statements, the

10 State presents its case.  Again, they go

11 first.  After the State rests, the defense

12 presents its case, if any.

13   At the close of all the evidence, the

14 lawyers will get up and give what's known as a

15 closing argument.  It's simply an opportunity

16 for them to review the evidence in the case

17 with you and talk a little bit about the law

18 that applies to the case.  And they will argue

19 what the evidence and the law mandates, an

20 acquittal or conviction, depending on who is

21 doing the argument at that particular point in

22 time.  The State goes first followed by the

23 defense.  Then the State gets a rebuttal again

24 because they had that burden of proof.

25   We will try to take a break every hour or

1   so just to keep everybody fresh.  If you need

2   to take a break more frequently than that,

3   raise your hand, jump up and down, whatever

4   you need to do to get my attention or get

5   Jan's attention.  We will be happy to break if

6   you need one.  We are going to do everything

7   we can to accommodate you.  I realize that

8   y'all are the ones that are doing us a favor

9   by being here this week.  Y'all are the ones

10  that are taking time away from your jobs and

11  families to participate in the process.  I do

12  everything that I can do to make this as less

13  of an inconvenience to you as I possible can.

14      We will generally go up until about 4:30

15  in the afternoon.  I will try not to go past

16  that.  If there is a witness in the middle of

17  its testimony, we may go a little beyond that

18  just so we can finish that testimony for the

19  day.  We might be able to finish the case this

20  afternoon.  If not, we will finish it up

21  tomorrow morning, just for your planning

22  purposes.  Okay.  Ready to go?

23      MR. HUGHES:  Yes, sir.  May it please the

24  Court, Ms. May, members of the jury.  We are

25  here today because about a little over two

23

1    years ago the defendant in this case Ms. Rena

2    Stinson scammed three elderly women, Ms. Emma

3    Jean Anderson, Ms. Carol Ray and Ms. Evaceal

4    Williams out of the bulk of their savings

5    account.  When I say bulk, I mean the bulk.  I

6    mean, there was -- I don't think that you will

7    hear evidence that they zeroed it out, but

8    pretty close, just several thousand dollars to

9    just a few hundred dollars.

10   How she went about this is what's

11   commonly referred to as a flim flam scam.

12   Some of you may have heard of it.  But what it

13   boils down to is two counts of theft property

14   first degree and one count of theft property

15   in the second degree.  She used this scam to

16   steal their money.  Again, Ms. Anderson and

17   Ms. Ray, theft of property first degree is

18   what Ms. Stinson charged with.  Ms. Williams,

19   it's a count of theft property in the second

20   degree.

21   Theft of the property in the second

22   degree is just saying she stole more than five

23   hundred dollars but less than twenty-five

24   hundred dollars.  Theft of property in the

25   first degree, Ms. Stinson is charged with

24

1    stealing greater than twenty-five hundred
2    dollars.
3        I submit to you the evidence is going to
4    show that through this scam she stole
5    approximately thirty-five hundred dollars from
6    Ms. Anderson, ninety-five hundred dollars from
7    Ms. Ray and about fifteen hundred dollars from
8    Ms. Williams.  How that scam would go, I'm not
9    going to go into each case in detail right
10   now.  You will hear evidence from the stand, I
11   submit, on how each case came about.
12       But basically the scam worked like this.
13   The defendant would approach elderly women
14   searching out -- in this case approached
15   elderly women in a parking lot of Sears, Winn
16   Dixie on Atlanta Highway, Burlington Coat
17   Factory and Wal-Mart, super Wal-Mart on
18   Atlanta Highway.  She would approach these
19   women and say, you know, excuse me, is this
20   your purse or bank bag or whatever.  There
21   would be some container.  They would say, no,
22   that's not mine.  The defendant would then say
23   well there is a bunch of money in here and
24   sometimes she would disclose an amount.  I
25   think one time she said there is a hundred and

25

1    twenty thousand dollars in here.  The other
2    times she would say, look, I'm not sure how
3    much but it's a lot.  She would ask the victim
4    what do you want to do.  The victim would say
5    I don't know.  Call the police.  I don't know.
6         Well the defendant would say, well, I
7    don't know, let's call my boss.  He is an
8    attorney with Wal-Mart, or he is the
9    accounting guy at Burlington Coat Factory or
10   some authority figure they she would know to
11   let's call this person and they will know what
12   to do.
13        She gets on the phone.  Ms. Stinson gets
14   on the phone and talks to somebody.  I don't
15   know who, a male voice.  She will hang up and
16   says about two or three different ways in
17   these cases.  She says, hey, he said we can
18   keep the money, we just have to pay the
19   taxes.  He knows about this stuff.  We just
20   bring him the money for the taxes and we can
21   keep it, or you go get money from the bank, we
22   can take it to him, whatever position he is
23   in, attorney at Wal-Mart whatever, and he will
24   trade out some of the bills because we don't
25   know where this money came from.  He will

1    write down the serial number on the bills.  So

2    basically saying, hey, you give me a little

3    money to cover this little bit and your award

4    is going to be big, ten thousand, sixty

5    thousand dollars.

6        So inevitably the victim would go to

7    their bank and a lot of times she would ask

8    how much can you get.  The victim may say,

9    well, I have got some money in Max or Comala

10    Credit Union or money at A. G. Edwards.  And

11    they'd say, well, go get all you can.  That's

12    how this -- she didn't care what she was

13    doing.  She said go get whatever you got and

14    bring it to me.

15        So they would go to the bank.  Ms.

16    Anderson withdrew thirty-five hundred dollars.

17    That's all she had.  Ms. Williams withdrew

18    fifteen hundred dollars.  That's what she had

19    in her account.  Ms. Ray withdrew nine

20    thousand five hundred dollars.  Okay.  Again,

21    these are elderly women.  They are not earning

22    income anymore.  What they have is what they

23    have.  I submit the evidence is going to show

24    Ms. Stinson took it from them.

25        Then they would come back from the bank

27

1   and say this is all I could get.  Almost

2   apologetic, like I'm sorry I couldn't get no

3   more.  I hope this is enough.  But it was

4   enough for Ms. Stinson.  Anything is enough

5   for Ms. Stinson.  She says, hey, let's go over

6   to this place and we will go talk to the

7   person who told us about this.

8        In Ms. Ray's case they actually -- the

9   defendant was going to walk into Wal-Mart.

10  Ms. Ray said you got nine thousand dollars of

11  my money and I'm coming with you.  She was

12  like okay.  So they go walking into Wal-Mart

13  and stand around the customer service desk.

14  Ms. Stinson just takes off running.

15  Obviously, Ms. Ray is not going to keep up

16  with her.  She loses her and lost her money.

17       In another case they go into -- the

18  defendant goes into Burlington Coat Factory,

19  comes back out and the victim says where is

20  the money.  Ms. Stinson says, oh, he is

21  writing the serial number down.  I will go

22  back and get it.  The defendant goes back in

23  and after about thirty minutes, doesn't come

24  back out.  The victim starts to say, hey, I

25  just lost my money.

28

1        In another case she just says thanks.  Go

2    in and he's got it waiting on you when you go

3    in.  Ms. Anderson goes in to Sears looks

4    around, realized, hey, I just got scammed.

5    She took advantage of these women.  She took

6    what they had.  Again, theft of property in

7    the first degree is why we are here, two

8    counts and theft of property in the second

9    degree.

10        It took about a year for them to track

11    down who was doing this.  They described as

12    best they could, the victims did.  They

13    eventually rounded up a suspect.  Ms. Stinson.

14    They put her in a photographic lineup,

15    presented to each victim that you're going to

16    hear from today.  Evidence is going to show

17    they picked her out in every single one of

18    them and said that's her, over a year later.

19    That's how much it affected these women.  I

20    don't know how sharp my memory is but a year

21    later they were able to say, bam, that's her.

22    She is the one that took my money.  She is the

23    one that emptied my bank account.

24        They go visit her after she is picked out

25    of lineup.  The police go to where she is and

29

1    question her.  You're going to hear the
2    defendant admit, hey, I have got a gambling
3    addiction.  I have got a gambling problem.
4    Okay.  She admitted she had a gambling
5    problem.
6         Again, ladies and gentlemen, that's the
7    case.  I submit that's the evidence you're
8    going to hear today.  At the end of the case
9    after hearing all the witnesses and seeing all
10   the evidence, I'm going to ask that you find
11   Ms. Rena Stinson guilty of theft of property
12   in the first degree for taking thirty-five
13   hundred dollars from Ms. Anderson, theft of
14   property in the first degree for taking nine
15   thousand five hundred dollars from Ms. Carol
16   Ray and theft of property in the second degree
17   for taking fifteen hundred dollars from Ms.
18   Eva Williams.  Thank you very much.
19        MS. MAY:  May it please the Court.
20   Ladies and gentlemen of the jury, my job at
21   this particular juncture of this trial is to
22   give you a glimpse into what you will see and
23   what you will hear today.  One thing that you
24   will hear is testimony.  But the people giving
25   the testimony, they are elderly people.

30

1          Now, there are two undercurrents in this
2      trial.  One is sympathy and one is mistaken
3      identity.  I want you to understand very
4      clearly that you have a duty and you have a
5      task today.  And although the victims are
6      elderly, I don't want you to get caught up in
7      sympathy.  I'm not saying that your heart
8      shouldn't go out to them.  My heart goes out
9      to them.  The reason heart goes out to them,
10      my contention is not that they are not
11      victimized.  My contention is that Rena
12      Stinson right there is not the person.  She is
13      not the person who victimized these women.
14          So today as testimony comes forward, what
15      I want you to listen to, listen to the
16      descriptions that are given.  Listen very
17      closely to what these women said.  The bottom
18      line is they were victimized.  And I'm sorry
19      that they were victimized.  But because of
20      sympathy, the authority finger that somebody
21      had to pay, somebody had to pay.  And who did
22      they finger?  They fingered my client Rena
23      Stinson.
24          But today listen very carefully.  Rena
25      Stinson is not the person who did this to

31

1    these women.  She is not the individual who

2    stole from these women.  And when all is said

3    and done, at the end when I have sat down,

4    when Mr. Hughes the State has sat down and you

5    go back there and you think about the

6    testimony and you review the facts and you

7    review the evidence at the end, if there is in

8    your mind a reasonable doubt as to whether or

9    not Rena did this, you got to find her not

10   guilty.  It's part of your job.  It's a part

11   of your duty today.

12         Listen, I plead with you listen.  Because

13   of sympathy, somebody had to take a fall.

14   Listen carefully to the evidence presented.

15   Look carefully at the evidence presented.

16   Rena Stinson is not the person who did this.

17   If you listen today, if you watch the evidence

18   presented today, you will see that.  But again

19   if there is reasonable doubt at the end, you

20   have got to find her not guilty.

21         THE COURT:  Call your first witness.

22         MR. FOREMAN:  Your Honor, the State would

23   call Carol Ray.

24               CAROL RAY,

25   A witness, after having first been duly sworn

32

1    to speak the truth, the whole truth, and
2    nothing but the truth, took the stand and
3    testified as follows:
4                    DIRECT EXAMINATION
5    BY MR. FOREMAN:
6    Q.    State your name for the record, please.
7    A.    Carol Ray, R-a-y.
8    Q.    Ms. Ray, how old are you?
9    A.    Seventy-five.
10   Q.    You live here in Montgomery County?
11   A.    Uh-huh.
12   Q.    How long have you lived here?
13   A.    All my life.
14   Q.    All your life.  I want to take you back if I
15         can, back to April 9th, 2003, were you in
16         Montgomery County at that time?
17   A.    Yes.
18   Q.    Did you have occasion to come in contact with
19         the defendant Rena Stinson on that day?
20   A.    Yes.
21   Q.    How did you come in contact?
22   A.    At Wal-Mart on the Atlanta Highway.  And I put
23         my things in my car, in my trunk of my car and
24         went to take the buggy back.
25   Q.    You had been shopping there?

33

```
 1  A.   I had been shopping.

 2  Q.   Do you remember what time of day that was?

 3  A.   It was about 1:30 in the afternoon.

 4  Q.   Middle of the day?

 5  A.   Uh-huh.

 6  Q.   Okay.  So you had been shopping?

 7  A.   Uh-huh.

 8  Q.   Going back out to your car?

 9  A.   Uh-huh.

10  Q.   What, if anything, happened at that time?

11  A.   I came back to my car and there was a zippered

12       bag right by my door.  And she just appeared.

13       And she reached over and picked it up and

14       opened it.  It was full of money.

15  Q.   It was full of money?

16  A.   Uh-huh.

17  Q.   When you said she, you mean the defendant?

18  A.   It had a note in it.  It said the big boys got

19       theirs.  This is yours.  Or this is yours, the

20       big boys got theirs.

21  Q.   When you said she just appeared out of

22       nowhere, you mean the defendant?

23  A.   She was just there when I came back from

24       putting my buggy up.

25  Q.   Okay.  Do you recognize Ms. Stinson?  Do you
```

34

1       see her in the courtroom today?

2  A.  Yes.  She had a different hair.

3  Q.  Do you see her in the courtroom today?

4  A.  Yes.

5  Q.  Can you point to her or identify something she

6      is wearing?

7  A.  A white top.

8        MR. FOREMAN:  Your Honor, let the record

9      reflect that the witness identified the

10     defendant.

11       THE COURT:  Okay.

12  A.  That day she had on a dress and a jacket and

13     heels and her hair was to her shoulders.

14  Q.  So did the defendant approach you with a bag

15     of money that she had found?

16  A.  Yes.

17  Q.  What did she do with that bag of money at that

18     time?

19  A.  She said what are we going to do.  I said,

20     call the police.  And she said, well, this is

21     drug money and they will just take it.  It

22     will just be gone.  She got in my car.  And

23     she said let's talk about it.

24  Q.  She got in the car with you?

25  A.  Uh-huh.

35

| | | |
|---|---|---|
| 1 | Q. | Okay. Did you talk to her about it? |
| 2 | A. | Yes. She held my hand. |
| 3 | Q. | What did you decide to do with the money? |
| 4 | A. | Well, she was talking to a man on the phone |
| 5 | | all the time. She kept calling him on her |
| 6 | | cell phone. He kept telling her what to do. |
| 7 | | Then he even talked to me. |
| 8 | Q. | So you talked to a man on the cell phone? |
| 9 | A. | Uh-huh. |
| 10 | Q. | Did he identify himself? |
| 11 | A. | Huh? |
| 12 | Q. | Did he identify himself? |
| 13 | A. | No. Well, he said he was a lawyer, an |
| 14 | | attorney for Wal-Mart. She worked for |
| 15 | | Wal-Mart. And that they were there for a |
| 16 | | meeting and that he was inside in a meeting. |
| 17 | Q. | So she identified herself as working for |
| 18 | | Wal-Mart? |
| 19 | A. | Uh-huh. |
| 20 | Q. | And this gentleman on the phone identified |
| 21 | | himself as being an attorney at Wal-Mart? |
| 22 | A. | She identified him. |
| 23 | Q. | Okay. So after you spoke to that gentlemen, |
| 24 | | what happened then? |
| 25 | A. | He kept calling back and forth and back and |

36

1        forth.  Well, I was scared of course.  And he

2        kept talking about he was on the New York

3        stock exchange.  And that he needed some

4        serial numbers.  He also said there was a

5        negotiable bond in that zippered bag.  So we

6        get in the car and when we got to the bank,

7        her bank was by my bank and I put her out.

8    Q.  Can I stop you for a second?

9    A.  Uh-huh.

10   Q.  He said that he needed some serial numbers?

11   A.  Off of the money to -- I don't know, to run it

12       through some way.  I just -- I just really

13       didn't --

14   Q.  So between the phone conversation you had and

15       you in the car with Ms. Stinson, what at that

16       point what did you decide that needed to be

17       done with that money?

18   A.  She said I'm going to get some money too.  Put

19       me off at my bank and go to your bank.  They

20       were right by each other.  So that's what I

21       did.

22   Q.  So you dropped her off at her bank?

23   A.  Uh-huh.

24   Q.  Do you remember what bank that was?

25   A.  It was Compass or Alliant one, right there at

37

```
 1        Eastdale.  It was right there.
 2   Q.   You dropped her off and then you went to your
 3        bank?
 4   A.   Uh-huh.
 5   Q.   Which bank do you use?
 6   A.   Comala Credit Union at Eastdale.  It's where
 7        they have a branch at Eastdale.
 8   Q.   What did you do when you got to your bank?
 9   A.   I went and got cash money out of my account.
10   Q.   What kind of account?
11   A.   It was my savings account.
12   Q.   How much money did you get out?
13   A.   Nine thousand five hundred.
14   Q.   Was that all the money you had in there?
15   A.   I had a thousand more.
16   Q.   So that was majority of it?
17   A.   Uh-huh.
18   Q.   What did you do after you got your money out?
19   A.   I went back and she was waiting on me.  We
20        went back and she gave me a bank bag.
21   Q.   She was waiting on you at her bank?
22   A.   Uh-huh.  She gave me a bank bag.  She said,
23        here, you take this.  My husband is real -- if
24        I come home with this money, I don't know what
25        he'll do to me.  She said you take it.  I
```

38

1      said, no, I don't want it.

2  Q.  Was this the same bank bag?

3  A.  No, it was a bank bag.  It was zippered on one

4      side.  The other one had three sides zippered.

5  Q.  So --

6  A.  So she said well I'm going the take these in

7      here and get the serial numbers off.  And I

8      will be back.  And so she took off and I got

9      out and followed her.  And her picture was on

10     Wal-Mart --

11 Q.  Let me stop you for a second.  She got out.

12     Where were you?

13 A.  Back at Wal-Mart.

14 Q.  So you were back at Wal-Mart this time?

15 A.  Uh-huh.

16 Q.  Go ahead.

17 A.  She got out and said she was going to take the

18     money to have them get the numbers off.  And I

19     followed her.  I went behind her.

20 Q.  You went in the store with her?

21 A.  Uh-huh.

22 Q.  Was she going to go in without you?

23 A.  Yeah.  But I followed her.  And then when we

24     walked through the door, they had a picture of

25     me right behind her.  And we went to customer

39

1        service.  And she said -- she stood there and
2        said you can't go back there where he is in
3        the meeting.
4    Q.  Where he is?
5    A.  Yes, she said he was in Wal-Mart in a meeting.
6    Q.  When you say he, who are you referring to?
7    A.  The man she was talking to on the phone.
8    Q.  The guy she identified as an attorney?
9    A.  Uh-huh.
10   Q.  He was supposedly in the building at that
11       time?
12   A.  Yes.
13   Q.  And it was your impression she was waiting to
14       talk to him?
15   A.  She was going to take the money and let him
16       get -- they had a machine supposedly that he
17       could get the numbers off the money, the
18       serial numbers.  And so when we got to
19       customer service, she looked at me and she
20       said you can't go back there.  And she turned
21       around and ran out of Wal-Mart.  And I chased
22       her and I lost her.
23   Q.  So she just took off running with your money?
24   A.  Uh-huh.
25   Q.  And --

40

| | | |
|---|---|---|
| 1 | A. | I felt like he was following us when we went |
| 2 | | to the bank.  Somebody was following us. |
| 3 | Q. | Now, this Wal-Mart is on Atlanta Highway? |
| 4 | A. | Yes. |
| 5 | Q. | The bank, is all that located in Montgomery |
| 6 | | County? |
| 7 | A. | They are all right there close together. |
| 8 | Q. | In Montgomery County? |
| 9 | A. | Yes. |
| 10 | Q. | So you tried to follow her out when she took |
| 11 | | off? |
| 12 | A. | Yes.  She turned the corner and lost me. |
| 13 | Q. | Okay.  Was that the last you saw of her? |
| 14 | A. | Yes.  Then we called the police.  I went back |
| 15 | | to customer service and they called the police |
| 16 | | for me.  They called the security.  And then |
| 17 | | they called the police. |
| 18 | Q. | Did you have any intentions on giving Ms. |
| 19 | | Stinson that money for her to keep? |
| 20 | A. | No. |
| 21 | Q. | So it was your impression that you would be |
| 22 | | getting that money back? |
| 23 | A. | Yes. |
| 24 | Q. | Did you have occasion after this date to |
| 25 | | identify Ms. Stinson in a photo lineup? |

41

```
 1   A.   At the police department.

 2   Q.   Okay.  Do you remember when that was?

 3   A.   I think it was two years ago.

 4             MR. FOREMAN:  Your Honor, may I approach

 5        the witness?

 6             THE COURT:  Sure.

 7   Q.   Ms. Ray, I want to show you what I have marked

 8        State's Exhibit 1 and ask you if you can

 9        identify that?

10   A.   Yes.

11   Q.   Can you tell us what that is?

12   A.   That was from the police department.

13   Q.   Okay.

14   A.   That had six pictures on here.

15   Q.   Do you see a date on there anywhere?

16   A.   April 13th.

17   Q.   Of what year?

18   A.   '04.

19   Q.   2004?

20   A.   Uh-huh.

21   Q.   I want to ask you, is that your name written

22        right there?

23   A.   This?

24   Q.   Yes, ma'am.

25   A.   Yes.
```

42

```
 1   Q.   Is that your signature?

 2   A.   Yes.

 3   Q.   Did you sign that?

 4   A.   Yes.

 5   Q.   Also right here where it says remarks, does

 6        that appear to be your handwriting?

 7   A.   Yes.

 8   Q.   Do you remember writing that?

 9   A.   Yes.

10   Q.   Can you read what it says right there, please?

11   A.   Her hair was different but the facial features

12        are the same.  I'm sure the female pictured in

13        number four is the person that helped scam me.

14   Q.   You identified the picture that was in place

15        number four?

16   A.   Uh-huh.

17   Q.   Okay.  Also quickly, do you see where it says

18        time observation started?  Can you tell us

19        what that says?

20   A.   Right here?

21   Q.   Yes, ma'am.

22   A.   0729.

23   Q.   0729?

24   A.   Yes.

25   Q.   Do you see the time when it ended?
```

43

1    A.    0733.

2    Q.    So it took you just a couple of minutes to

3          pick her out?

4    A.    Yes.

5    Q.    When you saw that photo lineup, were you sure

6          that you I.D.'d the right person?

7    A.    Yes.

8    Q.    Did anyone lead you to believe -- before you

9          saw it, did anyone tell you which one to pick?

10   A.    No.

11   Q.    Okay.  So you you picked number four because

12         that's who you remembered as being the one?

13   A.    Yes.

14              MR. FOREMAN:  Judge, May I approach?

15              (Off-the-record discussion was held and

16              the following occurred in open court:)

17              MS. MAY:  Judge, I'm going to voice an

18         objection to the admission of these.  I

19         requested them on an earlier bases and it's

20         just now today that I have seen them.

21              MR. FOREMAN:  Your Honor, may I approach

22         the witness?

23              THE COURT:  I think you better.  Or

24         approach me.

25              (Off-the-record discussion was held and

44

```
 1              the following occurred in open court:)
 2    Q.   Ms. Ray, I am going to show you what's marked
 3         State's Exhibit 2 and ask you if you can
 4         identify that?
 5    A.   I know the hair is not the same.
 6    Q.   Okay.  Can you tell us what that is?
 7    A.   What what is?  The person?
 8    Q.   Just what this is.
 9    A.   It's six pictures.
10    Q.   Is that what you were shown when you were
11         asked to identify the defendant?
12    A.   Uh-huh, yeah.
13    Q.   That is the same one?
14    A.   Uh-huh.
15    Q.   And you stated earlier that you identified
16         number four?
17    A.   Uh-huh.
18    Q.   That appears to be the same thing that you
19         were shown?
20    A.   Yeah, except for the hair.  Her smile is the
21         same.
22    Q.   So you're saying that except for the hair.
23         Are you saying the hair is different from when
24         you saw her at Wal-Mart that day?
25    A.   Yeah.
```

45

1    Q.    But that's the same picture you were shown?

2    A.    Yes.

3          MR. FOREMAN:   No further questions, Your

4          Honor.

5                    CROSS-EXAMINATION

6    BY MS. MAY:

7    Q.    Ms. Ray, while you were at Wal-Mart, you say

8          that your testimony is that someone, a woman,

9          just appeared?

10   A.    Yes.

11   Q.    Again, refresh my memory.  What exactly were

12         you doing when this woman just appeared?

13   A.    I was getting in my car.

14   Q.    You were getting in the car?

15   A.    Yes.

16   Q.    Had you finished loading your groceries?

17   A.    I had put the groceries in the trunk.  Then I

18         took the buggy to where they keep the buggies

19         and came back to my car.

20   Q.    Okay.  Where were you parked in the parking

21         lot?

22   A.    In about the middle.

23   Q.    About the middle?

24   A.    Uh-huh.

25   Q.    So while you were pushing your buggy to the

46

```
 1        car, did you pass a number of people on your
 2        way to your car?
 3   A.   No.
 4   Q.   No one was in the parking lot?
 5   A.   No one was.
 6   Q.   No one was walking in the parking lot while
 7        you were walking middle ways in the parking
 8        lot to your car?
 9   A.   No.
10   Q.   Now, this incident -- can you tell me when the
11        incident happened?
12   A.   About 1:00 or 1:30 in the afternoon.
13   Q.   And how long ago?
14   A.   About two years ago, I guess.
15   Q.   Two?
16   A.   It's been a long time.
17   Q.   It has been a long time.  It has.  Now, a few
18        seconds ago you were shown some photographs.
19        You were a little hesitant with the
20        photographs.  Are you positive that those are
21        the same photographs that were shown to you at
22        the police station?
23   A.   I'm not positive.  It looked like them.  But
24        that's been a long time ago.
25   Q.   You're right, that has been a long time ago.
```

47

```
 1   A.    A long time ago.
 2   Q.    It resembles them but you're not quite sure
 3         that that's them?
 4   A.    I'm not one hundred percent positive now on
 5         what I saw two years ago.
 6   Q.    You're not one hundred percent positive now on
 7         what you saw two years ago.  Okay.  You say
 8         that it was my client who approached you in
 9         the parking lot.  How are you positive or how
10         are you sure that it was her now?  How are you
11         sure it was her then?
12   A.    Well, she has the same facial features.  Her
13         hair is not the same.
14   Q.    What facial features are those?
15   A.    Well, she had a like a smile when she was
16         smiling at me and holding my hand.
17   Q.    She had a smile?
18   A.    Uh-huh.
19   Q.    Anything else?
20   A.    Her wig.  She had a wig on.  I could tell it
21         was a wig.  It was a page boy.
22   Q.    It was what?
23   A.    A page boy.
24   Q.    Page boy.
25   A.    About the length of yours.
```

48

1　Q.　Tell me more about the facial features.  You

2　　　said she smiled?

3　A.　She had on makeup, you know, a good bit of

4　　　rouge and makeup.

5　Q.　Okay.  And other than that, are there any

6　　　other specific facial features?

7　A.　She looks about the same size.  Oh, facial

8　　　features?  No.

9　Q.　Now, when you went to the police station, how

10　　　did you describe the person who took your

11　　　money?  Do you remember what description you

12　　　gave them?  Did you give them a height and a

13　　　size?

14　A.　Yes.

15　Q.　About how tall was that person, do you

16　　　remember?

17　A.　Taller than me.  About five six or seven and I

18　　　couldn't tell for sure the age.  I thought it

19　　　was around fifty, forty-five.

20　Q.　About five six, five seven.  What about the

21　　　size?

22　A.　A little bit taller than I am.  I'm five

23　　　three.

24　Q.　What about the size?

25　A.　Not as big as I am, not quite.

49

```
1   Q.   Okay.  So were they petite?  Let's do this.

2   A.   Not really petite.  They were not shorter than

3        me.  I'm five three.  They were taller than

4        me.

5   Q.   All right.  We have ladies on the jury.  Were

6        they a size ten, size twelve, size fourteen?

7   A.   She looked like about a twelve or fourteen.

8   Q.   About a twelve or a fourteen.  Again, so that

9        I'm clear, about five six, five seven, about

10       twelve or fourteen.  What color did you

11       describe?

12  A.   Color?

13  Q.   What color?  What complexion?

14  A.   Light.  Not real dark.

15  Q.   Not real dark.  A light complected black

16       female?

17  A.   Yes, female.

18  Q.   Thank you.

19            MS. MAY:  No more questions.

20                 REDIRECT EXAMINATION

21  BY MR. FOREMAN:

22  Q.   Briefly, Your Honor.  You said it has been a

23       couple of years, is that correct, since this

24       happened?

25  A.   Yes.
```

50

1  Q.  When you were shown that lineup, you said that
2      was closer to the time after the event than
3      now; is that correct?
4  A.  Yes.
5  Q.  You also stated you didn't have any trouble
6      picking her out of the lineup at that time?
7  A.  No.
8  Q.  Was it fresher on your mind at that time?
9  A.  Yes.
10         MR. FOREMAN:  Nothing further.
11                RECROSS-EXAMINATION
12 BY MS. MAY:
13 Q.  You didn't have any trouble picking her out of
14     the lineup, right?
15 A.  No.
16 Q.  But the description was basically the same,
17     right, the description you just gave me, five
18     six to five seven, twelve to fourteen, light
19     complected black female?
20 A.  I think so.
21 Q.  Thank you, Ms. Ray.
22         THE COURT:  Okay.
23         MR. HUGHES:  That's it.
24         THE COURT:  Ms. Ray, you can step down.
25     Thank you, ma'am.

51

```
 1              (Witness excused.)
 2              MR. HUGHES:  May Ms. Ray be excused?
 3              THE COURT:  Yes.
 4              MR. HUGHES:  She requested to sit out
 5         here.
 6              MS. MAY:  Yes, that's fine with me.
 7              MR. HUGHES:  Calling Ms. Anderson
 8                   EMMA JEAN ANDERSON,
 9    A witness, after having first been duly sworn
10    to speak the truth, the whole truth, and
11    nothing but the truth, took the stand and
12    testified as follows:
13    BY MR. HUGHES:
14    Q.   Good afternoon, Ms. Anderson.  If you could,
15         state your name for the Court, please.
16    A.   My name is Emma Jean Anderson.
17    Q.   How old are you, Ms. Anderson?
18    A.   I'm seventy-two years old.
19    Q.   Okay.  Now, do you live here in Montgomery
20         County?
21    A.   Yeah.
22    Q.   Okay.  I'm going to direct your attention back
23         to a little over two years ago to April 28th,
24         2003.  Do you remember that day?
25    A.   I remember that day.
```

52

```
1   Q.   Do you remember going to Winn-Dixie that day?
2   A.   Yes.
3   Q.   Do you remember being approached by a black
4        female that day?
5   A.   Yeah.
6   Q.   Do you see the woman that approached you, do
7        you see her in court today?
8   A.   Well, when I seen her, she had on a wig.  And
9        I haven't seen no more in the picture of her
10       since I identified her at the police
11       headquarters.
12  Q.   So I'm just going to ask you, yes or no for
13       the Court's purposes, do you recognize anyone
14       in this courtroom that approached you that
15       day?
16  A.   Well, you know, it has been so long.
17  Q.   That's okay.  Just tell the truth.  It's going
18       to be all right.
19  A.   Well --
20  Q.   You're not real sure?
21  A.   No.
22  Q.   Fair enough, Ms. Anderson.  Do you remember
23       that day, the events of that day, what
24       happened when you were approached?
25  A.   Uh-huh.
```

53

1  Q.  Okay.  Now what happened when you were
2       approached that day?

3  A.  Well, I was fixing to get in the car.  And
4       this lady walked up, you know, talking.  And
5       she opened a purse like a purse, you know.

6  Q.  Who did?  Did the female that approached you?

7  A.  Right.  And then it just seemed like, you
8       know, that you be in a dream.

9  Q.  All right.  Let me ask you this.  Did she show
10      you anything inside the purse?

11  A.  I didn't see anything inside the purse.

12  Q.  Did she open it up and show it to you?

13  A.  I didn't see anything inside the purse.

14  Q.  But you said she opened a purse?

15  A.  Right.

16  Q.  Did she say anything to you?

17  A.  Well, yeah, she talked.

18  Q.  What did she say?

19  A.  It's been so long that I don't remember.

20  Q.  Did she mention anything to you about money?

21  A.  Well, no.

22  Q.  Okay.  Did you have an opportunity to leave
23      there and go to your bank at any time?

24  A.  Yeah, that's where they take me.

25  Q.  Okay.  Why did you go to your bank?

54

```
 1   A.   She said that -- I can't remember about that.
 2   Q.   You remember going to your bank?
 3   A.   Right.
 4   Q.   What did you do at your bank?
 5   A.   I went there and I drawed three thousand
 6        dollars out.  I left there and went to -- up
 7        there to the mall, up there on the end there.
 8        So she said that go up and -- because they
 9        moved that store out of there.
10   Q.   A store in the mall?
11   A.   Yeah.  And she will be there to meet me when I
12        got back.
13   Q.   She would be where?
14   A.   In my car.
15   Q.   She -- are you by your car at this point?  Are
16        you beside your car with her?
17   A.   No, I was driving my car.  But you don't --
18   Q.   So she says -- tells you to go inside and
19        says, hey, when you get back, I will be right
20        here?
21   A.   Uh-huh.
22   Q.   Did you go inside?
23   A.   Yeah.
24   Q.   How long were you inside?
25   A.   About ten minutes.
```

55

1    Q.    What were you doing inside?  Do you remember?

2    A.    I don't remember that.  But about ten minutes

3          was whenever it was, I walked right side a

4          white guy.  I never will forget that.  And

5          seems like when he touched me, whoever he was

6          just went away.  Then I turned around.  And I

7          said, oh, I have been robbed.

8    Q.    So -- what did you do with that three thousand

9          dollars that you said you withdraw?

10   A.    To her.

11   Q.    You gave it to her before going in the store?

12   A.    Right.

13   Q.    Did you take anything in the mall with you?

14   A.    Uh-uh, nothing but my purse and my keys.

15   Q.    And your money was not in your purse?

16   A.    No.

17   Q.    So you walked back outside.  What did you do

18         then?

19   A.    I looked and she wasn't there.

20   Q.    Did she have your money?

21   A.    Uh-huh.

22   Q.    Did you give her permission to take off with

23         your money?

24   A.    No.

25   Q.    What did you do after you got outside and

56

1      realized that she had taken off with your

2      money?

3  A.   I called my son.  But he wasn't there.  So

4      then I went home.  And then I left home, me

5      and my daughter.  She came to the police

6      headquarters with me.

7  Q.   So you made it down to police headquarters?

8  A.   Right.

9  Q.   Now, when you were down at police

10     headquarters, what did you do at that point?

11  A.   They showed me some pictures.  She had on a

12     wig.

13  Q.   Let me ask you this.  I'm going to show you

14     what's previously been marked State's Exhibit

15     2.  Do you recognize this at all?

16  A.   Been so long.

17  Q.   If you could describe for the Court if you can

18     just what you're holding.  What is that whole

19     thing, if you know?

20  A.   Well, now --

21  Q.   Can you describe what you're holding to the

22     Court?

23  A.   Oh, that number four.

24  Q.   Ms. Anderson.  I'm sorry, we are not asking

25     you to pick out Ms. Stinson at this point.  If

57

```
 1        you could describe what you're holding.
 2   A.   Oh, a photo of some pictures.
 3   Q.   How many pictures is it?
 4   A.   Six pictures.
 5   Q.   What are they pictures of?
 6   A.   Ladies, I guess.
 7   Q.   Are they full body or face shots?
 8   A.   Face shots.
 9   Q.   Okay.  Do you recall seeing that lineup
10        before?
11   A.   Uh-uh.
12   Q.   You never looked at that?
13   A.   No.
14   Q.   Let me ask you this.  Thank you.  Did you look
15        at a photo lineup in the police station?
16   A.   Uh-uh.
17   Q.   I'm going to show you what's marked State's
18        Exhibit 3 and ask if you recognize that piece
19        of paper?
20   A.   I recognize the handwriting.
21   Q.   Have you seen that piece of paper before?
22   A.   Not lately.
23   Q.   Well, let me ask you this.  Do you see a date
24        on that piece of paper?
25   A.   Oh, this is the date here.
```

58

| 1 | Q. | No, ma'am, that's the case number.  I'm going |
| 2 | | to direct your attention over to this side. |
| 3 | | Do you see a date over there? |
| 4 | A. | Um. |
| 5 | Q. | What are those last two numbers there? |
| 6 | A. | Zero four. |
| 7 | Q. | So April 13th, 2004.  I'm going to ask you |
| 8 | | something.  Is this your name right here? |
| 9 | A. | Yeah. |
| 10 | Q. | What does it say there? |
| 11 | A. | Right here? |
| 12 | Q. | Yes, ma'am. |
| 13 | A. | Well, it says Emma Anderson. |
| 14 | Q. | You're Emma Anderson? |
| 15 | A. | Right. |
| 16 | Q. | Okay.  I want you to look at the line below |
| 17 | | that.  Do you recognize that handwriting? |
| 18 | A. | Yeah, that's my handwriting. |
| 19 | Q. | Is that your signature? |
| 20 | A. | Yes. |
| 21 | Q. | Okay.  Now, again, I'm just going to ask you |
| 22 | | if you remember or not, did you look at an |
| 23 | | assortment of pictures when you were handed |
| 24 | | that? |
| 25 | A. | Yeah, but they wasn't on -- I done forgot |

59

```
 1        now.  Maybe they was on there.  I don't
 2        remember that.
 3   Q.   Do you recall picking a number?  Do you recall
 4        picking a number out of those six pictures?
 5   A.   No, it's been so long.
 6   Q.   Okay.  I'm going to ask you to refresh your
 7        recollection on this piece of paper.  Do you
 8        see anywhere where it says where you picked
 9        out a number?
10   A.   Uh-huh.  Number four.
11   Q.   And did you pick out number four?
12   A.   Yeah.
13   Q.   Did you pick that out because you recognized
14        her as being the lady that took your three
15        thousand dollars?
16   A.   Uh-huh.
17   Q.   May I see that, please?  Thank you.  Now, Ms.
18        Anderson, did the events that we have talked
19        about today, did that occur in Montgomery
20        County?
21   A.   Yeah.
22   Q.   Okay.
23             MR. HUGHES:  That's all I have.
24                       CROSS-EXAMINATION
25   BY MS. MAY:
```

60

```
 1   Q.   You testified that on April 28th, 2003, you
 2        went to Winn Dixie; is that right?
 3   A.   Uh-huh.
 4   Q.   Okay.  And also you testified that you're not
 5        quite sure about the woman who walked up to
 6        you, but that someone did walk up to you with
 7        their purse; is that right?  That someone
 8        walked up to you with their purse; is that
 9        right?
10   A.   (Affirmative response.)
11   Q.   Now, is it your testimony that you're not
12        really sure on who walked up with that purse?
13        You just know that it was a black woman who
14        walked up with that purse?
15   A.   No, I know.
16   Q.   You know?
17   A.   I know about that picture.
18   Q.   The picture?
19   A.   Uh-huh.  I never seen her.  But I know about
20        the picture.
21   Q.   You never saw it.  So when you went down to
22        the police station you never saw a picture?
23   A.   No, because I just had got robbed then.  And
24        that's when they showed the pictures.
25   Q.   Okay.  All right.
```

61

| | | |
|---|---|---|
| 1 | A. | And that's when I picked it out. |
| 2 | Q. | At the police station? |
| 3 | A. | Uh-huh. |
| 4 | Q. | Now, a few seconds ago Mr. Hughes right there |
| 5 | | showed you that form that had 4/13/04 on it, |
| 6 | | the form he just took back with him.  Okay. |
| 7 | | Earlier you testified that you didn't remember |
| 8 | | the form.  So is it now that you're saying you |
| 9 | | remember the form? |
| 10 | A. | May I say this?  When he brought me that |
| 11 | | picture, see, I had picked out number four. |
| 12 | | And then he brought me the paper.  Well, you |
| 13 | | know, it has been two years ago.  Okay.  Some |
| 14 | | things you -- |
| 15 | Q. | Okay.  I understand.  I understand. |
| 16 | | MR. HUGHES:  Your Honor, I object.  I |
| 17 | | guess let Ms. Anderson finish her answer.  I |
| 18 | | believe Ms. May cut her off. |
| 19 | | THE COURT:  Let her finish. |
| 20 | Q. | Finish what you were saying. |
| 21 | A. | Some things be two years ago you forget a |
| 22 | | little bit of it.  And some things you don't. |
| 23 | Q. | Okay.  So what are you saying that you |
| 24 | | remember?  Are you saying you remember going |
| 25 | | to the police station? |

62

1   A.    Yeah.   I remember the picture.

2   Q.    You --

3   A.    I remember the picture.   He showed me pictures

4         before he showed me the form.

5   Q.    Okay.

6   A.    So I identified number four.

7   Q.    Okay.   And also you stated that at Winn-Dixie

8         the hair was different?

9   A.    Sure.

10  Q.    Okay.   What other features do you remember?

11        Do you remember other features of the woman?

12  A.    No.

13  Q.    Okay.   All right.   Thank you, Ms. Anderson.

14              MR. HUGHES:   No further questions, Judge.

15              THE COURT:   Ms. Anderson, you can step

16        down.

17              MR. HUGHES:   May she be excused?

18        MS. MAY:   Yes.

19        (Witness excused.)

20              MR. HUGHES:   State will call Ms. Eva

21        Williams.

22                  EVA WILLIAMS,

23  A witness, after having first been duly sworn

24  to speak the truth, the whole truth, and

25  nothing but the truth, took the stand and

63

1    testified as follows:

2                    DIRECT EXAMINATION

3    BY MR. HUGHES:

4    Q.    Ms. Williams, if you could state your name for

5          the Court, please.

6    A.    Evaceal Hall Williams.

7    Q.    Do you go by Eva sometimes?

8    A.    Eva.

9    Q.    You live here in Montgomery County?

10   A.    Yes.

11   Q.    How old are you, Ms. Williams?

12   A.    Seventy-nine.

13   Q.    Okay.  Thank you.  I am going to take you back

14         to June 25th, 2003.  Do you remember that day

15         at all?

16   A.    I think it was August.

17   Q.    Okay.  Well, do you remember sometime in that

18         time frame being approached?

19   A.    I do.

20   Q.    In a parking lot?

21   A.    Yes.

22   Q.    Do you remember where that was?

23   A.    Sears.

24   Q.    Do you know who approached you?

25   A.    I know who she told me she was.

64

```
 1   Q.   Who did she tell you she was?

 2   A.   Shirley.

 3   Q.   She said her name was Shirley.

 4   A.   Uh-huh.

 5   Q.   Okay.  Was it a black female?

 6   A.   Yes.

 7   Q.   Now, had you seen her before that day?

 8   A.   No.

 9   Q.   Were you shopping at Sears?

10   A.   I was.

11   Q.   Where were you?

12   A.   I was outside, though.

13   Q.   Were you leaving Sears or were you going in?

14   A.   Uh-huh.

15   Q.   Did you have some packages with you?

16   A.   I don't think I bought anything.

17   Q.   Okay.  Were you attempting to get in your car?

18   A.   I did.  I was in my car.

19   Q.   What happened?

20   A.   She approached me on the driver's side.  I

21        didn't see her until she was just there.  And

22        she had a wallet thing in her hand.  And she

23        asked me if it was mine.  I said no.  She says

24        I don't know what to do with it.  I said take

25        it in Sears and give it to them in the
```

65

```
 1        office.  She said I don't think I should do
 2        that.  I said, well, give it to the security
 3        guard.  No, I am not going to give it to the
 4        security guard.  Then she opened it and showed
 5        me all this money.
 6   Q.   Do you know how much money was in there?
 7   A.   I don't.  I don't even know If it was real
 8        money or not.  I never touched it.  It was
 9        like this.
10   Q.   Okay.  Do you know the denominations or
11        anything?
12   A.   No.
13   Q.   What did she do at that point?
14   A.   Well, she kept saying she didn't know what to
15        do.  And she was talking on the speaker phone
16        to this man.  And they were suppose to have
17        been working at Burlington.  She said she
18        worked -- that he was the office manager and
19        she worked in the office.
20   Q.   Burlington Coat Factory?
21   A.   Uh-huh.
22   Q.   You said it was a cell phone she was talking
23        on?
24   A.   Uh-huh.
25   Q.   But you could hear both conversations?
```

66

```
 1  A.   I could hear it, yeah.  She asked him what to
 2       do with it.  He said bring it on down here and
 3       let me see what we should do.  He says I know
 4       your car is broke down.  But says maybe this
 5       lady will bring you down here.  Stupid me, I
 6       put her in the car and here we go.  She went
 7       in and she come back out.  I can't really
 8       remember all the things that she said.  But
 9       she was talking to him all the time.
10  Q.   While you were driving to Burlington Coat
11       Factory?
12  A.   Uh-huh.  And down there, I didn't get out of
13       the car.  I parked and she went in the store
14       and come back.  And he wanted to know if I
15       could give them some money so they could get
16       the serial numbers off.  He said it was drug
17       money.  Get the serial numbers off of it.
18  Q.   What did you do at that point?
19  A.   Well, they talked me into going up to the bank
20       at the mall.  What is it?  Not Regions, the
21       other one.  Max.
22  Q.   Okay.  Do you bank at Max?
23  A.   Well, I had an account there.  I had one at
24       Regions, too.
25  Q.   Did they tell you how much to take out?
```

67

```
 1   A.   All I could.  They wanted me to take all I
 2        had.  I didn't have but fifteen hundred in
 3        there.
 4   Q.   Did you go down to the bank?
 5   A.   Yeah.
 6   Q.   This is after the first trip to Burlington?
 7   A.   Yes.
 8   Q.   Did you go in the bank?
 9   A.   Yeah, I went in the bank.  But she didn't.
10        She said she wanted to go over to Sears to the
11        bathroom.
12   Q.   Did you take her to Sears?
13   A.   No, she just walked across the street.
14   Q.   When you were at Max?
15   A.   I was at Max.
16   Q.   Did you withdraw any money?
17   A.   I drawed the fifteen hundred dollars.
18   Q.   How much did that leave in your account?
19   A.   Eight dollars.
20   Q.   Okay.  Now after you withdrew the fifteen
21        hundred dollars, what did she do with that
22        money?
23   A.   She took it and we went back down to Max
24        (sic).  He was going to get the serial
25        numbers.  And she took it in and she come back
```

68

```
 1            one time out to the car.  And she had two bank
 2            bags.
 3   Q.       Let me stop you right there.  You said you
 4            left Max and went to Max.
 5   A.       I left Max and went back to Burlington with
 6            the money.
 7   Q.       What happened at that point?
 8   A.       She went in and she took the fifteen hundred
 9            dollars.  He was going to take the serial
10            numbers off of them.  She was going to bring
11            it back to me.  And she left it.  She come
12            back with those bags that had -- she said ten
13            thousand dollars in them.  She was going to
14            take one and going to give me one.  But we
15            couldn't spend it until -- I don't understand
16            it -- until they heard from -- what do you do
17            when they try to get money out?
18   Q.       That's above my pay raise, ma'am, I don't
19            know.
20   A.       I don't know.  Anyway, they went back and
21            forth.  She left my fifteen hundred in there
22            for him to be taking the serial numbers off.
23   Q.       She went in by herself?
24   A.       Yeah.  I never did go in Burlington.
25   Q.       At some point did she come back?
```

69

| | | |
|---|---|---|
| 1 | A. | Yeah, she come back. And then she says I am |
| 2 | | going back and get your money. When she went |
| 3 | | back that time, I realized what I had done. I |
| 4 | | called the police right away. |
| 5 | Q. | Did you go in looking for her? |
| 6 | A. | No. |
| 7 | Q. | Did she ever come back out? |
| 8 | A. | No. I watched the door. Evidently went out |
| 9 | | another door. |
| 10 | Q. | Did you give her permission to keep your |
| 11 | | fifteen hundred dollars? |
| 12 | A. | To keep it? No, she was supposed to bring it |
| 13 | | back to me. |
| 14 | Q. | Okay. What did you do after you called the |
| 15 | | police? |
| 16 | A. | I waited for them. They come out and they |
| 17 | | went in there. She told me that he was the |
| 18 | | office manager and she worked in the office. |
| 19 | | And they went in there and they said they had |
| 20 | | no such people working there. |
| 21 | Q. | So you are saying the defendant and this guy |
| 22 | | said that they were working there? |
| 23 | A. | Yes. And that was the last I saw of them. |
| 24 | Q. | Did you ever make a trip down to the police |
| 25 | | station? |

70

```
 1  A.    Yes, I did.

 2  Q.    Okay.  Were you shown a photographic lineup?

 3        Do you remember?

 4  A.    Yes.

 5  Q.    I am going to show you what again has been

 6        marked State's Exhibit Number 2 and ask if you

 7        could describe for the Court what this is?

 8  A.    That's her.

 9  Q.    Without picking her out, what is that?  What

10        are you looking at?

11  A.    Well, I don't know.

12  Q.    Let me ask you this.  Are there some pictures

13        on there?

14  A.    Yeah.

15  Q.    How many pictures are there?

16  A.    Six.

17  Q.    How would you describe the pictures?  What are

18        they pictures of?

19  A.    Women.

20  Q.    Like face shots, body shots?

21  A.    Face shots.

22  Q.    Okay.  And do you recall seeing that photo

23        lineup or if you remember?

24  A.    I don't remember all the faces.  But I think

25        this is her.
```

71

| | | |
|---|---|---|
| 1 | Q. | Which number are you pointing at? |
| 2 | A. | Four. |
| 3 | Q. | I am going to show you this State's Exhibit 4. |
| 4 | | Yes, ma'am, State's Exhibit 4.  If you could |
| 5 | | just look over it and describe for the Court |
| 6 | | what that is. |
| 7 | A. | I don't understand what you mean. |
| 8 | Q. | Let me rephrase the question.  Have you seen |
| 9 | | this piece of paper before? |
| 10 | A. | I don't know. |
| 11 | Q. | Is there a date on that piece of paper |
| 12 | | anywhere? |
| 13 | A. | This says 4/13 right here. |
| 14 | Q. | What year? |
| 15 | A. | '04. |
| 16 | Q. | April 13, 2004? |
| 17 | A. | That's what it says. |
| 18 | Q. | Now, I am just going to ask you.  Do you see |
| 19 | | your name on there anywhere? |
| 20 | A. | Yeah. |
| 21 | Q. | What does it say? |
| 22 | A. | Evaceal Williams. |
| 23 | Q. | Do you see your signature on it? |
| 24 | A. | Yes. |
| 25 | Q. | So you signed that piece of paper? |

72

```
 1   A.   Uh-huh.
 2   Q.   Okay.  Does it represent anywhere on that
 3        piece of paper what number you picked out of
 4        the photographic lineup?
 5   A.   Yeah, number four.
 6   Q.   So you picked out number four on the lineup
 7        you looked at?
 8   A.   Yeah.
 9   Q.   That was in fact the person who took your
10        money?
11   A.   That's the one.
12   Q.   Were you sure at that time?
13   A.   I am positive.
14   Q.   Okay.  Ms. Williams, everything that occurred
15        that we have just talked about, did that occur
16        in Montgomery County?
17   A.   Yes.
18            MR. HUGHES:  No further questions.
19                   CROSS-EXAMINATION
20   BY MS. MAY:
21   Q.   Ms. Williams, you say you were at Sears
22        parking lot; is that right?
23   A.   I don't hear very good.  You're going to have
24        to come closer.
25   Q.   No problem.  You were at Sears parking lot?
```

73

| 1 | A. | Uh-huh. |
| 2 | Q. | And where were you parked in the parking lot? |
| 3 | A. | Right out the door in the handicap in the |
| 4 | | front of the mall in a handicapped area. |
| 5 | Q. | You say that a woman approached you? |
| 6 | A. | Yeah. |
| 7 | Q. | And she had a wallet? |
| 8 | A. | Yeah. |
| 9 | Q. | And what was the description you gave to the |
| 10 | | police? |
| 11 | A. | What's the what? |
| 12 | Q. | What was the description?  How did you |
| 13 | | describe her when you went to the police? |
| 14 | A. | I tried to describe her.  She had a wig on. |
| 15 | Q. | Give me height, weight. |
| 16 | A. | Well -- |
| 17 | Q. | Facial features. |
| 18 | A. | I don't remember that.  But I tried to |
| 19 | | describe the clothing that she had on. |
| 20 | Q. | You don't really remember how her face looked? |
| 21 | A. | No, I just remember that her teeth were not |
| 22 | | real straight in the front. |
| 23 | Q. | Was she light complected or dark? |
| 24 | A. | That, I don't remember. |
| 25 | Q. | You don't remember.  Okay. |

74

1   A.   It was a real hot day and I was trying to get
2        home.
3   Q.   I understand.  So you don't remember if she
4        was light complected or dark complected.  You
5        just remember the wig?
6   A.   The wig.  And she wasn't real -- I don't think
7        she was real dark dark.
8   Q.   What do you call dark dark?
9   A.   I don't know.
10  Q.   Am I dark dark?
11  A.   I didn't think she was as dark as you are.
12  Q.   Okay.  Was she fair, fair skinned?
13  A.   I guess, I don't know.
14  Q.   You're not sure?
15  A.   I am not sure.
16  Q.   Thank you, Ms. Williams.
17                    REDIRECT EXAMINATION
18  BY MR. HUGHES:
19  Q.   One question.  I'm sorry I didn't ask you
20       previously.  Do you see the woman that took
21       your money?
22  A.   Yeah, I think that's the woman.
23  Q.   Could you point to her and describe her?
24  A.   (Pointing.)
25  Q.   If you could describe for the Court what she

75

```
 1        is wearing for the record.
 2   A.   Huh?
 3   Q.   Describe some distinguishing feature about her
 4        or what she is wearing for the Court and for
 5        the record today.
 6   A.   Today?  I don't know.  She wasn't wearing that
 7        type of clothes that day.  I don't know.
 8   Q.   Okay.  Do you see the woman that took your
 9        money in the courtroom today?
10   A.   Yes, I think so.
11   Q.   If you could just point out who you think it
12        is and describe her clothing?
13   A.   Well, she has got on a white blouse and a dark
14        skirt.
15   Q.   Thank you, ma'am.  That's all I have.
16             THE COURT:  Anything further for this
17        lady?
18             MS. MAY:  No, Judge.
19             THE COURT:  You can step down.  Thank
20        you.
21             MR. HUGHES:  May she be excused?
22             THE COURT:  Yes.
23             (Witness excused.)
24   MR. FOREMAN:  State would call Detective
25        Roberts.
```

76

```
 1              THE COURT:  Short witness.
 2              MR. FOREMAN:  Yes, sir, should be pretty
 3       brief.
 4                    JASON ROBERTS,
 5   A witness, after having first been duly sworn
 6   to speak the truth, the whole truth, and
 7   nothing but the truth, took the stand and
 8   testified as follows:
 9                    DIRECT EXAMINATION
10   BY MR. FOREMAN:
11   Q.   Can you state your name, please?
12   A.   Jason Roberts.
13   Q.   Where are you employed?
14   A.   City of Montgomery as a detective.
15   Q.   How long have you been employed with them?
16   A.   About four years now.
17   Q.   Four years?
18   A.   (Affirmative response.)
19   Q.   You were employed with them -- so you were
20       employed with them back in 2003?
21   A.   Yes, sir.
22   Q.   What were your duties at that time?
23   A.   Detective.
24   Q.   Now, were you assigned to be the case agent on
25       some cases involving some scams that have gone
```

77

```
 1        on in various parking lots during that time?
 2   A.   Yes.
 3   Q.   Were you involved with a case involving Ms.
 4        Carol Ray?
 5   A.   Yes, sir.
 6   Q.   Were you involved with a case involving a Ms.
 7        Evaceal Williams?
 8   A.   Yes, sir.
 9   Q.   Involving Ms. Emma Jean Anderson?
10   A.   Yes.
11   Q.   Were you the case agent on all those cases?
12   A.   That's correct.
13   Q.   What does it mean to be a case agent on the
14        case?
15   A.   If there is any investigating to do, excuse
16        me, if there is any investigating to do, you
17        do the investigating and then you compile the
18        case file, turn it over to the D.A.'s office.
19   Q.   During your investigations on those three
20        cases were you able to develop a suspect?
21   A.   I was.
22   Q.   How were you able to develop a suspect?
23   A.   Well, these crimes are very, very hard to
24        solve.  If you don't catch them in the act,
25        more than likely you're not going to catch
```

78

1       them.  I saw a couple of still shots that the

2       bank had printed out for me.  Of course, I

3       just studied those and studied those.  We have

4       got a data base, a computer that everybody

5       that gets arrested, brought up there, gets put

6       in city jail, is brought to us for

7       questioning.  We take their photograph.  And

8       put them into a data base.

9              MR. HUGHES:  May I have a moment?

10   Q.   You were saying you had a data base?

11   A.   Put them in a data base.  Actually put into

12       the perimeters for my search which, you know,

13       you can break it down by black male, sixteen

14       or seventeen years old.  Black female, age

15       perimeters, weight perimeters.  And I got

16       several thousand photos.  And I just sat,

17       took my time and went through all those and

18       developed that way because it matched real

19       close to the still shots.

20   Q.   So who were you able to develop as a suspect

21       after doing all that?

22   A.   Rena Stinson.

23   Q.   That was sifting through photos?

24   A.   Sifting through photos and a fellow detective

25       was dropping somebody off at the county jail

79

```
 1        and observed her at the county jail and gave
 2        me her name there.
 3   Q.   Did you take Ms. Stinson into custody?
 4   A.   No, sir, not at this time.
 5   Q.   Did you question her?
 6   A.   Not at this time.  I did question her after I
 7        put her in the photographic lineup.
 8             MR. FOREMAN:  May I approach the witness,
 9        Your Honor?
10             THE COURT:  Sure.
11   Q.   I want to show you what is marked State's
12        Exhibit 2 and ask you if you can identify
13        this?
14   A.   That's correct.  That's a photographic lineup.
15   Q.   Did you compile that lineup?
16   A.   I did.
17   Q.   What perimeters did you use as far as choosing
18        who would go in that lineup?
19   A.   I just random, no particular order.  Just
20        people same race, same approximate age,
21        weight.
22   Q.   So did you base that on the descriptions that
23        you got?
24   A.   That's correct.
25   Q.   Now, did you show this lineup to any of the
```

80

```
 1        victims in the case?
 2   A.   I did.
 3   Q.   When did you do that?
 4   A.   I don't have the exact date.
 5   Q.   I am going to show you what's marked as
 6        State's Exhibit 1 and ask you if you can
 7        identify that?
 8   A.   That's correct.  This is a photo lineup work
 9        sheet.  Whenever you use a standard lineup,
10        you would actually use a photo lineup sheet
11        and on 4/13/04 approximately 7:42 I showed the
12        lineup and --
13   Q.   Who did you show that lineup to?
14   A.   Ms. Carol Ray.
15   Q.   And I want to ask you a question.  There are
16        some -- appears to be some squares down
17        there.  What are those squares?
18   A.   Those squares signify the picture order just
19        as it is marked on the folder one through
20        six.  It's got numbers one through six.
21   Q.   Was Ms. Ray able to pick someone out of that
22        lineup?
23   A.   She picked out number four.
24   Q.   Okay.  Did she sign that form to your
25        knowledge?
```

81

```
 1   A.   She did.
 2   Q.   I am going to show you what is marked State's
 3        Exhibit 3 and ask you if you can identify
 4        that?
 5   A.   Yes, sir.  It's also a photo lineup where that
 6        was showed on 4/13/04.
 7   Q.   Who was that one shown to?
 8   A.   Emma Jean Anderson.
 9   Q.   Same photo lineup?
10   A.   I showed her the same photo lineup.
11   Q.   Was she able to pick out someone?
12   A.   She also picked out number four.
13   Q.   Okay.  And number four is?
14   A.   Rena Stinson.
15   Q.   You said that occurred on the same date?
16   A.   That's correct.
17   Q.   I also want to show you State's Exhibit 4 and
18        ask you if you can identify that?
19   A.   This is also a photo lineup work sheet.  It
20        was shown to Evaceal Williams on the same date
21        and she also picked out number four.
22   Q.   Okay.  So you showed all three of these
23        victims the same photo lineup, and they all
24        picked number four; is that correct?
25   A.   That's correct.
```

82

```
 1   Q.   Number four is Ms. Rena Stinson?

 2   A.   That's correct.

 3   Q.   You compiled this and you --

 4   A.   That's correct.

 5   Q.   What did you do with this after you showed it

 6        to them?

 7   A.   After I showed it to them, it was impounded

 8        for safekeeping.

 9   Q.   You impounded it?

10   A.   That's correct.

11             MR. FOREMAN:  Your Honor, at this time

12        the State would move to admit State's Exhibit

13        1, 2, 3, and 4 into evidence.

14             THE COURT:  Okay.

15             (State's Exhibit Numbers 1, 2, 3 and 4

16             were admitted into evidence.)

17   Q.   Now at any time did you question Ms. Stinson?

18   A.   I did.

19   Q.   At what point did you question her?

20   A.   After I had positively identified Ms. Stinson

21        as the person --

22             MR. HUGHES:  Sorry, Judge, may I have a

23        moment.

24   Q.   You did have an opportunity to interview Ms.

25        Stinson?
```

83

```
 1  A.   Yes, sir.

 2  Q.   When you interviewed Ms. Stinson, did you read

 3       her her rights?

 4  A.   I did.

 5  Q.   I want to show you what's marked as State's

 6       Exhibit Number 5 ask you if you can identify

 7       that?

 8  A.   This will be the standard City of Montgomery

 9       Miranda Rights Form that was filled out on

10       4/13/04.

11  Q.   That's when you questioned Ms. Stinson?

12  A.   That's correct.

13  Q.   Is that signature -- whose signature?

14  A.   That is going to be my signature saying that I

15       read her her rights.

16  Q.   So you sign that after you read her her

17       rights?

18  A.   That's correct.

19  Q.   Did she sign that indicating that she

20       understood those rights?

21  A.   She did.

22  Q.   So at that time did Ms. Stinson make any

23       statements?

24  A.   She did not.  She denied all the allegations.

25  Q.   She denied the allegations?
```

84

1   A.   Yes.

2   Q.   She didn't make any statements at all?

3   A.   No.

4   Q.   In your duties you compile the case file?

5   A.   I do.

6   Q.   I am going to show you and ask you if you can

7       identify that?

8   A.   That is a supplementary offense report.  Every

9       time we do any follow-up investigation, we do

10      one of these to refresh ourselves when it

11      comes time for court.

12   Q.   Is that from your case file?

13   A.   Yes, it is.

14   Q.   Did you compile that yourself?

15   A.   I did.

16   Q.   I want to direct your attention to this right

17      here.  Is that from -- is that from your

18      conversation with Ms. Stinson?

19   A.   That's correct.

20   Q.   And did you remember her saying anything at

21      that time?

22   A.   Well, I talked to her very briefly.  She, like

23      I said, denied all allegations but did admit

24      to --

25           MS. MAY:  I object as to the grounds for

85

```
 1        this, the relevancy of it.
 2             MR. FOREMAN:  Your Honor, I feel it's
 3        relevant to show that possibly her motive for
 4        committing these crimes.
 5             THE COURT:  As far as she denied, she
 6        said she --
 7             MR. HUGHES:  May we approach, Your
 8        Honor?
 9             THE COURT:  Yes.
10             (Off-the-record discussion was held and
11             the following occurred in open court:)
12   Q.   Did she say anything?  Did she make a
13        statement?
14   A.   She did.  She told me that she had a gambling
15        condition.
16             MR. FOREMAN:  Nothing further, Your
17        Honor.
18                       CROSS-EXAMINATION
19   BY MS. MAY:
20   Q.   Detective Roberts, how long did it take you to
21        conclude your investigation?
22   A.   A couple of months.
23   Q.   A couple of months.  So during that time was
24        this the only case or investigation that you
25        worked on?
```

86

```
 1  A.   No, ma'am.

 2  Q.   You worked on others?

 3  A.   Yes.

 4  Q.   On this particular investigation, did you

 5       follow any other leads?

 6  A.   There were no other leads.

 7  Q.   There were no other leads.  So other than

 8       someone pointing to my client, there was no

 9       other lead?

10  A.   Well, and them actually picking her out of a

11       photographic lineup.

12  Q.   Now, how did you come up with the numbering or

13       this lineup within itself?  Seeing that all of

14       the women who have taken the seat where you're

15       standing, they have varying descriptions, how

16       did you come up with this particular

17       arrangement?

18  A.   There is no particular arrangement.  You just

19       take six or five photographs besides the

20       person that you were looking into and put them

21       in there.  No particular order.

22  Q.   You just give them to the person and do you

23       leave them alone to pick?

24  A.   Absolutely.  Nothing having been said.  I tell

25       them I am going to show them a photographic
```

87

```
 1        lineup.  I tell them this does not mean that
 2        the person that committed the offense is in
 3        this lineup.  I give them as long.  Then I
 4        notate how long they looked at the
 5        photographic lineup.
 6   Q.   By chance do you remember?
 7   A.   They are going to be on the lineup sheet.
 8   Q.   Okay.  Now when you questioned her, as far as
 9        this particular incident, she denied
10        everything.  No implicating statements other
11        than what you read about her gambling problem?
12   A.   That's correct.
13   Q.   She denied everything?
14   A.   That's correct.
15   Q.   Thank you, detective.
16            MR. FOREMAN:  Nothing further.
17            THE COURT:  All right.
18            (Witness excused.)
19            MR. HUGHES:  State has nothing further.
20            THE COURT:  Ladies and gentlemen, why
21        don't we take a break right now.  Be back in
22        the jury assembly room at three o'clock.  We
23        will come get you at that time, okay.  Again,
24        remember don't let anybody discuss the case
25        with you.  Don't discuss the case with each
```

88

1 other.  Okay.

2  (Outside jury's presence.)

3  THE COURT:  Ms. May, would you like to

4 make a motion at this time?

5  MS. MAY:  At this time, Judge,

6 considering the evidence presented, we move

7 for a directed verdict.

8  THE COURT:  Denied. I understand the

9 defense is going to rest.

10  MS. MAY:  Yes, sir.

11  THE COURT:  Motion?

12  MS. MAY:  Renew.

13  THE COURT:  Deny it.  Let's talk real

14 quick about jury charges.  Got anything of

15 great import?  Theft of property first degree

16 controlled by deception, taking from person of

17 another.  It's got deception six different

18 ways.  Pick the one we like the best.  Which

19 of these things do y'all want me to read?  Do

20 y'all need to look at them real quick?

21  MR. HUGHES:  Yes, Your Honor.

22  (Off-the-record discussion was held and

23  the following occurred in open court:)

24  (In the presence of the jury:)

25  THE COURT:  Ladies and gentlemen, both

89

1   the plaintiff and the State and the defense

2   have rested in the case.  So what we have

3   before us now is the closing argument portion

4   of the case.  This is an opportunity for the

5   lawyers to get up and review with you what

6   they believe the evidence in the case has

7   been.  If your recollection of what an

8   attorney says a witness said on the stand is

9   different from the attorney's recollection,

10  you're entitled to rely on your own.  I will

11  remind you what the attorneys say is not

12  evidence in the case.  The State goes first,

13  followed by the defense.  The State gets

14  rebuttal because the State has the burden of

15  proof.  Okay.

16       MR. FOREMAN:  May it please the Court,

17  opposing counsel, ladies and gentlemen of the

18  jury.  Con artists, scam artists, flim flam

19  artists, whatever you want to call it, there

20  is an art involved in this.  It takes a lot of

21  planning.  You have -- to start off, you have

22  to find the right location, a crowded parking

23  lot at Winn-Dixie or at the mall or at

24  Wal-Mart, because you have a lot of people

25  that can come by, a lot of potential victims,

90

1    a good place to set up your scheme.

2        You have to have a good scheme, good

3    plan, good line.  Come up to someone's car and

4    say, hey, did you drop this money, is this

5    yours.  No, it's not my money.  Well, what do

6    you want to do with it.  Let's call the

7    police, because that's what we should do.  But

8    what the defendant did was continue her little

9    con which, no, let's don't call the police,

10   because there is drug money.  I know somebody

11   that -- we can keep it.  I know somebody that

12   knows these things, maybe an office manager at

13   Burlington, an attorney who works for

14   Wal-Mart, let me call him.  I will even let

15   you talk to him.  He can tell you how we can

16   keep it.

17       All we got to do is go get some money.  I

18   need some of your money first.  Go to your

19   bank account, get your money.  Then we need to

20   get the serial numbers off of it.  Once you

21   get those serial numbers, we will be able to

22   keep it because he is an attorney.  He is an

23   office manager, someone who knows these things

24   and he says it's okay.

25       So you take them to the bank, withdraw

1    the majority of your savings account because
2    you have been led under the false impression
3    that if you're doing this, this is all
4    perfectly legal, that you're going to get some
5    money out of it.  You're going to get your
6    money back and you're going to get some more
7    money out of it.  But that wasn't the case.
8    Because the third part of the art of pulling
9    off this con is you have to find the right
10   victim.
11          Ms. Stinson, the victim that she shows in
12   each one of these is an elderly lady.  I don't
13   know why she chose an elderly lady, maybe it's
14   easier for her to talk them into it.  Maybe
15   she is thinking they are old and they won't
16   remember when they come to court if something
17   does go wrong.  That's who she chose.
18          She chose the first victim you heard from
19   was Ms. Carol Ray.  This occurred to her at
20   Wal-Mart.  She took ninety-five hundred
21   dollars out of her savings account because
22   this lady told her to.  Told her she was going
23   to get it back.  Told her she might even get
24   some more money on top of that.  She got back
25   at Wal-Mart and she was going to go in with

92

1    that money.  Ms. Ray said you have got my

2    money, I am going in with you.  Followed her

3    in.  They get to the customer service counter

4    to go talk to this mysterious attorney that

5    was on the phone that told her all of this was

6    good.  This is how you do it.  She said --

7    Ms. Stinson said, Ms. Ray, you can't go back

8    there in the back where he is.  You can't go

9    back there.  He is in a meeting or something.

10         Well, at that point what does Ms. Stinson

11    do?  She has the money in her hand.  She takes

12    off running out the door.  She runs off with

13    it, ninety-five hundred dollars.

14         Then you get to Ms. Anderson, same

15    thing.  Approaching her in a parking lot with

16    some money, Winn-Dixie parking lot.  Ms.

17    Anderson testified that she took three

18    thousand dollars of her money.

19         Then finally you get to Eva Williams,

20    Sears parking lot Eastdale mall, same con,

21    same scam, different location.  Takes her to

22    the bank.  She withdraws fifteen hundred

23    dollars.  She testified she left eight

24    dollars in her account.  Ms. Stinson once

25    again runs off with the money, victimizing

93

1    these people.

2        It's your job to listen to the evidence

3    and to decide what the evidence is.  That's

4    what you do.  That's why you're here.  You

5    have the most important job of all of us.

6    You're the sole triers of the fact.  It's your

7    job to listen to the evidence that comes from

8    this witness stand, to watch those witnesses,

9    to decide whether or not you believe them,

10   decide whether they are telling the truth and

11   give weight to what they say.

12       What evidence do we have in this case?

13   We have the testimony of these three ladies,

14   all testified someone took their money.  Two

15   of these ladies, Ms. Ray and Ms. Williams,

16   said the defendant did it.  They identified

17   her.  Yeah, that's her.  There she is right

18   there.  She is the one at that took my money.

19   Well, also all three of these victims, a year

20   after it happened.  When it's a little fresh

21   on their mind, approached by Detective Roberts

22   and shown a photographic lineup, all three of

23   the ladies pick out number four.  Number four

24   is the defendant Rena Stinson.  All three of

25   them without hesitation number four.  She is

94

1    the one that took my money.  That's the one,

2    except she had a wig on.  But that's her.

3    Hair was different.  She had a wig on.  But

4    that's her.  That's the evidence that you

5    have.  You have the positive I. D. by three

6    victims that identified her as the one that

7    took their money.

8         Now, you can call it, you know, a scam,

9    flim flam, con.  The State of Alabama calls it

10   a theft.  She is charged with three counts of

11   theft, two counts of theft property first

12   degree.  The judge will instruct you on the

13   law.  That's his job.  That's what he is going

14   to do.  But what the State of Alabama contends

15   the law is that if you exert the control of

16   the property of another by deception, then

17   that constitutes theft.  If the value is over

18   twenty-five hundred dollars, then that

19   constitutes theft of property in the first

20   degree.  If it's over five hundred dollars,

21   it's theft of property in the second degree.

22        Ladies and gentlemen, the evidence is

23   there.  There has been evidence that

24   ninety-five hundred dollars was stolen from

25   Ms. Ray, theft property first degree.  Three

95

1    thousand dollars was stolen from Ms. Anderson,

2    theft of property in the first degree.  And

3    fifteen hundred dollars stolen from Ms.

4    Williams, theft of property in the second

5    degree.

6         I am asking all of you to go back and use

7    your common sense.  Listen to that evidence,

8    look at the exhibits that are admitted and

9    find Rena Stinson guilty on all three counts.

10        MS. MAY:  May it please the Court, State,

11   ladies and gentlemen.  At the beginning of

12   this I asked you not to get caught up in

13   something.  I explained to you that our hearts

14   go out to these people.  You have got to look

15   at what's been placed before you.  Part of

16   your duty today is to look at what's been

17   placed before you.

18        Now, the first woman, Carol Ray, she took

19   the stand and she admitted that she was unsure

20   of the person who approached her.  She

21   described the person as roughly five seven and

22   light complected.  Ms. Stinson, would you

23   stand for me?  Thank you.  Ms. Stinson isn't

24   five seven.  She is not light complected.

25        Ms. Ray also said that she couldn't

96

1    remember the facial features of the person who

2    approached her.  She can't remember.

3        Ms. Anderson took the stand and couldn't

4    even remember being shown a photo lineup.

5    True enough, they pointed to Rena.  But she is

6    in the defendant's chair.  They pointed to the

7    person that was in court.  She remembered --

8    Ms. Anderson remembered more about when she

9    was in the Winn-Dixie parking lot, the white

10    man who passed her, than she did about the

11    person who showed up.  She remembered more

12    about the purse than the person was holding --

13    than the person who took her money.  She

14    didn't remember.

15        Ms. Williams.  Ms. Williams was unsure

16    about all their features, all the features.

17        Detective Roberts.  Detective Roberts

18    took the stand and testified before you.  But

19    he also stated that he didn't follow any other

20    leads.

21        Remember earlier I told you that this was

22    about sympathy.  Somebody had to be fingered.

23    Somebody had to take the fall.  They chose

24    Rena Stinson to be fingered.  He didn't follow

25    any other leads.  He pointed to her.  He put

97

1    her in a photo lineup.  If you think back and
2    you think to all of the witnesses, their
3    recurring thing was number four.  Number
4    four.  They remembered the number four more
5    than they remembered the features of the
6    person who took their money.  Number four.
7    But they couldn't tell you her facial
8    features.  They can't remember if she was
9    light or dark.  But they remembered that
10    number four.  They didn't remember the
11    person.  Rena Stinson is not a number.  She is
12    a person.  She is a person.  She is not a
13    number.  They couldn't even remember the
14    person who took their money.  I ask you to ask
15    yourself what does that say.  What does that
16    say.
17        Earlier I explained to you that you have
18    a duty to do.  That when you go back to
19    deliberate and you think over everyone that
20    took this stand and you recall the testimony,
21    when it's all said and done, if there is a
22    reasonable doubt in your mind, that Rena
23    Stinson did this, you must find her not
24    guilty.
25        I am going to remind you don't get caught

98

1    up in sympathy. My heart goes out to these

2    women. It does. But Rena Stinson is not the

3    person who did it. She is not the person who

4    did it. And they can't remember who did it.

5    That was the only lead that was followed. And

6    these people remember a number and not a face

7    or not features. Reasonable doubt. Find her

8    not guilty.

9        MR. HUGHES: May it please the Court, Ms.

10    May, members of the jury. Ms. May says they

11    don't remember, victims don't remember who

12    took their money. I submit to you here's

13    three pieces of evidence that they did

14    remember. Carol Ray, number four, that's Ms.

15    Stinson. That's the person who took my

16    money. Her hair was different, face features

17    are the same. I am sure that female featured

18    in number four is the person that scammed me.

19    Her testimony, State's Exhibit 2, you can take

20    this back with you. Number four, the

21    defendant. She says, well, Ms. Williams

22    didn't remember. Yeah, she did. Again,

23    number four. Who is number four? Ms.

24    Stinson. Once again Ms. Emma Jean Anderson,

25    she don't remember either. The evidence is

99

1    that she did.  Okay.  This is evidence.

2    Anything entered in, such as an exhibit,

3    testimony heard from the stand, is evidence.

4    You can take it back there.  You can look at

5    it.  You can hold it.

6         Victims don't remember?  I submit to you

7    they remember very well.  She wants to say

8    forget about what happened to them three years

9    ago, that this even happened.  Forget that

10   roughly a year after that they picked her out

11   of a lineup, every one of them, the same

12   person.  Forget that.  Let's flip to today

13   three years later.  Well, they don't remember

14   every detail, therefore, they are -- she's not

15   guilty.  Don't remember every detail after

16   that day three years after it happened.

17        A seventy-two, seventy-five and a

18   seventy-nine year old woman, they don't

19   remember every detail of that day, therefore,

20   let -- Ms. Anderson made a very important

21   statement.  I hope y'all recall this.  She

22   stated in two years some things you remember,

23   some things you don't remember.  She said,

24   hey, I remember that picture.  I remember she

25   is the one that took my money.  You're not

1     taking fifteen hundred dollars.  To some

2     people, that may not be a lot or ninety-five

3     hundred is not a lot.  To them, it was

4     everything.  It was all but eight dollars for

5     Ms. Williams.  Ms. Ray took everything but a

6     thousand dollars.

7          Again, I am going to ask you to look

8     what's before you.  Go back and look at what

9     is evidence.  What did you hear.  What did you

10    not hear.  You didn't hear any evidence that

11    they were coached into.  The evidence was show

12    it to them, tell them they may not be -- even

13    be in there.  Do you see anybody you

14    recognize.  Jot down how long it takes to

15    look.  Move on.  They pick her.  They put

16    their signature on the line.  They said, hey,

17    we are sure.  Yeah, I signed it.  That's my

18    signature.  Okay.  That's why they do all this

19    stuff.  That's how they get a record.

20         Her picture was picked on all three of

21    them.  Well, the defendant is not a number.

22    She is not a number.  She is number four in

23    that picture.  We know that.  That's

24    undisputed.  She is number four in that

25    picture.  There is no evidence refuting that

101

1    that's her.  That's the defendant.  That's Ms.
2    Stinson.  There is no evidence showing these
3    people didn't get their money stolen.  These
4    people were victimized.  They tell you it was
5    Ms. Stinson.  Sure, I tell you somebody comes
6    up, approaches you, wipes out your bank
7    account.  That kind of hangs on with you.
8         I will leave you with this, ladies and
9    gentlemen.  No other leads.  They didn't
10   follow any other leads.  No other leads.  Make
11   a big deal though once they identified her
12   three times, three separate people, three
13   times, they stopped their investigation.
14   Glory be, that's a problem.  They should have
15   kept looking.
16        Ladies and gentlemen, those of you who
17   play golf, and I try, some people mark their
18   golf ball so they can find it.  They took a
19   Sharpie, one dotted, three put their initials
20   so they can locate their ball in case they
21   lose it.  If you are like me, you get to
22   feeling good and one day you sail one into the
23   woods.  Okay.  What a way to start.  You walk
24   in there tromping around.  You may find a lot
25   of golf balls.  You find your ball.  It's got

102

1    BH on it.  It's my ball.  I use a Titlist.  My
2    ball.  I hit it.  I know it's my ball.  Well,
3    should I then put that ball in my pocket and
4    then go look at every single other ball in the
5    woods to make sure?  I have got my marking, my
6    ball.  This is my ball.  Do I then need to go
7    to every other ball to verify just to make
8    sure that somebody else doesn't have the exact
9    same ball.
10       I submit to you they found the golf ball.
11   They found number four.  So why then should --
12   he said we have got three people that identify
13   her.  We have got this picture that everybody
14   says that's her.  That's it.  Why then should
15   they spend more time, more money, say let's
16   examine everybody just to make sure?  I submit
17   to you they were sure.  Ms. Anderson, Ms.
18   Williams and Ms. Ray were sure.  They told you
19   they were.  I submit they were very honest in
20   what they said.
21       Based on the evidence you have heard and
22   the exhibits placed into evidence, I ask that
23   you find Ms. Stinson guilty of theft of
24   property in the first degree from Ms.
25   Anderson, theft of property first degree from

1      Ms. Ray and theft of property second degree

2      from Ms. Williams by deception exerting

3      unauthorized control, taking their money,

4      deceiving them out of their money.  Go back

5      and look at the evidence, look at it, use your

6      common sense and find her guilty on all three

7      counts.  Thank you.

8          THE COURT:  All right.  Folks, we are at

9      that point where I tell you the law that

10     applies to this case.  The case is brought to

11     you via an indictment.  I am supposed to read

12     the indictment to you.  Hang with me.

13         Count one, the Grand Jury of said County

14     charge that, before the finding of this

15     indictment, Rena Dorsey Stinson, alias Rena D.

16     Stinson, alias Rena Dorsey, whose name is

17     otherwise unknown to the Grand Jury, did

18     knowingly obtain or exert unauthorized control

19     over, or did knowingly obtain by deception

20     control over lawful currency and/or coinage of

21     the United States of America, a better

22     description of which is unknown to the Grand

23     Jury, of some value greater than twenty-five

24     hundred dollars, the property of Emma

25     Anderson, with intent to deprive the owner of

1    the property, in violation of Section 13A-8-3

2    of the Code of Alabama, against the peace and

3    dignity of the State of Alabama.

4        Count two, the Grand Jury of said County

5    further charge that, before the finding of

6    this indictment, Rena Dorsey Stinson, alias

7    Rena D. Stinson, alias Rena Dorsey, whose name

8    is otherwise unknown to the Grand Jury, did

9    knowingly obtain by deception control over

10   lawful currency and/or coinage of the United

11   States of America, a better description of

12   which is unknown to the Grand Jury, of some

13   value greater than twenty-five hundred

14   dollars, the property of Carol Ray, with

15   intent to deprive the owner of the property,

16   in violation of Section 13A-8-3 of the Code of

17   Alabama, against the peace and dignity of the

18   State of Alabama.

19       Count four, the Grand Jury of said County

20   further charge that, before the finding of

21   this indictment, Rena Dorsey Stinson, alias

22   Rena D. Stinson, alias Rena Dorsey, whose name

23   is otherwise unknown to the Grand Jury, did

24   knowingly obtain or exert unauthorized control

25   over, or did knowingly obtain by deception

105

1    control over lawful currency and/or coinage of

2    the United States of America, a better

3    description of which is unknown to the Grand

4    Jury, of some value greater than five hundred

5    dollars, the property of Avaceal Williams,

6    with intent to deprive the owner of the

7    property, in violation of Section 13A-8-4 of

8    the Code of Alabama.

9        Now the indictment itself has no bearing

10   on the guilt or innocence of Ms. Stinson.

11   It's simply the process by which the case gets

12   into court.  It is not evidence in this case.

13       As to that indictment, she has pled not

14   guilty.  By pleading not guilty, she has put

15   the burden on the State of Alabama to prove

16   her guilt beyond a reasonable doubt.

17       Before a conviction can be had, each of

18   you must be satisfied of her guilt, otherwise

19   she is entitled to an acquittal.

20       Furthermore, she is presumed to be

21   innocent of this offense or offenses, I should

22   say.  That presumption stays with her until

23   her guilt is established from the evidence

24   beyond a reasonable doubt.  This presumption

25   of evidence is evidence in the case and is to

1    be considered by you along with the other

2    evidence in the case.  Unless the evidence

3    convinces you beyond a reasonable doubt of the

4    proof of each and every element of the charge,

5    she is presumed innocent.  We will talk more

6    about reasonable doubt to sort of try to help

7    you with that concept.

8        While the State's burden of proof is a

9    strict or heavy burden, it's not necessary

10    that guilt be proved beyond all possible

11    doubt, only required that the State excludes

12    any reasonable doubt concerning Ms. Stinson's

13    guilt.

14        A reasonable doubt is a real doubt based

15    upon reason and common sense after a careful

16    and impartial consideration of all the

17    evidence in this case.  Proof beyond a

18    reasonable doubt means there has to have been

19    proof of such a convincing character that you

20    would be willing to rely and act upon it

21    without hesitation in the most important of

22    your own affairs.

23        Again, as I told you earlier, y'all are

24    the sole judges of the evidence.  Let me go

25    over again with you real quick what is and

107

1    what is not evidence in the case.  The

2    indictment that I read to you, that's not

3    evidence.  Arguments and statements of

4    attorneys are not evidence.  Rulings that I

5    make are not evidence.

6        What is evidence is the testimony of

7    witnesses from the witness stand who are under

8    oath, exhibits that have been allowed into

9    evidence and the presumption of innocence that

10   we have already discussed.

11       Just as you're the sole judges of the

12   evidence, you're also the sole and exclusive

13   judges of the credibility of the witnesses and

14   the weight that should be given to their

15   testimony.

16       In passing on the credibility or

17   believability of a witness, you have a right

18   to consider the following.  Number one, any

19   bias, interest or prejudice that may have been

20   exhibited to you while that person testified.

21   Number two, the demeanor of the witness on the

22   stand.  How did the person look, how did they

23   act while they testified, their basis for

24   testifying, how do they know the facts that

25   they have testified to.  Did they have a

108

1    opportunity to learn and know the facts to

2    which they testified.  You can accept or

3    reject any part of the testimony of any

4    witness.  You may accept only the testimony

5    you consider worthy of belief.  In other

6    words, if you think a witness has not been

7    completely candid with you while they

8    testified, you can disregard all of that

9    witness' testimony or you can just elect to

10   disregard that portion of the testimony that

11   you don't find to be worthy of belief.

12        Now, Ms. Stinson has chosen not to take

13   the stand.  As I told you earlier, she is

14   presumed to be innocent.  She is not required

15   to prove her innocence nor is she required to

16   take the stand.  She has that constitutional

17   right not to testify in this case.  You should

18   not infer anything prejudicial whatsoever

19   because she has not testified.

20        Let me talk to you about the specific

21   charges.  Two counts of theft property first

22   degree.  A person commits the crime of theft

23   of property if he knowingly -- if she

24   knowingly obtains by deception control of the

25   property of another by taking the property

109

1    from the person of another with the intent to

2    deprive the owner of his or her property.

3        To convict, the State must prove beyond a

4    reasonable doubt each of the following

5    elements of theft of property in the first

6    degree. Number one, that Rena Stinson

7    knowingly obtained by deception control over

8    the property of Emma Anderson or Carol Ray --

9    let's see over the property of Emma Anderson

10   or Carol Ray, more specifically their money.

11       Number two, that the defendant took the

12   property from the person of another and,

13   three, that the defendant acted with intent to

14   deprive the owner of her property. When acts

15   with intent to deprive another of her

16   property, when she acts with the purpose of

17   causing that result, the term obtaining

18   control over property includes but is not

19   necessarily the taking or carrying away or

20   itself conveyance of interest or in possession

21   of property. The deception occurs when a

22   person knowingly creates or confirms another's

23   impression which is false and which the

24   defendant is not to be believed to be true or

25   a false impression which the defendant

110

1    previously has created or confirmed.

2        If you find from the evidence that the

3    State has proved beyond a reasonable doubt

4    each of the above elements of the theft of

5    property first degree as charged, then you

6    shall find the defendant guilty of theft of

7    property in the first degree.

8        On the other hand, if you find that the

9    State has failed to prove beyond a reasonable

10   doubt any one or more of the elements of

11   offense of theft of property first degree,

12   then you cannot find Ms. Stinson guilty of

13   theft of property first degree.        Also

14   count two of theft property second degree.

15   The difference between first and second degree

16   is the value of the property taken.  A person

17   commits the crime of theft of property if he

18   knowingly obtains by deception control over

19   property of another with intent to deprive the

20   owner of property.  The theft of property

21   which exceeds two hundred fifty but does not

22   exceed one thousand constitutes theft property

23   second degree.

24        To convict, the State must prove beyond a

25   reasonable doubt the following elements of

111

1   theft of property second degree.  That Rena

2   Stinson knowingly obtained by deception the

3   control over the property of Ms. Williams,

4   more specifically her money, that such

5   property exceeded two hundred fifty dollars in

6   value but did not exceed a thousand dollars in

7   value and that Ms. Stinson acted with the

8   intent to deprive the owner of her property.

9      If you find from the evidence that the

10   State has proved beyond a reasonable doubt

11   each of the above elements of the offense of

12   theft property second degree as charged, then

13   you shall find the defendant guilty of theft

14   of property second degree.

15      On the other hand if you find that the

16   State has failed to prove beyond a reasonable

17   doubt either one or more of the elements of

18   the offense of theft of property second

19   degree, then you cannot find the defendant

20   guilty of theft of property in the second

21   degree.

22      In a moment we are going to let you go

23   back into the jury deliberation room back

24   here.  When you do so, I want you to use your

25   knowledge of people and their affairs.  That's

112

1    what we call common sense.  That's why we have

2    got y'all in here today is to bring your

3    common sense to bear in this case.  In

4    arriving at your verdict, do not allow

5    sympathy, prejudice or emotions to influence

6    you.

7        Furthermore, don't base your verdict on

8    any preconceived, popular or unpopular

9    verdict.  As you know, your verdict is

10   strictly based on the evidence presented and

11   the law that applies to the case.

12       I will explain to you before you could

13   reach a verdict all twelve of you must agree

14   on the verdict.  It cannot be a split

15   verdict.  It must be a unanimous decision.

16       The first thing you need to do is select

17   someone to act as your foreperson.  A

18   foreperson's opinion is not entitled to any

19   more weight than anybody else's opinion  but

20   simply to act as spokesperson.  Discuss the

21   case.  If you have a question, write the

22   question down on a piece of paper, knock on

23   the door at the other end of the room and we

24   will come get the question.  That's about the

25   last thing I can promise you is that we will

113

1    come get the question.  Whether we answer it

2    or not, I can't tell you that.  I will give

3    you some perimeters.

4         If it's a question about the facts of the

5    case, who said what, who did what, y'all are

6    the judges of the facts.  So I probably can't

7    answer a question about the facts in this case

8    because that's y'all's job.  If it's a

9    question about the law in the case and you

10   need me to reread some of what I said to you

11   just now, I could probably do that for you.

12   Only thing I assure you is we won't ignore

13   you.  I can't promise we can answer it.

14        But once you have reached a verdict, have

15   your foreperson sign the verdict form, print

16   their name, knock on this door, come get us.

17   This is a verdict form.  It reads count one,

18   we, the jury, find the defendant guilty of

19   theft of property first degree as to Emma

20   Anderson as charged in the indictment, or we,

21   the jury, find the defendant not guilty.  See

22   count one you have to find guilty -- make a

23   finding of guilty or not guilty.

24        Count two, we, the jury, find the

25   defendant guilty of theft of property first

114

1    degree should be as to Carol Ray as charged in

2    the indictment, or we, the jury, find the

3    defendant not guilty.

4        Again, with regard to count two, Ms. Ray,

5    you need to make a finding either guilty or

6    not guilty as you find the evidence to be.

7        Count four, we, the jury, find the

8    defendant guilty of theft of property second

9    degree as to Evaceal Williams as charged in

10   the indictment, or we, the jury, find the

11   defendant not guilty.

12       So you are dealing with three counts,

13   numbered counts one, two, four.  Then you need

14   to make a finding as to each count.  When

15   y'all have reached a verdict and the

16   foreperson signs his name, prints his name,

17   knock on the door and we will come get you.

18       The last thing we need to do is Mr.

19   Loucks, you were selected as the alternate in

20   this case.  So we are going to excuse you

21   because we are only allowed to send twelve

22   folks back there.  Some people say, you mean I

23   sat through all this and I don't get to make

24   the decision.  Some people are like, good,

25   glad to go.  I don't know how you feel about

115

1        it.  But we keep an alternate, just so y'all

2        will know, sometimes people don't come back

3        from lunch.  Sometimes people get sick or they

4        have a family emergency.  And we can't go

5        forward without twelve people.  So to keep

6        from having to start all over, we keep a

7        spare, for lack of a better term.

8                Anything from either side?

9                (No response.)

10               THE COURT:  Okay.  Go on back to the jury

11       assembly room.  Mr. Loucks, wait on us just a

12       second, please, sir.

13               (Outside jury's presence.)

14               THE COURT:  Second degree is five hundred

15       dollars to a thousand?

16               MR. HUGHES:  Twenty-five hundred.

17               THE COURT:  Mr. Loucks, I just want to

18       tell you again I hope you don't feel like you

19       wasted your time.  We appreciate you being

20       here.  I guess you're excused for the rest of

21       the day.  Call the code-a-phone tonight and

22       they will let you know if you are needed the

23       rest of the week.

24               JUROR:  I can go.

25               THE COURT:  The lawyers may want to talk

116

1       to you.  You're welcome to discuss the case
2       with them or you if you don't want to talk
3       about it with them, I am sure they will
4       respect your wishes in that regard.  Thank
5       you, sir.
6                   (Mr. Loucks exited the courtroom.)
7               THE COURT:  Want me to read the whole
8       charge again?
9               MR. HUGHES:  Just clarify the amount.
10              MS. MAY:  Satisfied.
11              THE COURT:  Okay.  Bring them back in.
12              (In the presence of the jury:)
13              THE COURT:  I messed something up is the
14      long and short of it.  I apologize to
15      everybody.  I need to recharge y'all a little
16      bit on theft of property first degree and
17      theft of property second degree.  I told you
18      the difference was the amounts.
19              JUROR:  We know.
20              THE COURT:  Did y'all go to law school?
21      Y'all are quicker on this than I am.  Let me
22      clarify.
23          Theft of property first degree, the
24      person commits the crime of theft of property
25      in the first degree if he knowingly obtains by

1    deception control of the property of another

2    by taking the property from the person of

3    another with the intent to deprive the owner

4    his or her property.

5        Theft of property which exceeds

6    twenty-five hundred dollars in value

7    constitutes theft of property in the first

8    degree.

9        Second degree is the same thing except

10   the theft of property in the second degree

11   means the value of property exceeds five

12   hundred dollars in value but does not exceed

13   twenty-five hundred dollars in value.  That's

14   theft of property in the second degree.

15   That's the difference between the two.  Okay.

16   I apologize for that.  If it's the only

17   mistake I made today, I will be all right.

18   Y'all go back and start your --

19       JUROR:  We did talk about that first

20   thing.

21       THE COURT:  All right.

22       (Outside jury's presence.)

23       THE COURT:  Anything from anybody?  Want

24   to save me again?

25       MR. HUGHES:  Satisfied.

1          (Outside jury's presence.)

2          THE COURT:  We have a question from the

3     jury that says, can we see the original police

4     report with descriptions of flim flam and also

5     question that says where did the photos come

6     from and where are the still shots from

7     Wal-Mart.  In response to that question the

8     parties have all agreed that we will send in a

9     following written response to the question.

10    It just says all the evidence that you're to

11    consider has been presented.

12          (Jury has a question at 4:37 p.m.)

13          (In the presence of the jury:)

14          THE COURT:  Ladies and gentlemen, I read

15    your question, could we see the transcripts.

16    I am not real sure you mean transcripts of

17    what the witnesses said in here today.  No,

18    there are no transcripts of what the witnesses

19    said today.  There could be in a week or two.

20    You need to rely on your own recollection what

21    the witnesses testified to.  I am sorry.  Yes,

22    sir?

23          JUROR:  There was something said about

24    her being recognized in the courtroom or in

25    the courthouse.  I believe the officer said

119

1    something and we were not really clear what

2    that was.  How she was recognized or what

3    was -- no way for us to understand that.

4        THE COURT:  If the question is about the

5    facts, the question is about what a witness

6    has testified to, I can't help you with that.

7    It's just y'all have to rely on your own

8    recollection what the witnesses testified to.

9        JUROR:  I have a question, please.  Was

10    something mentioned about there was a bank

11    shot at one of the banks that was used, an

12    I.D. for her?

13        THE COURT:  Y'all are asking about the

14    facts of the case.  I can't discuss the facts

15    of the case with you.  Okay?  That's the

16    best -- I know y'all are frustrated.  But

17    those are the limits of what I can do.  I

18    can't come in here and say, well, that witness

19    said this and that witness said that.  That's

20    y'all's job, not my job.  Sorry, folks.  If

21    y'all will go back and have at it some more,

22    please.  Just for y'all's -- we are getting up

23    to five o'clock.  It's up to y'all how late

24    y'all want to stay.  When y'all want to go,

25    just y'all let us know what y'all's wishes are

120

1  in that regard.  If y'all want to go to a

2  certain time and stop and come back tomorrow,

3  we will be there with you.  Whatever y'all

4  feel like doing.  That's something you need to

5  talk among yourselves.  Okay?

6    (Court adjourned for the day at 5:05

7    p.m.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

121

```
 1                    PROCEEDINGS
 2                  AUGUST 23, 2005
 3                  COURTROOM 3-A
 4          (The jury knocked with a verdict at ten
 5          a.m.)
 6          (In the presence of the jury:)
 7          THE COURT:  Everybody have a seat.  I
 8     have been handed the verdict form which I will
 9     read in the record.  Circuit Court, State of
10     Alabama versus Rena Stinson, count one, we,
11     the jury, find the defendant Emma Anderson
12     guilty of theft of property first degree as
13     charged in the indictment.  Count two, we, the
14     jury, find the defendant guilty of theft of
15     property first degree as to Carol Ray as
16     charged in the indictment.  As to count four,
17     we, the jury, find the defendant guilty of
18     theft of property second degree as to Evaceal
19     Williams as charged in the indictment.  I'll
20     ask each of you if that's your verdict.
21          (The Court polled the jury and each juror
22          responded affirmatively.)
23          THE COURT:  The Court adjudicates the
24     defendant guilty of two counts of theft of
25     property first and one count of theft property
```

122

1     second.  We will do the sentencing September
2     19th.

3          Ladies and gentlemen, thank you so much
4     for your jury service.  I can give you a
5     little bit of good news, y'all are released
6     for the rest of the day.  Call the
7     code-a-phone tonight.  It will give you
8     additional instructions.

9          Ms. Stinson, you will be going back to
10    Department of Corrections.  You will be
11    brought back for the sentencing.

12         Thank you so much for your jury service.
13    We can't do it without you.

14         (Court adjourned.)

15

16

17

18

19

20

21

22

23

24

25

123

```
 1      CERTIFICATE OF COMPLETION OF REPORTER'S
                        TRANSCRIPT
 2      CIRCUIT COURT OF MONTGOMERY COUNTY,
        ALABAMA, FIFTEENTH JUDICIAL CIRCUIT
 3
        STATE OF ALABAMA
 4
        VS.                  CASE NUMBER CC-04-1694
 5
        RENA STINSON
 6                    *   *   *   *   *   *   *   *   *

 7            I, JAN GOSS, OFFICIAL COURT REPORTER

 8      FOR THE FIFTEENTH JUDICIAL CIRCUIT OF ALABAMA

 9      HEREBY CERTIFY THAT I HAVE THIS DATE COMPLETED

10      AND FILED WITH THE CLERK OF THE TRIAL COURT THE

11      ORIGINAL AND THREE COPIES OF A TRUE AND CORRECT

12      TRANSCRIPT OF ALL THE EVIDENCE AND MATTERS

13      TAKEN IN THE ABOVE-STYLED CAUSE.  ALL PAGES ARE

14      NUMBERED SERIALLY, PREFACED BY AN INDEX AND

15      ENDING WITH THE NUMBER APPEARING AT THE TOP OF

16      THIS CERTIFICATE.

17            I FURTHER CERTIFY THAT A COPY OF THIS

18      CERTIFICATE HAS THIS DATE BEEN SERVED ON THE

19      CLERK OF THE APPELLATE COURT, THE DISTRICT

20      ATTORNEY'S OFFICE, THE ATTORNEY GENERAL'S OFFICE,

21      AND COUNSEL FOR THE DEFENDANT.

22          DATED THIS 12th DAY OF January, 2006.

23

24                      _____
                        JAN GOSS
25                      OFFICIAL COURT REPORTER
```

1

1

2     IN THE FIFTEENTH JUDICIAL CIRCUIT
      IN AND FOR MONTGOMERY COUNTY
3       MONTGOMERY, ALABAMA

4

5

6  STATE OF ALABAMA,    )

7       Plaintiff,  )

8  VS.         ) CRIMINAL ACTION

9  RENA STINSON,     ) NO. 04-1694

10      Defendant.  )

11  _____/

12     TRANSCRIPT OF SENTENCING

13    MONDAY, OCTOBER 24, 2005

14

15    MONTGOMERY COUNTY COURTHOUSE

16      COURTROOM 3-A

17

18  BEFORE: THE HON. TRUMAN M. HOBBS, JR.

19      CIRCUIT JUDGE

20       APPEARANCES
21  FOR THE STATE:
   BRANDON HUGHES, ESQUIRE
22  MONTGOMERY, ALABAMA

23  FOR THE DEFENDANT:
   TOMMY GOGGANS, ESQUIRE
24  MONTGOMERY, ALABAMA

25      JUDY E. SHELTON
      OFFICIAL REPORTER

1              * * * * * * * * * * *

2              THE COURT:  Do you want a

3    formal sentencing hearing?

4              MR. GOGGANS:  No, sir.  We will

5    proceed on.

6              THE COURT:  Okay.  What do you

7    want to say?

8              MR. GOGGANS:  Your Honor, I

9    have reviewed the presentence report in

10   this case.  As the Court is aware, I was

11   not the trial lawyer in the case.  I am a

12   little bit behind the curve on addressing

13   any of those issues, which actually are

14   issues for another day anyway.

15             The presentence report

16   indicates on the health aspects that

17   there are heart problems.  Additionally

18   -- this is a little bit more recent.

19   There are some issues with cancer as well

20   which is more recent.  I have some

21   records here which I am showing the

22   prosecutor indicating that this is a

23   fairly recent diagnosis.

24             Ms. Stinson, what is the

25   diagnosis and treatment plan on that?

3

1          THE DEFENDANT:  When I left

2    Julia Tutwiler Prison, they had got a

3    report back in March and hadn't done

4    anything about it.  I had breast cancer.

5    So when I got back in September, my

6    husband rushed me to the doctor because I

7    had been in prison for six months with a

8    lump up under my nodes that hadn't been

9    treated.  So when I went to see the

10   cancer center, they had a biopsy done.

11   They said the cancer had -- was in my

12   breast.  Had moved to my lungs, my bone

13   sternum and the back of my neck because

14   they didn't do anything about it while I

15   was in prison.

16          I went to Dr. Franco.  My lungs

17   was eighty percent collapsed, and he had

18   to go in and drain some fluid off of my

19   lungs, Dr. Franco did, because they

20   hadn't treated me for my collapsed lung

21   before I got out of prison.  So now I am

22   going through therapy with Dr. Barnes,

23   and we got some alternative therapy we're

24   working on, plus hormone therapy, because

25   I didn't know whether or not how the

4

1    chemotherapy would work pending with what

2    was going on with me now.  So they are

3    doing some alternative therapy.

4            But while I was in prison, they

5    did not send me for care to catch this

6    tumor when they first saw it on the

7    mammogram.  So when I got out, I had to

8    go right away and have all this done.  So

9    that is what is going on with my medical.

10           MR. GOGGANS:  Ms. Stinson, have

11   they told you about how long this

12   treatment course will last?

13           THE DEFENDANT:  Well, right now

14   it is indefinite because they say I have

15   stage four cancer, and that's all I

16   know.  They don't say it is curable but I

17   have faith and I am trusting that God

18   -- that he still can heal me.  I can't

19   give up on that regardless how this

20   sickness spread throughout my body.  I

21   can't give up and give into it.  But I

22   had -- they didn't give me treatment.

23   They didn't send me off when I was at

24   Julia to get any care for it.  It had

25   just metastasized, they said.

1          THE COURT:  Anything else from
2     the defense?
3          MR. GOGGANS:  No, sir, Your
4     Honor.
5          MR. HUGHES:  Just to state,
6     Judge, Ms. Carol Ray, one of the victims,
7     is here.  She does not wish to speak.
8     There were three -- actually, four
9     victims in this case.  One of the victims
10    was not able to be here for Court.  So
11    her case was nolle prossed.
12          The defendant, Ms. Stinson, was
13    found guilty of three counts of theft.
14    As the Court was aware and heard in the
15    trial, basically she preyed on elderly
16    women and essentially wiped out their
17    savings account.  The state would just
18    ask for a sentence commensurate with that
19    act.
20          MR. GOGGANS:  Your Honor, as I
21    said, I have reviewed the presentence
22    report.  I understand the sentencing
23    range in the case.  They did recommend a
24    split sentence in light of the -- like I
25    say, the trial issues are another issue

6

1      for another day or another court perhaps,

2      but I do think the recommendation is not

3      unreasonable.

4                  THE COURT:  Let's see.  You are

5      invoking the habitual offender?

6                  MR. HUGHES:  Yes.  Three prior

7      felonies.

8                  MR. GOGGANS:  With the three

9      prior felonies, that makes the sentencing

10     range where the --

11                 THE COURT:  Well, I will give

12     you a choice.  You want a split or not?

13                 MR. GOGGANS:  The alternative

14     would be a straight twenty.

15                 THE COURT:  Yes.

16                 MR. GOGGANS:  We would rather

17     have the split.

18                 THE COURT:  Okay.  Twenty split

19     five with five years probation.  Court

20     costs.  Attorney fees, a hundred fifty

21     dollars.  Crime Victims, fifty dollars.

22     Is there restitution?

23                 MR. HUGHES:  Yes, Your Honor.

24     It is twenty-two thousand and sixty

25     dollars and sixteen cents.  I apologize,

1    Judge.  That's the amount less one of the
2    victims that did not show up.  Can I just
3    leave that open for today?  I have got to
4    sort all this out.  There is one victim
5    that did not show up.  She does not have
6    to pay restitution for that victim.
7            THE COURT:  Okay.  Do you
8    understand what this -- do you understand
9    the sentence, Ms. Stinson?
10           THE DEFENDANT:  Could I say
11   something, Judge.
12           THE COURT:  Sure.
13           THE DEFENDANT:  Judge, I stand
14   before you and I have been before this
15   Court before three times because I had a
16   gambling problem, and I wrote checks.
17   That's what I did.  I actually wrote
18   checks.
19           The first time I heard about
20   this was when it was brought to my -- I
21   never was here for an arrangement (sic).
22   I never was here for a preliminary
23   hearing.  Honestly, Judge, when they came
24   to see me while in Julia Tutwiler Prison,
25   they said my facial expression favored

8

1       the person who they was looking for.

2               God knows I did not do this,

3       sir.  I am sorry I favor the person who

4       did it but I have never met any of those

5       ladies.  During 12/3 when this was going

6       on, sir, I was working on a job.  I had a

7       contract with the state.  I had never had

8       a chance to even get on the stand to

9       testify.  My sympathy and heart goes out

10      to these ladies.  My attorney told me --

11              THE COURT:  Ms. Stinson, I'm

12      not going to retry the case.

13              THE DEFENDANT:  Okay.  I am not

14      asking you to retry the case.  What I am

15      trying to add, I never knew all of this

16      until I sit in your courtroom and heard

17      no one -- I never came before you to

18      plead guilty or not guilty.

19              MR. GOGGANS:  Ms. Stinson, that

20      is something we will take up at another

21      motion another day.

22              THE COURT:  Brandon, did we

23      ever arraign her?

24              MR. HUGHES:  I have it down

25      that she was arraigned on December 20th,

9

1    2004.  Winston Durant was appointed.

2    THE DEFENDANT:  I was at Julia

3    Tutwiler Prison.  I never appeared from

4    Julia Tutwiler for an arrangement or

5    preliminary hearing or nothing, no, sir.

6    THE COURT:  Okay.  Look, the

7    jury found you guilty.  That's all -- I

8    am giving you -- the minimum sentence you

9    can get is twenty years.

10    MR. HUGHES:  The only thing I

11    would say, Judge, you assessed a hundred

12    and fifty dollar attorney fee.  I think

13    she had a --

14    MR. GOGGANS:  I think the

15    previous counsel was retained, I believe.

16    THE COURT:  Was it?

17    MR. GOGGANS:  Yes.

18    THE COURT:  All right.  Thank

19    you for that.

20    MR. GOGGANS:  Your Honor, we

21    give oral notice of appeal at this time

22    and request an appeal bond be set.

23    (END OF PROCEEDINGS)

24

25

<u>C E R T I F I C A T E</u>

STATE OF ALABAMA        )
COUNTY OF MONTGOMERY    )


I, JUDY E. SHELTON, OFFICIAL COURT REPORTER IN AND FOR THE FIFTEENTH JUDICIAL CIRCUIT, MONTGOMERY COUNTY, ALABAMA, DO HEREBY CERTIFY THAT I REPORTED IN MACHINE SHORTHAND THE FOREGOING HEARING AS STATED IN THE CAPTION HEREOF; THAT MY SHORTHAND NOTES WERE LATER TRANSCRIBED BY ME OR UNDER MY SUPERVISION, AND THAT THE FOREGOING PAGES REPRESENT A FULL, TRUE AND CORRECT TRANSCRIPT OF SAID PROCEEDINGS; THAT I AM NEITHER KIN NOR OF COUNSEL TO ANY PARTIES IN THIS PROCEEDING NOR IN ANY WAY INTERESTED IN THE RESULTS THEREOF.

DATED THIS THE 3rd DAY OF January 2006.

*Judy E. Shelton*

JUDY E. SHELTON

OFFICIAL COURT REPORTER

APPELLATE DOCKET NUMBER CC-04-1694

IN THE COURT OF CRIMINAL APPEALS OF ALABAMA

RENA STINSON

APPELLANT

v.

STATE OF ALABAMA

APPELLEE

---

ON APPEAL FROM THE
CIRCUIT COURT OF MONTGOMERY COUNTY, ALABAMA
Case Number: CC-04-1694

---

BRIEF AND ARGUMENT
OF THE APPELLANT

---

RICHARD K. KEITH (KEI003)
Attorney for Appellant
KEITH & HAMM, P.C.
22 Scott Street
Montgomery, AL 36104
PH (334) 264-6776
FX (334) 265-5362



PENGAD 800-631-6989    EXHIBIT
B

## STATEMENT REGARDING ORAL ARGUMENT

The Appellant does not request oral argument is these proceedings.

## TABLE OF CONTENTS

Statement Regarding Oral Argument _____ ii

Table of Contents _____ iii

Statement of the Jurisdiction _____ iv

Table of Authorities _____ v

Statement of the Case _____ 1

Statement of the Issues _____ 3

Statement of the Facts _____ 4

Statement of the Standard of Review _____ 11

Summary of the Argument _____ 13

Argument _____ 15

    I. _____ 15

    II. _____ 18

Conclusion _____ 22

Appendix of Adverse Rulings _____ 23

Certificate of Service _____ 24

## STATEMENT OF THE JURISDICTION

The Court of Criminal Appeals of Alabama has jurisdiction to hear this appeal pursuant to § **12-3-10,** *Code of Alabama 1975.* The Circuit Court of Montgomery County, Alabama, had proper jurisdiction to hear the Appellant's criminal jury trial held on August 22, 2005 and the Appellant's sentencing hearing held on October 24, 2005, before the Honorable Truman S. Hobbs. The Appellant timely filed her Notice of Appeal with this Honorable Court on October 24, 2005. The undersigned filed his Notice of Appearance as counsel on appeal on November 30, 2005.

# TABLE OF AUTHORITIES

## CASES

### State

*Pearson v. State, 601 So.2d 1119 (Ala.Crim.App. 1992)* 12, 18, 20, 21

*Benson v. State, 473 So.2d 1131 (Ala. Cr. App., 1985)* 17

## STATUTES

§12-3-10, *Code of Alabama 1975* iv

§13A-8-3, *Code of Alabama 1975* 1, 4

§13A-8-4, *Code of Alabama 1975* 1, 4

§15-15-1, *Code of Alabama 1975* 16

## RULES

Rule 9.1, *A.R.Cr.P.* 15

Rule 14.1, *A.R.Cr.P.* 13

Rule 14.2, *A.R.Cr.P.* 11, 17

## CONSTITUTIONS

*Alabama Constitution of 1901, Art. 1 § 6* 17

## STATEMENT OF THE CASE

Appellant Rena Stinson was indicted on July 4, 2004 under a four (4) count indictment for Theft I and Theft II in violation of **§ 13A-8-3 and § 13A-8-4,** *Code of Alabama 1975.* (C 7, 8). Her case was subsequently set for trial before the Honorable Judge Truman S. Hobbs in the Circuit Court of Montgomery County, Alabama. (C 2).

Trial commenced on August 22, 2004, and was submitted to the jury the following day. The jury found the Appellant guilty of two counts of Theft I and one count of Theft II in violation of **§ 13A-8-3 and § 13A-8-4,** *Code of Alabama 1975* on August 23, 2005. (C 14). The sentencing hearing was set for September 19, 2005. (C 2). Sentencing commenced on October 24, 2005. (S 1).

At sentencing, the Court sentenced Appellant to three (3) twenty year split to serve five years sentences to be run concurrently. (C 2). Appellant was also ordered to pay restitution in the amount of $22,060.16 and $50.00 to the Crime Victim's Compensation Fund. (C 2).

1

The Appellant timely filed her Notice of Appeal with this Honorable Court on October 24, 2005. (C 2). The undersigned filed his Notice of Appearance as Appellant's counsel on November 30, 2005.

## STATEMENT OF THE ISSUES

### I.

WHETHER THE TRIAL COURT ABUSED ITS DISCRETION IN DENYING THE DEFENDANT'S STATUTORY RIGHT TO ARRAIGNMENT?

### II.

WHETHER THE DEFENDANT'S CONVICTIONS FOR THEFT 1 AND THEFT 2 WERE AGAINST THE SUFFICIENCY OF THE EVIDENCE PRESENTED AT TRIAL?

## STATEMENT OF THE FACTS

Appellant Rena Stinson (hereinafter "Stinson") was indicted, on July 9, 2004 under a four (4) count indictment for Theft I and Theft II in violation of § §13A-8-3 and §13A-8-4, *Code of Alabama 1975*. On December 20, 2005, Ms. Stinson's presence was waived as to her arraignment, without her knowledge or signature, and she never received an arraignment at any later date. Her case was set before the Honorable Judge Truman Hobbs in the Circuit Court of Montgomery County, Alabama. A jury was struck on August 22, 2005 and trial commenced on that day.

The factual basis for the Appellant's conviction stems from the lack of positive identification at trial. The Appellant was found to have been involved in the thefts of property by "flim-flam" scams, whereby the jury found that trial identifications of the defendant were sufficient not to acquit Stinson on all three counts tried.

The State first called victim Carol Ray to testify Carol Ray to testify concerning her account of the theft on April 9, 2003. (R 32). Ms. Ray testified that

4

she was returning a shopping buggy in the Wal-Mart parking lot on Atlanta Highway at approximately 1:30 p.m. when the thief approached her (R 33). The thief told her she had found a bag full of money and would split it with Ms. Ray upon getting advice from her friend, an attorney. (R 35-36). Upon convincing Ms. Ray to retrieve money from her bank, the thief took the money from her to take it to the attorney in Wal-Mart, and then ran off with Ms. Ray's money, not to be seen again. (R 39). Ms. Ray then proceeded to identify from a police photograph-lineup the woman she previously identified, two years prior to the court date. (R 42). Upon cross-examination, Ms. Ray admitted that she was not sure if the photographs she saw in court were the same as the photographs shown to her at the police station:

> Q: Are you positive that those are the same photographs that were shown to you at the police station?
>
> A: I'm not positive. It looked like them but that's been a long time ago.
>
> Q: You're right, that has been a long time ago.
>
> A: A long time ago.

Q: It resembles them but you're not quite
   sure that that's them?

A: I'm not one hundred percent positive now
   on what I saw two years ago.

(R 46-47). Ms. Ray further testified that the thief had

a good bit of makeup on, a light-complected black

female and was a little bit taller than her but nothing

more specific. (R 48-49).

The state then called their second witness, Ms.

Emma Jean Anderson. (R 51). Ms. Anderson is a seventy-

two year old woman who had problems identifying Stinson

in court. (R 52). When asked if she recognized the

person that took her money on April 28, 2003, Ms.

Anderson said "it's been so long" and said she was not

sure if the thief was in the court room and never

positively identified Stinson in court. (R 52). Further

demonstrating lack of memory, Ms. Anderson stated,

before that moment she never saw the line-up (State's

exhibit #2) that the State purported that she was

previously shown. (R 57).

After having trouble identifying certain parts of

the correct dates on State's exhibit #3, which was the

information card she signed after viewing a lineup on

the date of the crime, Ms. Anderson did recognize her own handwriting but admitted she did not know if the pictures were the same. (R. 59). Ms. Anderson only read from the paper that she picked number four from the information card after leading questions prompted her to admit so. (R 59).

Upon cross-examination, Ms. Anderson said she did not remember any features of the thief except "the hair was different" from the line-up photos, and that she could not identify the thief on her own. (R 62).

The State then called its third witness, Ms. Eva Williams. (R 62). Ms. Williams recalled the same facts surrounding the Wal-Mart scam, except she was in the parking lot of Sears. (R 63). Ms. Williams was told to go to Burlington Coat factory where this time, the supposed office manager would take the serial numbers from the found money. (R 66). Ms. Williams went to MAX credit union and withdrew $1500 from her account.

Ms. Williams then picked out Stinson's picture from State's exhibit 4, another line-up, but didn't remember signing the identification information card, until leading questions prompted that response. (R 71-

72). Upon cross-examination, Ms. Williams admitted that she did not remember any facial features of the thief, but only that her teeth were not straight and she had a wig (R. 73). Further proving she did not remember who took her money; Ms. Williams said she was not sure of the skin complexion of the thief. (R 74). Then upon re-direct, Ms. Williams was asked to identify the thief in court, stating she "thinks that is the woman" and could not describe anything distinguishing Stinson as the thief. (R 75).

The State then called its fourth and final witness, Detective Jason Roberts. (R 76). Detective Roberts personally saw Stinson and used her photo from the police database in the line-ups, but did not question her until later. (R 79). After compiling the line-up photos for the victims to view, all three photo-arrays put Stinson in the fourth position, and all three victims picked number four. (R 81). Upon questioning Stinson after these identifications, Stinson denied all allegations. (R 83). However, against an irrelevancy objection by Stinson's attorney,

the court allowed Detective Roberts to say that Stinson told him she had a gambling problem. (R 85).

Defense counsel then moved for a directed verdict which was denied. Upon that denial, the defense rested and renewed their motion to another denial, concluding the State and Defense cases. (R 88).

The jury was then charged with two counts of Theft I and one count of Theft II, and ultimately ruled Stinson guilty on all three counts. (R 121). The jury came to this conclusion after admitting to the judge that they were not sure on the facts upon which they convicted Stinson. (R 119). One juror told the judge that they were not sure on the actual identification on Stinson by a testifying witness, and the judge admonished them to decide without correct knowledge of all the facts, and told the jury it was getting close to 5:00 p.m. and time to go. (R 119-120). Here, the court learned of the heart problems and newly developed cancer attacking Stinson. (S 2). The court also was informed that Stinson was never actually arraigned; yet still, the court gave Stinson twenty years in prison. (S 9). Additionally Appellant Stinson was ordered to

pay $150 attorney's fees and $22,060.16 in restitution
(CAS 2).

## STATEMENT OF THE STANDARD OF REVIEW

### I.

**WHETHER THE TRIAL COURT ABUSED ITS DISCRETION IN DENYING THE DEFENDANT'S RIGHT TO AN ARRAIGNMENT?**

This issue should be reviewed *de novo* as a failure to arraign the Appellant is not harmless error under **Rule 14.2 (e),** *A.R.Cr.P.,* because the committee comments state that a plea of not guilty can only be entered when acknowledged by a defendant, through a written plea. This acknowledgement can only be satisfied by the receipt of a written copy of the charge against that defendant. None of these statutory requirements were met and thus the Appellant requires a trial *de novo.*

### II.

**WHETHER THE DEFENDANT'S CONVICTIONS FOR THEFT I AND THEFT II WERE AGAINST THE SUFFICIENCY OF THE EVIDENCE PRESENTED AT TRIAL?**

"A reversal based on the weight of the evidence... draws the appellate court into questions of credibility. The 'weight of the evidence' refers to a 'determination' by the trier of fact that a greater amount of credible evidence supports one side of an

11

issue or cause that the other." <u>Tibbs v. Florida</u>, 457 U.S. 31, 37-38, 102 S.Ct. 2211...(1982)...." **<u>Pearson v. State</u>**, *601 So.2d 1119 (Ala.Crim.App. 1992)*.

12

## SUMMARY OF THE ARGUMENT

### I.

**THE TRIAL COURT ABUSED ITS DISCRETION IN DENYING THE DEFENDANT'S RIGHT TO RIGHT TO ARRAIGNMENT.**

Ms. Stinson's due process was denied as her presence at her arraignment was waived without her express consent and she was never given opportunity to be heard before trial. The State charged Ms. Stinson with four counts of Theft, which the jury convicted her on the three brought before them.

### II.

**THE DEFENDANT'S CONVICTIONS FOR THEFT I AND THEFT II WERE AGAINST THE SUFFICIENCY OF THE EVIDENCE PRESENTED AT TRIAL.**

The evidence and testimony presented to the fact-finder was insufficient to warrant Stinson's convictions for Theft I and Theft II. Though Stinson neither testified nor presented evidence or testimony on her behalf (as she was not required to), the presumption of innocence remains constant throughout. Each of the three victim's testimony was incredible, as none could positively identify Stinson without pictures

that two of three witnesses did not remember seeing the
first time.

## ARGUMENT

### I.

**THE TRIAL COURT ABUSED ITS DISCRETION IN DENYING THE DEFENDNANT'S RIGHT TO AN ARRAIGNMENT.**

Appellant Stinson did not sign any waiver of arraignment, nor was she permitted to appear at her scheduled arraignment, on December 20, 2004, and thus did not receive mandatory due process as afforded by the laws of Alabama. (CAS 11)(S 8, 9).

According to **Rule 9.1 (a)**, *A.R.Cr.P.*, the defendant has the right to be present at the arraignment, along with every other stage of the trial. **Rule 9.1 (b)**, *A.R.Cr.P.*, specifically states that the defendant may only waive their right to be present at any proceeding in the following manner: (i) With the consent of the court, and by an understanding *and voluntary waiver in open court*, or by a *written consent executed by the defendant*, and by the defendant's attorney of record, filed in the case. Section (ii) states that the only other way to waive arraignment is that the defendant's absence be *voluntary* and that the defendant *have notice of the time and place of the proceeding and was informed of the right to be present.*

15

Stinson was not afforded the opportunity to an arraignment, nor any notice to that arraignment. Therefore, the denial of her appearance, much less notice to appear, severely abrogated her due process under ARCP, Rule 14.1. Section (a) provides that *no defendant shall be tried for the commission of any misdemeanor or felony offense until (s)he has been arraigned in open court.* Section (b) provides exceptions to this rule, including a waiver by defendant's counsel and a plea of not guilty, *signed by the defendant* and counsel...*acknowledging receipt by the defendant of a copy of the charge against him.*

The committee comments to Rule 14.2 further state that satisfaction of the not-guilty plea entered is only met when a written copy of the defendant's written plea of not guilty is acknowledged by the defendant. Appellant Stinson never was afforded the opportunity to plea not guilty. Furthermore, because she did not stand mute before a judge, **§15-15-1, *Code of Alabama 1975*,** does not apply, and the court was not allowed to enter a not guilty plea for her. She never signed a written plea, not allowing her to receive a written copy of

16

that plea, and thus her acknowledgement was therefore impossible, and no satisfaction of **Rule 14.2, A.R.Cr.P.**, could be had.

Stinson never received any notice of arraignment (violating the requirement set out by Art. 1, §6 of the Alabama Constitution of 1901), nor did she receive the opportunity to waive that arraignment. Because she was never made aware of the charges in open court, nor was she given the opportunity to plea guilty or not guilty and no signature of hers appeared on any waiver of any kind, no acknowledgement of the receipt of the charges against her were known to Stinson, thus statutorily violating her due process under the Alabama Rules of Criminal Procedure.

Alabama upholds that when arraignment is not waived, the resulting conviction is invalid when the counsel brings the issue of failure to arraign at trial. **Benson v. State**, *473 So.2d 1131 (Ala. Cr. App.,1985)*. While Stinson's counsel did not bring the issue at trial, she did herself to the judge, who dismissed it quickly at the end of the trial record. By the Article 1, §6 of the Alabama Constitution, the

17

Alabama Rules of Criminal Procedure, and the case law of the state, Stinson is entitled to an trial *de novo* as a matter of law, for the lower court's failure to afford her an arraignment, or even the notice and opportunity to be heard through a waiver, which she never was given the option to consider. The court did not recognize this during trial, even when Stinson brought it to the court's attention, and for this failure, the law entitles her to a new trial.

II.

**THE DEFENDANT'S CONVICTIONS FOR THEFT I AND THEFT II WERE AGAINST THE SUFFICIENCY OF THE EVIDENCE PRESENTED AT TRIAL.**

Appellant Stinson maintains that the evidence presented against her at trial was not sufficient to support her convictions for Theft I and Theft II.

A conviction rests upon insufficient evidence when, even after viewing the evidence in the light most favorable to the prosecution, no rational fact-finder could have found the defendant guilty beyond a reasonable doubt." **Pearson v. State**, *601 So.2d 1119 (Ala.Crim.App. 1992).* The evidence in the case against Stinson not only did not prove guilt beyond a

reasonable doubt, but did not present one testimony that was not overshadowed by reasonable doubt.

The State first called victim-witness, Carol Ray to testify to the "flim-flam" scam, which deprived her of $9500. Ms. Ray pointed to the defendant's chair, to identify Stinson, but said that she "had a different hair." Ms. Ray picked out "number four" as the other witnesses, did as well, even when they didn't remember the pictures, themselves. On cross-examination, Ms. Ray did admit that she was not sure that the photographs are even the same as the ones she saw previously, because it had been two years since the event. Ms. Ray then told the jury that she was actually not sure of what she saw two years ago, but that Stinson had "like features" and that was the extent of her memory, as Ms. Ray is seventy-five years old.

The State then called Emma-Jean Anderson, who is seventy-two years old. Ms. Anderson expressly told the court she could not identify Stinson as the person that scammed her. Ms. Anderson did not remember who she saw, nor what she heard. Ms. Anderson even stated that she had never seen the line-up that she supposedly

19

identified Stinson with, after the theft. Ms. Anderson
only remembered the number four from the lineup, but
she couldn't remember any other features of the lady
that stole from her, very much like Ms. Ray.

Next the State called Ms. Eva Williams, who is
seventy-nine years old to the stand. Ms. Williams says
she only remembers a wig from the day she was scammed,
but she does identify Stinson in court. After the three
elderly women recalled a wig, a black lady, and number
four on a photo-lineup, which they did not recall
seeing, but only that number, there is a doubt, which a
reason can be assigned to in this case.

**Pearson** states that even in light most favorable
to the prosecution, a reasonable fact-finder must not
be able to form one doubt that a reason could be
assigned to, in order to find the defendant guilty.
With all three fact witnesses not remembering the
person who stole from them, there are multiple doubts
which reason may be assigned to.

Because reasonable doubt is a legal standard
applied to facts, the role of the appellate court is
not to say what the facts are. [Their role] is to judge

whether the evidence is legally sufficient to allow submission of an issue for decision by the jury." All victim-witnesses could not remember more than a wig and similar features on the woman that robbed them, and they admitted so in court. With the trouble from the memory, the admitted lack of surety of the defendant, and the agreement that they remembered the number, rather than the picture in the lineup, there are multiple doubts, which reason may be assigned to many particular facts, and therefore this case did not fall within **Pearson** beyond reasonable doubt standard. The State failed to meet its burden of proof and Stinson's conviction is against the sufficiency of the evidence and testimony presented at trial. Thus, Appellant Stinson is due a reversal of her conviction and sentence and is due a trial *de novo*, free from prejudice, and as the interests of justice require.

## CONCLUSION

The Appellant seeks to have her conviction and sentence reversed due to the trial court's failure to properly arraign or even give notice of arraignment to the appellant before trial began, against her rights, according to the Constitution of Alabama, along with the Alabama Rules of Criminal Procedure. The verdict against the Appellant was rendered without facts sufficient to the evidence to form a doubt which no reason could be assigned to, according to the record. The jurors heard testimony that was unsound, doubtful, and even contradictory, which led the jurors to ask the court for help in their verdict because they were not even sure of what they heard. Upon the court's denial, the guilty verdict was improperly levied against the Appellant and therefore the Appellant seeks to have her conviction and sentence reversed and remanded for a trial *de novo* as the interests of justice require.

**RESPECTFULLY SUBMITTED**, this the 15th day of March, 2006.

_Richard K. Keith_
**RICHARD K. KEITH (KEI003)**
Attorney for Appellant

22

## APPENDIX OF ADVERSE RULINGS

1. Defendant's Motion for Judgment of Acquittal by Trial Court on January 1, 2006 (CR 28).

## CERTIFICATE OF SERVICE

I hereby certify that I have served a copy of the foregoing Brief and Argument upon the Honorable Lane W. Mann, Clerk, Court of Criminal Appeals of Alabama, and the Alabama Office of Attorney General, Appeals Division, by placing copies of the same in the U.S. Mail, postage pre-paid and properly addressed, on this 15th day of March 2006.

RICHARD K. KEITH (KEI003)
Attorney for Appellant
**KEITH & HAMM, P.C.**
22 Scott Street
Montgomery, AL 36104
PH (334) 264-6776
FX (334) 265-5362

24

CR-05-0182

=====

In the *COURT of CRIMINAL APPEALS*
*of ALABAMA*

———————◆———————

RENA DORSEY STINSON,

Appellant,

v.

STATE OF ALABAMA,

Appellee.

———————◆———————

*On Appeal From the Circuit Court of*
*Montgomery County (CC-2004-1694)*

=====

**BRIEF OF APPELLEE**

Troy King
*Attorney General*

Beth Slate Poe
*Assistant Attorney General*

Audrey Jordan
*Assistant Attorney General*
Counsel of Record*

State of Alabama
Office of the Attorney General
11 South Union Street
Montgomery, Alabama  36130-0152
(334) 242-7300*

April 12, 2006

EXHIBIT

C

PENGAD 800-631-6989

## STATEMENT REGARDING ORAL ARGUMENT

Oral argument in this case is not necessary because the record and briefs in this case adequately set forth the facts and law.  Ala. R. App. Pro. 34.

i

## TABLE OF CONTENTS

STATEMENT REGARDING ORAL ARGUMENT.......................... i

TABLE OF CONTENTS........................................ ii

TABLE OF AUTHORITIES.................................... iii

STATEMENT OF THE CASE.................................... 1

ISSUES PRESENTED FOR REVIEW............................. 3

STATEMENT OF THE FACTS.................................. 4

STANDARDS OF REVIEW.................................... 10

SUMMARY OF THE ARGUMENT................................ 11

ARGUMENT.............................................. 12

I.   Stinson Waived The Issue Of Whether She Was Denied
     Her Due Process Right To Arraignment Because She
     Failed To Object To The Lack Of Arraignment Before
     The Jury Returned Its Verdict...................... 12

II.  The State Presented A Prima Facie Case Of First And
     Second Degree Theft Of Property And, Therefore, The
     Case Was Properly Submitted To The Jury For A
     Determination Of Guilt............................ 17

CONCLUSION............................................ 22

CERTIFICATE OF SERVICE................................ 23

## TABLE OF AUTHORITIES

**Cases**

Benson v. State, 473 So. 2d 1131, 1132 (Ala. Crim.
  App. 1985) ........................................... 13

Blount v. State, 876 So. 2d 509, 512 (Ala. Crim.
  App. 2003) ........................................... 17

Brewer v. State, 497 So. 2d 567, 569 (Ala. Crim.
  App. 1986) ........................................... 18

Fortier v. State, 515 So. 2d 101, 106 (Ala. Crim.
  App. 1987) ........................................... 21

Johnson v. State, 453 So. 2d 1323, 1324, 1328
  (Ala. Crim. App. 1984) ........................... 13, 20

Marsden v. State, 475 So. 2d 588, 588 (Ala. 1984) ....... 12

Mayfield v. State, 641 So. 2d 1294, 1295 (Ala.
  Crim. App. 1994) ..................................... 18

Miller v. State, 602 So. 2d 488, 497(Ala. Crim.
  App. 1992) ........................................... 20

Pender v. State, 740 So. 2d 482, 484 (Ala. Crim.
  App. 1999) ........................................... 13

Ray v. State, 809 So. 2d 875, 884-85 (Ala. Crim.
  App. 2001) ........................................... 13

Rowell v. State, 647 So. 2d 67, 69-70 (Ala. Crim.
  App. 1994) ........................................... 20

Smith v. State, 745 So. 2d 922, 934 (Ala. Crim.
  App. 1999) ........................................... 20

Watts v. State, 460 So. 2d 204, 206 (Ala. 1983) ......... 12

Woods v. State, 724 So. 2d 40, 48 (Ala. Crim.
  App. 1997) ........................................... 17

**Other Authorities**

Code of Alabama (1975),

   Section 13A-8-3(a) ................................... 18

   Section 13A-8-4(a) ................................... 18

## STATEMENT OF THE CASE

This is an appeal from the conviction in the Circuit Court of Montgomery County, Alabama of two counts of first-degree theft of property and one count of second-degree theft of property (CC-2004-1694).   Judge Truman Hobbs presided.

Rena Dorsey Stinson, the appellant in this case, was indicted by a Montgomery County Grand Jury on July 9, 2004, and charged with three counts of first-degree theft of property in violation of Section 13A-8-3 of the Code of Alabama (1975) and one count of second-degree theft of property in violation of Section 13A-8-4 of the Code of Alabama (1975).  (C. 6-8)  On December 20, 2004, Mr. Winston Durant was appointed to represent Stinson.  (C. 1) On May 2, 2005 Ms. Cynthianther L. May entered a notice of appearance on behalf of Stinson.  (C. 1)

On August 22, 2005, the trial court granted the State's motion to nolle pros count three of the indictment – first-degree theft of property – and trial commenced on the remaining three counts.  (R. 18)  On August 23, 2005, the jury found Stinson guilty of two counts of first-degree theft of property and one count of second-degree theft of

property.  (C. 14; R. 121) (C. 37; R. 498)  On September

23, 2005, May filed a motion to withdraw as counsel because

Stinson retained new legal representation.  (C. 15)

On October 24, 2005, the trial court sentenced Stinson,

who was represented by Mr. Thomas M. Goggans at sentencing,

to twenty years' imprisonment on each count.  (C. 2)  The

trial court ordered Stinson's sentences split to serve five

years and that each sentence run concurrently.  (C. 2)  The

trial court also ordered Stinson to pay $22,060.16 in

restitution and $50 to the Crime Victim's Assessment Fund.

(C. 2)  Stinson provided oral notice of appeal.  (Sent.[1] R.

9)  On November 21, 2005, Stinson, through retained counsel

Goggans, filed a motion for judgment of acquittal.  (C. 28-

29)  The trial court denied Stinson's motion on January 9,

2006.

---

[1]Sent. R. references the transcript for the sentencing
hearing.

2

## ISSUES PRESENTED FOR REVIEW

I.  Was Stinson denied her due process right to arraignment?

II.  Did the trial court properly deny Stinson's motion for judgment of acquittal?

3

## STATEMENT OF THE FACTS

On April 9, 2003, around 1:30 p.m., seventy-five-year-old Carol Ray was placing items she had purchased from Wal-Mart inside the trunk of her vehicle. (R. 32)  She took the shopping cart to a shopping cart rack and, when she returned to her vehicle, she noticed a "zipper bag right by [her] door." (R. 33)  Immediately, a woman, later identified as Rena Dorsey Stinson, appeared at Ray's vehicle and picked up the bag. (R. 33)  Stinson opened the bag and Ray saw that it "was full of money." (R. 33)  The bag also contained a note stating something to the effect that "this is yours, the big boys got theirs." (R. 33)

Stinson asked Ray what they should do with the money. (R. 34)  Ray suggested contacting the police, however, Stinson dismissed the idea and stated that the money was "drug money and they will just take it." (R. 34)  Stinson suggested that they "talk about it" and got into Ray's vehicle. (R. 34)  At this time, Stinson began speaking with a man on her cellular telephone. (R. 35)  She also held Ray's hand. (R. 35)  Stinson identified herself as a Wal-Mart employee and identified the man she was speaking

4

to as an attorney for Wal-Mart.  (R. 35)  Ray spoke

momentarily to man.  (R. 35)

He told Stinson that he was in a meeting inside Wal-

Mart and continually spoke about the fact "he was on the

New York stock exchange."  (R. 35-36)  He informed Stinson

and Ray that he needed serial numbers "[o]ff of the

money...to run it through some way."  (R. 36)  Stinson

stated that she and Ray needed money and asked Ray to drive

her to the bank.  (R. 36)  Ray dropped Stinson off at the

bank and then drove next door to her own bank, Comala

Credit Union.  (R. 37)  Ray withdrew $9,500, leaving $1,000

in her savings account.  (R. 37)  Ray returned to Stinson's

bank where Stinson was waiting.  (R. 37)

Ray and Stinson returned to Wal-Mart.  (R. 37)  Stinson

stated that she would take the "money and let him get - -

[that] they had a machine supposedly that he could get the

[serial] numbers off the money."  (R. 39)  Ray followed

Stinson inside Wal-Mart to the customer service area.  (R.

39)  Stinson informed Ray that she could not "go back there

where he [wa]s in the meeting."  (R. 39)  Stinson then

turned around and ran away with Ray's money.  (R. 39)  Ray

5

attempted to follow Stinson, but "lost her."  (R. 39)  Ray

returned to the customer service area where an employee

contacted store security and the police.  (R. 40)

On April 28, 2003, seventy-two-year-old Emma Jean

Anderson was approached by a black female when she was

about to enter her vehicle parked in the Winn-Dixie parking

area.  (R. 52)  The woman, later identified as Stinson,

began talking to Anderson and opened a purse.  (R. 53)  As

a result of their conversation, Anderson and Stinson drove

to the nearby the mall where Anderson's bank was located.

(R. 53-54)  Anderson withdrew $3,000 from her account.  (R.

54)  Per Stinson's instructions, Anderson drove them to the

mall and then went inside the mall about ten minutes.  (R.

54-55)  Stinson remained inside Anderson's vehicle with

Anderson's money.  (R. 54-55)  Realizing that she had been

"robbed", Anderson returned to her car, but Stinson – along

with Anderson's money -- was gone.  (R. 55)  Anderson went

home and told her daughter about the incident.  (R. 56)

They subsequently reported the incident to the police.  (R.

56)

On June 25, 2003, seventy-nine-year-old Eva Williams

was approached in the Sears parking area by a woman who identified herself as "Shirley." (R. 63-64) Williams was about to get into her vehicle when Shirley, later identified as Stinson, asked Williams if the wallet Stinson was holding was hers. (R. 64) Williams stated that it was not her wallet. (R. 64) Stinson stated she was unsure what to do with the wallet. (R. 64) Williams suggested taking the wallet inside Sears and let their office handle it. (R. 64-65) Stinson replied "I don't think I should do that." (R. 65) Williams then suggested that Stinson give the wallet to the security guard. (R. 65) Stinson responded that she was not "going to give it to the security guard" and then opened the wallet showing Williams "all this money." (R. 65) Stinson "kept saying she didn't know what to do." (R. 65) She began speaking to a man on speaker phone. (R. 65) Stinson identified herself and the man as office employees of Burlington Coat Factory ("Burlington"). (R. 65) The man told Stinson to bring the wallet to him at Burlington to determine what should be done and suggested that Williams drive her. (R. 66) Williams drove Stinson to Burlington and Stinson went

7

inside the store.  (R. 66)  She returned to Williams's
vehicle shortly thereafter and stated that the man "wanted
to know if [Williams] could give them some money so they
could get the serial numbers."  (R. 66)  The man informed
Stinson that the money was "drug money" and they convinced
Williams to go to her bank, Max Credit Union, and withdraw
$1,500.  (R. 67)  After the withdrawal, Williams's account
retained $8.  (R. 67)

Williams and Stinson returned to Burlington.  (R. 68)
Stinson went inside the store with Williams's money to
"take the serial numbers off."  (R. 68 )  Stinson returned
to Williams's vehicle and informed her that she would bring
Williams's money back outside briefly.  (R. 68-69)  Stinson
returned inside the store. (R. 68-69)  At this time,
Williams realized that she had been "scammed" and contacted
the police.  (R. 69)  Williams never saw Stinson exit the
store from where she was parked.  (R. 69)  When the police
arrived, they questioned store employees who confirmed that
no person fitting Williams's description worked there.  (R.
69)

On April 13, 2004, Ray, Anderson, and Williams

8

## STANDARDS OF REVIEW

I.   Constitutional claims of due process are waived when not timely presented to the trial court.  *See* <u>Watts v. State</u>, 460 So. 2d 204, 206 (Ala. 1983).  *See generally* <u>Puckett v. State</u>, 680 So. 2d 980, 983 (Ala. Crim. App. 1996).

II.   This Court, in reviewing the trial court's denial of a motion for judgment of acquittal, must determine "whether there existed legal evidence before the jury, at the time the motions were made, from which the jury by fair inference could have found the defendant guilty beyond a reasonable doubt."  <u>Kabat v. State</u>, 867 So. 2d 1153, 1160 (Ala. Crim. App. 2003).  This Court must view the evidence in the light most favorable to the State.  *See* <u>Fitch v. State</u>, 851 So. 2d 103, 120 (Ala. Crim. App. 2001).

## SUMMARY OF THE ARGUMENT

Stinson has waived her claim that she was denied due process when the trial court failed to arraign her because this issue was not raised before the jury returned its verdict.  Additionally, the State presented a prima facie case for two counts of first-degree theft of property and one count of second-degree property.  Any inconsistencies or discrepancies by the victims in identifying Stinson as the perpetrator goes to the weight and credibility of their testimony and is a question of fact for the jury to determine.

11

## ARGUMENT

I.  **Stinson Waived The Issue Of Whether She Was Denied Her Due Process Right To Arraignment Because She Failed To Object To The Lack Of Arraignment Before The Jury Returned Its Verdict.**

Stinson contends that she was denied her right to due process when she failed to be arraigned.  She argues that she "never received any notice of arraignment", that she did not waive her right to arraignment, and that she was never actually arraigned.  (Stinson's brief, pg. 17.) Thus, Stinson avers that she was never informed of the charges and is entitled to "a[] trial de novo as a matter of law."  (Stinson's brief, pg. 18.)  Because Stinson effectively waived her right to arraignment, this issue does not warrant reversal on appeal.

A defendant's claim that she was denied her due process rights because she was not arraigned is waived when she failed to raise this issue before the jury returned its verdict.  *See* Watts v. State, 460 So. 2d 204, 206 (Ala. 1983) (defendant waived claim that he was not arraigned on substitute indictment); Marsden v. State, 475 So. 2d 588, 588 (Ala. 1984) ("[E]ven though Marsden was not formally arraigned[,] he had waived arraignment by pronouncing his

12

After the trial court imposed Stinson's sentence, the following discussion occurred:

[Court]: Okay. Do you understand what this - - do you understand the sentence, Ms. Stinson?

[Stinson]: Could I say something, Judge.

[Court]: Sure.

[Stinson]: Judge, I stand before you and I have been before this Court before three times because I had a gambling problem, and I wrote checks. That's what I did. I actually wrote checks.

The first time I heard about this was when it was brought to my - - I never was here for an arrangement (sic). I never was here for a preliminary hearing. Honestly, Judge, when they came to see me while in Julia Tutwiler Prison, they said my facial expression favored the person who they was looking for.

God knows I did not do this, sir. I am sorry I favor the person who did it but I have never met any of those ladies. During 12/3 when this was going on, sir, I was working on a job. I had a contract with the state. I had never had a chance to even get on the stand to testify. My sympathy and heart goes out to these ladies. My attorney told me - -

[Court]: Ms. Stinson, I'm not going to retry the case.

[Stinson]: Okay. I am not asking you to retry the case. What I am trying to add, I never knew all of this until I sit in your courtroom and heard no one - - I never came before you to plead guilty or not guilty.

[Defense Counsel]: Ms. Stinson, that is something

14

we will take up at another motion another day.

[Court]: Brandon, did we ever arraign her?

[Mr. Hughes]: I have it down that she was
arraigned on December 20th, 2004. Winston Durant
was appointed.

[Stinson]: I was at Julia Tutwiler Prison. I never
appeared from Julia Tutwiler for an arrangement
(sic) or preliminary hearing or nothing, no, sir.

[Court]: Okay. Look, the jury found you guilty.
That's all – – I am giving you – – the minimum
sentence you can get is twenty years.

(Sent. R. 7-9)

Foremost, the record does not support Stinson's

contention that an arraignment was not held.  The case

action summary sheet shows that she was arraigned on

December 20, 2004.  (C. 1)  It further notes that Winston

Durant was appointed trial counsel and that Stinson's

presence was waived.  (C. 1)  Stinson's arraignment date is

further noted on her pro se motion for a speedy trial and

by the trial court when the issue was brought to his

attention.  (C. 11; Sent. R. 8-9)  Thus, though clearly an

arraignment hearing was held, it is not clear from the

record whether Stinson waived her right to be present.

Assuming, though not conceding, that Stinson did not

15

waive her right, through counsel, to be present at arraignment, she has waived her claim that her due process rights were violated. During the two-day trial, Stinson did not bring to the trial court's attention that she had not been arraigned. Instead, she proceeded through jury selection, witness testimony, and jury instructions as though she had been arraigned and a formal plea of not guilty had been given.

Stinson admitted that she is not a novice to the Alabama court system. (Sent. R. 7) She has three prior felony convictions. (C. 2) Yet, Stinson waited until October 24, 2004, sixty-one days following the jury's verdict, to inform the trial court, after it had imposed a twenty-year sentence, that she had been denied this right. Thus, because Stinson never raised the issue before the jury returned its verdict, her formal waiver of arraignment is conclusively implied and reversal is not warranted.

II.  **The State Presented A Prima Facie Case Of First And Second Degree Theft Of Property And, Therefore, The Case Was Properly Submitted To The Jury For A Determination Of Guilt.**

Stinson contends that the State failed to present a prima facie case of her convictions for two counts of first-degree theft of property and one count of second-degree theft of property.  Stinson only appears to argue that the State failed to prove the identity of the assailant.  This contention is without merit.

When determining the sufficiency of evidence, this Court must decide whether in "viewing the evidence in the light most favorable to the prosecution, a rational finder of fact could have found the defendant guilty beyond a reasonable doubt." Blount v. State, 876 So. 2d 509, 512 (Ala. Crim. App. 2003). *See also* Woods v. State, 724 So. 2d 40, 48 (Ala. Crim. App. 1997).  This Court may not determine what the facts are, but must "judge whether the evidence is legally sufficient to allow submission of an issue for decision [by] the jury." Id.  Moreover, "circumstantial evidence may form the proof of the corpus delicti; '[i]f facts are presented from which the jury may reasonably infer that the crime has been committed the

17

question must be submitted to the jury.'" <u>Woods</u>, 724 So. 2d at 48.

Section 13A-8-3(a) of the Code of Alabama (1975) provides that "[t]he theft of property which exceeds two thousand five hundred dollars ($2,500) in value, or property of any value taken from the person of another, constitutes theft of property in the first degree." Section 13A-8-4(a) of the Code of Alabama (1975) provides that "[t]he theft of property which exceeds two hundred fifty dollars ($250) in value but does not exceed one thousand dollars ($1,000) in value, and which is not taken from the person of another, constitutes theft of property in the second degree." This Court has held that "[t]he testimony of the victim alone may be sufficient to establish a prima facie case." <u>Brewer v. State</u>, 497 So. 2d 567, 569 (Ala. Crim. App. 1986). *See also* <u>Mayfield v. State</u>, 641 So. 2d 1294, 1295 (Ala. Crim. App. 1994).

The record establishes that, on April 9, 2003, a woman identified both in court and in an out-of-court photographic lineup by Ray as Stinson, took $9,500 from Ray. (R. 39) The record also shows that, on April 29,

18

2003, Stinson, identified by Anderson in an out-of-court photographic lineup, took $3,000 from Anderson. (R. 55) The record further establishes that, on June 25, 2003, Stinson, whom Williams identified in court and in an out-of-court photographic lineup, took $1,500 from Williams. (R. 68-69) In each instance, the victims did not give Stinson the money, but rather expected her to return the money. Thus, there is sufficient evidence to establish that Stinson committed two counts of first-degree theft of property and one count of second-degree theft of property. Because the State presented a prima facie case of both first and second degree theft of property, the trial court properly submitted the issue of guilt to the jury.

Moreover, the basis of Stinson's complaint, however, is not the sufficiency of the evidence, but rather the credibility and weight of the evidence. This Court has previously noted that

> The *weight* of the evidence is clearly a different matter from the *sufficiency* of the evidence. The *sufficiency* of the evidence concerns the question of whether, viewing the evidence in the light most favorable to the prosecution, [a] rational fact finder could have found the defendant guilty beyond a reasonable doubt.
>
> In contrast, the '*weight* of the evidence'

19

> refers to a determination [by] the trier of fact that a greater amount of credible evidence supports one side of an issue or cause than the other. "We have repeatedly held that it is not the province of this court to reweigh the evidence presented at trial." 'The credibility of witnesses and the weight or probative force of testimony is for the jury to judge and determine.' Conflicting evidence presents a jury question not subject to review on appeal, provided the state's evidence establishes a prima facie case.

Smith v. State, 745 So. 2d 922, 934 (Ala. Crim. App. 1999) (Emphasis in original).  Therefore, Stinson's challenge of the strength of the victim's testimony regarding identifying her as the perpetrator "[goes] to the weight of the evidence and create[s] questions of fact to be resolved by the jury." Rowell v. State, 647 So. 2d 67, 69-70 (Ala. Crim. App. 1994). See also Johnson v. State, 453 So. 2d 1323, 1328 (Ala. Crim. App. 1984) ("The question of whether the victim's identification was positive or not goes to the weight and credibility of her testimony, and was a question for the jury."); Miller v. State, 602 So. 2d 488, 497(Ala. Crim. App. 1992) ("Inconsistencies between the victim's description of the assailant and the defendant go to the credibility of the witness and present a question for the jury."); Fortier v. State, 515 So. 2d 101, 106 (Ala. Crim.

20

App. 1987). Consequently, because the issue of the identity

of the assailant is a factual question for the jury to

determine, Stinson is not entitled to any relief under this

claim.

## CONCLUSION

Based on the foregoing, this case should be affirmed on appeal.

Respectfully submitted,

Troy King
Attorney General

Audrey Jordan
Assistant Attorney General

22

## CERTIFICATE OF SERVICE

I hereby certify that on this <u>12th</u> day of April, 2006,

I did serve a copy of the foregoing on the attorney for

Stinson, by placing same in the United States Mail, first

class, postage prepaid and addressed as follows:

      Richard K. Keith
      Keith & Hamm, P.C.
      22 Scott Street
      Montgomery, Alabama 36104

      Audrey Jordan
      Assistant Attorney General

ADDRESS OF COUNSEL:
Office of the Attorney General
Criminal Appeals Division
11 South Union Street
Montgomery, Alabama 36130-0152
(334) 242-7300

118687/87141

23

REL 09/22/2006 STINSON
Notice: This unpublished memorandum should not be cited as precedent. See Rule 54, Ala.R.App.P. Rule 54(d),
states, in part, that this memorandum "shall have no precedential value and shall not be cited in arguments or
briefs and shall not be used by any court within this state, except for the purpose of establishing the application
of the doctrine of law of the case, res judicata, collateral estoppel, double jeopardy, or procedural bar."

# Court of Criminal Appeals
State of Alabama
Judicial Building, 300 Dexter Avenue
**P. O. Box 301555**
**Montgomery, AL 36130-1555**

**H.W."BUCKY" McMILLAN**
**Presiding Judge**
**SUE BELL COBB**
**PAMELA W. BASCHAB**
**GREG SHAW**
**A. KELLI WISE**
**Judges**

**Lane W. Mann**
**Clerk**
**Gerri Robinson**
**Assistant Clerk**
**(334) 242-4590**
**Fax (334) 242-4689**

## MEMORANDUM

CR-05-0182                 Montgomery Circuit Court CC-2004-1694

Rena Dorsey Stinson, alias v. State of Alabama

COBB, Judge.

Rena Dorsey Stinson was convicted following a jury trial of two counts of first-degree theft of property and one count of second-degree theft of property, violations of §§ 13A-8-3, -4, Ala. Code 1975. The trial court sentenced Stinson to concurrent 20-year terms of imprisonment on each count; the sentence was split and Stinson was ordered to serve 5 years in prison. The trial court also ordered Stinson to pay restitution and $50 to the Crime Victims Compensation Fund. Thereafter, Stinson filed a motion for a judgment of acquittal, which the trial court denied. This appeal follows.

The testimony presented at trial, held on August 22-23,

1



EXHIBIT
D

2005, tended to show that Stinson was engaged in "flimflam" activities outside of local businesses and that she had convinced three elderly women to withdraw money from their bank accounts to give to her temporarily, and she then ran away with their money. Specifically, 75-year-old Carol Ray testified that on the afternoon of April 9, 2003, she returned to her vehicle after shopping in a Wal-Mart store and she saw a zippered bag on the ground near her vehicle. A woman she identified in court as Rena Stinson "just appeared" and she picked up the zippered bag, which was full of money. The bag also contained a note that stated something like, "The big boys got theirs. This is yours." (R. 33.) Stinson told Ray that she worked for Wal-Mart. She asked Ray what they should do with the money and Ray suggested calling the police. Stinson told her that it was drug money and the police would take it. She got into Ray's car and suggested that they talk about what to do with the money. Stinson held Ray's hand and called a man on her cell phone. Stinson said the man was a lawyer for Wal-Mart. Ray spoke to the man on Stinson's cell phone, and he said he was inside the store in a meeting. Ray testified that the man and Stinson kept calling back and forth and he said he needed some serial numbers from other bills to "run it through some way," so Ray and Stinson were to go to their banks to get some money. Ray dropped Stinson off at a bank located next to her credit union, and Ray withdrew $9500 from her savings account, leaving a balance of $1000 in the account. Stinson gave her a bank bag to hold, as if she had also taken money out of her bank account.

Ray then drove them back to Wal-Mart. Stinson got out of Ray's car and told her that she was going to take Ray's money into the store to get the serial numbers in some sort of machine and then would return the money to Ray. Ray followed her into the store. Ray testified that the store's video camera had photographed the pair walking in together. Stinson walked to the customer service department and Ray followed. Stinson told Ray that she could not into the room where the "Wal-Mart attorney" was in the meeting. Stinson then turned around and ran out of the store, taking Ray's $9500 with her. Ray attempted to follow her, but could not find her. Store personnel contacted the police. Ray identified Stinson in a photographic lineup approximately one year after the incident. Ray said that she was certain of her identification when she made it.

2

Seventy-two-year-old Emma Jean Anderson testified that April 28, 2003, as she prepared to enter her vehicle in the parking lot of a grocery store, she was approached by a black woman she identified later in a photographic lineup as Stinson. Stinson talked to her, but Anderson could not remember exactly what she said. After the conversation, Anderson drove to her bank and withdrew $3000. Stinson then told her to drive to the mall and go inside. Stinson told Anderson that she would wait in Anderson's car until she returned from the store, but when Anderson returned, Stinson had taken Anderson's money and fled.

Seventy-nine-year-old Eva Williams testified that she was approached in a parking lot of a department store by a woman who identified herself as "Shirley." Williams later identified Stinson from a photographic lineup as the woman who had approached her. Stinson had a wallet in her hand and asked Williams if it belonged to her. Williams said that it did not and Stinson said she did not know what to do with it. Williams told her to take it to the department store office, but Stinson did not want to do that. She opened the wallet and showed Williams what appeared to be a lot of money.

Stinson kept telling Williams she did not know what to do with the money, and she talked on her cell phone with a man she said was the office manager at another store, Burlington Coat Factory; Stinson said she worked in the office of the store, too. He told Stinson to bring the wallet to his store; he also told Stinson that he knew her vehicle was not working and suggested that she ask Anderson to drive her. Anderson drove to the store and Stinson went inside. She told Anderson that the man wanted to know if Anderson could give them some money so they could get the serial numbers off of it. He said the wallet contained drug money. Anderson stated that they talked her in to going to her credit union and withdrawing all the money she had -- $1500, leaving a balance of $8.

Anderson then drove her vehicle, with Stinson riding along, to the Burlington store and Stinson went into the store with Anderson's money. Anderson thought that the man was going to take the serial numbers off of the bills and return them to her. Stinson returned to the vehicle with bags that she said contained $10,000. She was going to give one to

3

Anderson, she said, but they were not to spend the money right away. Stinson returned to the store, telling Anderson that she was going to get her $1500, but Anderson never saw her again. Anderson contacted the police, and she later identified Stinson from a photographic lineup.

Detective Jason Roberts testified that he was the case agent on the cases involving the scams of Ray, Williams, and Anderson. He studied the still photographs of the woman who took the victims' money that were provided by the banking institutions and compared them to photographs in the Montgomery Police Department database of individuals who had been arrested. Stinson became a suspect in the cases and Det. Roberts placed her photograph in a lineup. After the victims identified Stinson as the woman who stole their money, he took Stinson into custody and questioned her. Stinson denied the allegations, but admitted she had a gambling problem.

After the State rested its case, Stinson made a motion for a directed verdict, which the trial court denied. The defense rested its case without presenting any evidence. The jury found Stinson guilty of all charges.

On October 24, 2005, the trial court held a sentencing hearing. Stinson had 3 prior felony convictions and the court ordered her to serve a 20-year term of imprisonment, split to serve 5 years and to serve 5 years of probation. The court also ordered her to pay court costs, a $50 crime victims compensation assessment, and restitution in an amount to be determined later. This appeal follows.

I.

Stinson first argues that she is entitled to a new trial because she was never arraigned on the charges. The State argues that Stinson waived this claim by failing to timely raise it. We agree.

Stinson first raised this issue at her sentencing hearing, approximately 2 months after she was tried and convicted. The untimely objection waived the issue for purposes of appellate review. E.g., Soriano v. State, 527 So. 2d 1367, 1372 (Ala. Crim. App. 1988).

Moreover, it appears from the record that Stinson was arraigned. When she made the objection at her sentencing hearing, the trial court asked the prosecutor if she had been arraigned; the prosecutor stated that his notes indicated that she was arraigned on December 20, 2004, and that an attorney was appointed for her at that time. The clerk's record reflects that on December 20, 2004, a proceeding abbreviated as "ARRG" was scheduled. The notations in the record on December 20, 2004, indicate that the defendant's presence was waived and that an attorney was appointed. December 20, 2004, was also noted as the arraignment date on Stinson's pro se motion for a speedy trial. (C. 11.) Thus, the record indicates that Stinson was arraigned and that her newly-appointed attorney waived her presence. Thus, even if Stinson had made a timely objection, and she did not, she would not be entitled to any relief on this claim.

II.

Stinson argues that the evidence presented at trial was not sufficient to support the convictions. She preserved a claim regarding the sufficiency of the evidence by making a motion for a directed verdict at the end of the State's case. The trial court denied the motion for a directed verdict. We find no error in the trial court's ruling.

> "'"Appellate courts are limited in reviewing a trial court's denial of a motion for judgment of acquittal grounded on insufficiency." McFarland v. State, 581 So. 2d 1249, 1253 (Ala.Crim.App. 1991). "The standard of review in determining sufficiency of evidence is whether evidence existed at the time [the defendant's] motion for acquittal was made, from which the jury could by fair inference find the [defendant] guilty." Linzy v. State, 455 So. 2d 260, 26 (Ala.Crim.App. 1984) (citing Stewart v. State, 350 So. 2d 764 (Ala.Crim.App. 1977), and Hayes v. State, 395 So. 2d 127 (Ala.Crim.App.), writ denied, 395 So. 2d 150 (Ala. 1981)). In determining the sufficiency of the evidence, we view the evidence in the light

5

most favorable to the State.    <u>Linzy</u>,
<u>supra</u>.'"

"<u>Ex parte Burton</u>, 783 So. 2d 887, 890-91 (Ala.
2000).

"'The role of appellate courts is not to say
what the facts are.    Our role ... is to judge
whether the evidence is <u>legally</u> sufficient to allow
submission of an issue for decision to the jury.'
<u>Ex parte Bankston</u>, 358 So. 2d 1040, 1042 (Ala.
1978)."

<u>Ex parte Williford</u>, [Ms. 1031319, Sept. 16, 2005] ___ So. 2d
___, ___ (Ala. 2005)

Stinson argues that none of the State's witnesses were
able to adequately identify her as the thief.    She claims,
"With all three fact witnesses not remembering the person who
stole from them, there are multiple doubts which reason must
be assigned to." (Stinson's brief at p. 20.)    The facts are
otherwise.

Viewing the evidence in the light most favorable to the
State, we find that the trial court correctly denied the
motion for a directed verdict.    The testimony presented by the
State established that all of the victims identified Stinson
in a photographic lineup as the person who stole from them.
Furthermore, two of the witnesses identified Stinson in court.
(R. 34, 74-75.)    Stinson was in the presence of each victim
for an extended period of time as she gained each woman's
trust and as she appeared to make a plan with the man to whom
she had spoken on her cell phone regarding the "found money."
Stinson rode in each victim's vehicle as she went to her
financial institution to withdraw money.    Therefore, the
victims had more than a fleeting chance to observe Stinson.
Each victim was able to identify Stinson's photograph in a
police lineup, although one victim honestly admitted at trial
that she could not identify her in court.

That Stinson cross-examined the witnesses about their
difficulty in recalling details about her did not somehow
eliminate their earlier identifications of her as the thief.
Stinson raises questions about the credibility of the victims'

6

identification of her, and questions of credibility were for the jury to resolve.

Viewing the evidence in the light most favorable to the prosecution, we find that the evidence was legally sufficient to allow submission of the case to the jury. Thus, the trial court correctly denied the motion for a directed verdict, and Stinson is not entitled to any relief on this claim.

The judgment of the Circuit Court of Montgomery County is due to be affirmed.

AFFIRMED.

McMillan, P.J., and Shaw, and Wise, JJ., concur. Baschab, J., concurs in the result.

7

# COURT OF CRIMINAL APPEALS
## STATE OF ALABAMA

H. W. "BUCKY" McMILLAN
Presiding Judge
SUE BELL COBB
PAMELA W. BASCHAB
GREG SHAW
A. KELLI WISE
Judges



Lane W. Mann
Clerk
Gerri Robinson
Assistant Clerk
(334) 242-4590
Fax (334) 242-4689

**CR-05-0182**

Rena Dorsey Stinson, alias v. State of Alabama  (Appeal from Montgomery  Circuit
Court: CC04-1694)

## <u>ORDER</u>

   Attorney Richard K. Keith's motion to withdraw as counsel for the appellant is
GRANTED.

                            Done this the 2nd day of October, 2006.


                            H. W. "Bucky" McMillan, Presiding Judge
                            Court of Criminal Appeals


cc: Richard K. Keith, Attorney
    Rena D. Stinson, Pro Se
    Hon. Audrey Jordan, Asst. Attorney General



EXHIBIT

E

# COURT OF CRIMINAL APPEALS
## STATE OF ALABAMA

Lane W. Mann
  Clerk
Gerri Robinson
  Assistant Clerk



P. O. Box 301555
Montgomery, AL 36130-1555
(334) 242-4590
Fax (334) 242-4689

November 3, 2006

**CR-05-0182**

Rena Dorsey Stinson, alias v. State of Alabama  (Appeal from Montgomery  Circuit Court: CC04-1694)

## NOTICE

You are hereby notified that on November 3, 2006 the following action was taken in the above referenced cause by the Court of Criminal Appeals:

Application for Rehearing Overruled.

Lane W. Mann, Clerk
**Court of Criminal Appeals**

cc: Hon. Melissa Rittenour, Circuit Clerk
    Rena D. Stinson, Pro Se
    Hon. Audrey Jordan, Asst. Attorney General



EXHIBIT
F

# THE STATE OF ALABAMA - - JUDICIAL DEPARTMENT
# THE ALABAMA COURT OF CRIMINAL APPEALS

**CR-05-0182**

Rena Dorsey Stinson, alias v. State of Alabama  (Appeal from Montgomery  Circuit Court: CC04-1694)

## CERTIFICATE OF JUDGMENT

WHEREAS, the appeal in the above referenced cause has been duly submitted and considered by the Court of Criminal Appeals; and

WHEREAS, the judgment indicated below was entered in this cause on September 22nd 2006:

### Affirmed by Memorandum.

NOW, THEREFORE, pursuant to Rule 41 of the Alabama Rules of Appellate Procedure, it is hereby certified that the aforesaid judgment is final.

**Witness. Lane W. Mann, Clerk**
**Court of Criminal Appeals, on this**
**the 21st day of November, 2006.**

**Clerk**
**Court of Criminal Appeals**
**State of Alabama**

cc: Hon. Truman Hobbs, Circuit Judge
Hon. Melissa Rittenour, Circuit Clerk
Rena D. Stinson, Pro Se
Hon. Audrey Jordan, Asst. Attorney General

EXHIBIT
G



Jordan

# IN THE SUPREME COURT OF ALABAMA

December 1, 2006

**1060338**

Ex parte Rena Dorsey Stinson.  PETITION FOR WRIT OF CERTIORARI TO THE COURT OF CRIMINAL APPEALS  (In re: Rena Dorsey Stinson, alias v. State of Alabama)   (Montgomery Circuit Court: CC04-1694; Criminal Appeals : CR-05-0182).

## ORDER

IT IS ORDERED that the petition for writ of certiorari filed on November 27, 2006, is dismissed pursuant to Rule 2(c), Alabama Rules of Appellate Procedure, as untimely filed.

I Robert G. Esdale, Sr., as Clerk of the Supreme Court of Alabama, do hereby certify that the foregoing is a full, true and correct copy of the instrument(s) herewith set out as same appear(s) of record in said Court.

Witness my hand this _1st_ day of _December_ _2006_

*Robert D Esdale, Sr.*

**Clerk, Supreme Court of Alabama**

cc:
Rena Dorsey Stinson, Pro Se
Hon. Troy R. King, Attorney General
Hon. Audrey Jordan, Asst. Attorney General



EXHIBIT

H

# IN THE SUPREME COURT OF ALABAMA

Jordan
87141

December 11, 2006

**1060338**

Ex parte Rena Dorsey Stinson.  PETITION FOR WRIT OF CERTIORARI TO THE COURT OF CRIMINAL APPEALS  (In re: Rena Dorsey Stinson, alias v. State of Alabama)   (Montgomery Circuit Court: CC04-1694; Criminal Appeals : CR-05-0182).

## ORDER

The petition for writ of certiorari having been dismissed on December 1, 2006, as untimely filed,

IT IS ORDERED that the petitioner's motion to reinstate the petition for writ of certiorari is denied.  See Rules 2 and 26, Alabama Rules of Appellate Procedure.

I Robert G. Esdale, Sr., as Clerk of the Supreme Court of Alabama, do hereby certify that the foregoing is a full, true and correct copy of the instrument(s) herewith set out as same appear(s) of record in said Court.

Witness my hand this _11th_ day of _December  2006_

*Robert D Esdale Sr*

**Clerk, Supreme Court of Alabama**

cc:
Rena Dorsey Stinson, Pro Se
Hon. Troy R. King, Attorney General
Hon. Audrey Jordan, Asst. Attorney General

EXHIBIT
I

/ag

MIDDLE DISTRICT
NORTHERN DIVISION
FEDERAL DISTRICT COURT

RECEIVED

RENA D. STINSON
Petitioner

2007 MAR 14  A 9: 21

2:07 cv 225 -WHA

    v.

~~A P. HAC~~ Case Number: 2004-1694
U.S. DISTRICT COURT
MIDDLE DISTRICT ALA

STATE OF ALABAMA
Respondent

### PETITION FOR WRIT OF HABEAS CORPUS

    Petitioner Rena D. Stinson, Pro Se, comes before this court filing a Petition for Writ of Habeas Corpus.

    Petitioner during this cause has been denied United States Constitutional Rights, State of Alabama Constitutional Rights of 1901, as well as Federal and Statutory Laws.

    Petitioner comes before this court and petition this court to grant a Writ of Habeas Corpus and states:

    Petitioner has filed an appeal that was affirm.

    Petitioner has filed an application of rehearing that was overruled.

    Petitioner Writ of Certiorari was dismissed due to untimely being filed.

    Petitioner presently went Pro Se after obtaining legal representation of three paid counsel that were all ineffective assistace of counselors as the enclosed documentation will confirm.

    Petitioner has enclosed a variety of information and letters, statements, etc to support the  Petition for Habeas Corpus as follows:



1. Petitioner is a citizen of the State of Alabama, currently assigned to Birmingham Community Workcenter, in Birmingham Alabama, Department of Corrections.

2. Petitioner filed an appeal with the Alabama Court of Criminal Appeal, raising the following issues.
    a. Petitioner was denied an arraignment.
    b. Sufficiency of Evidence

3. Petitioner attorney Richard Keith filed these grounds on his own without Petitioner being in agreement because Petitioner after discovering that he was not going to include ineffective assistance of counselors as the trial attorney was ineffective in many areas as Writ will show.

4. Petitioner never had an opportunity to enter a plea.

5. Petitioner was not never notified of any court appearance by the circuit court,the arraignment, any hearings, or the trial itself.

6. Petitioner was not arraigned as required by the Alabama State Constitution and the U.S. Constitution.

7. Petitioner was not allowed a preliminary hearing as required.

8. Petitioner was not allowed by trial attorney to have witnesses.

9. Petitioner was not allowed to testify even thou Petitioner wanted to and beg to testify.

10. Petitioner was not allowed to give an alibi.

11. Petitioner was notified of the trial less than 24 hours.

12. Petitioner trial attorney did not do any investigations. *Exhibt D*

13. Petitioner trial attorney did not hold a suppression hearing or evidence hearing.

14. Petitioner trial attorney did not file appropriate motions.

15. Petitioner's trial attorney did not object appropriately. *Exhibt B, H*

16. Petitioner's trial attorney was not prepared for trial. *Exhibt 2*

17. Petitioner's trial attorney did not file motions to obtain discovery and all evidence the DA and Police Deparment had. *Exhibt I*

18. Petitioner's trial attorney allowed hearsay to be admitted during the trial. *Exhibt B, H*

2

19. Petitioner's trial attorney did not allow Petitioner to have witnesses on Petitioner behalf as Petitioner wanted witnesses.

20. Petitioner's trial attorney as enclosed letters will show was contacted by Petitioner in order to obtain infor- about the charges, dates, times, places, etc., and her re- ponses were she will notify Petitioner of her findings as soon as she completed her review. Petitioner was never notified of the findings. ( letters enclosed Exhibt A, B, and C).

21. Petitioner's trial attorney was informed of the still shot photo that Detective Roberts had shown Petitioner during the interrogation. The trial attorney did not obtain them as evidence and they never made it to court. Petitioner informed the detective that the person who he was pointing to as Petitioner was not Petitioner, if he would look at the picture he could see it was not Petitioner. The still shot photo was of two black females and a white elderly lady. This information was passed to all three paid attorneys. The picture would have vindicated Petitioner.

22. Petitioner's trial attorney did not object appropriately to leading questions or have evidence presented to the court when she had the opportunity too. One of the victims Ms. Carol Ray, mentioned the still shot phot, during the DA questioning her. Petitioner trial attorney, the prosecutor, or the court had them prodcued to the jury as evidence. Ms. Ray stated this twice during her questioning. The Da ignored it everytime.

23. Petitioner's trial attorney was fired immediately after the conviction. The Petitioner was forced to sit through a trial afriad to say anything with threats of being charged with contmep.   Exhibit 3  Petitioner wrote notes but they were ignored by trial attorney.

Petitioner trial attorney was not prepared as enclosed Motion to Continue states. She was informed of the trial by a return telephone call from the prosecutor. According to her letter, she had not been notified of a schedule trial date until the prosecutor returned her call and it was rescheduled. This date or any date was given to the Petitioner. Petitioner was notified of the trial less than 24 hours, no preparation.

3

Trial counselor was ineffective in objecting to leading statement made by the prosecutor as he pointed to the photo line-up during Ms. Ray questioning.

Trial counselor was ineffective in objecting and having the still shot photo presented to the court when the victim mentioned them during her questioning.

Trial counselor was ineffective in asking detective Roberts questions relating to the still shot photo, videos tapes, and DNA relating to the crimes.

Trial counselor was ineffective in not being prepared for trial as her motion to continue states dated August 10, 2005. Exhibit 2

Trial counselor was ineffective in not allowing Petitioner to testify, have witnesses and give an alibi even thou Petitioner begged counselor to let her testify.

Trial counselor was ineffective in not having an evidence hearing, suppression hearing, submitting motions to obtain evidence, discovery, witness statements, investigating, etc.

Trial counsel was ineffective as she did not prepare Petitioner for trial.  Petitioner was notified less than 24 hours of the trial.

Prosecutor before the trial pointed the Petitioner out to one of the victims, and later put Ms. Ray on the stand and asked the victim did she see the lady in court today and what was she wearing.

Prosecutor did not allow Ms. May to review the tapes as her letters confirmed he had survillance tapes of the crimes that never made it to court.  It was the duty of the prosecutor to turn over all favorable evidence.

Trial counselor had an obligation to investigate and prepare the case for court.  To discharge her duty faithfully.  To ensure that Petitioner was aware of all charges and confront witnesses.  Trial counselor did not.  Exhibit A, b.

4

24.  Petitioner was represent at trial by Attorney
Cynthianter May. Sentencing/first appeal attorney Thomas
Goggans.  Final appeal attorney Richard Keith.  Prosecutor
Brandon Hughes.  Court appointed attorney Winston Durant.

25.  Petitioner sentencing attorney failed to let Petitioner
review presentence report before sentencing; did not file
a motion for new trial; did not do any investigation as
requested by Petitioner; He allowed Petitioner initial appeal
to be dismissed because he failed to pay the docket fees and
prepare the forms to the court of criminal appeal; He waited
87 days to submit the motion for acquittal, when he was
fired;  He failed to keep Petitioner abreast of the status of
the appeal and appeal bond, etc.  Exhibit F

26.  Petitioner's appeal attorney Richard Keith, failed
to include in the appeal all of the many ways the trial
attorney was ineffective, even when he was asked by Petitioner
to include them.  He stated afterward he was saving them
to file a Rule 32, which would require an additional fee.
Attorney Keith filed a fraudulent motion to the court with-
out Petitioner permission, and did not informed Petitioner
of his actions.  Petitioner's husband paid Attorney Keith
his asking fee of $4,000 to file the appeal.  The fee included
the cost for the transcript, dockett fees, and his personal
service fees on November 21, 2005.  On January 23, 2006 he
submitted a Motion to Proceed Informa Pauperis on Apppeal.
It was approved by Judge Hobbs on January 24, 2006. He
intentionally left out valid grounds in the appeal that
would have resulted in a different outcome.  He promised to
conduct investigation, but later quoted after he was paid
it would be an additional $500 an hour, for him to do investi-
gation.

A complete detail of how this case has went is enclosed as I
have written 60 minutes, America Most Wanted and Date Line
Television soliciting their help as I am not guilty of
these crimes.  Enclosed is a copy of the letter that was
to each of them.

27.   The conviction and sentence under which Petitioner is serving time are unlawful, unconstitutional, and void because of the violation of Petitioner's forth, fifth, sixth and fourteenth amendment right to due process.

28.   Petitioner filed a motion for retrial and it was denied.

29.   Petitioner's Trial attorney 's representation fell below an objective standard of reasonableness if it had not been for counsel's unprofessional errors the result of the proceeding would have been different.   Trial attorney did not put on any defense on Petitioner behalf.

30.   Trial attorney has a duty to conduct both factual and legal investigation on behalf of his client and that the failure to conduct such an investigation and present the evidence that would have been disclosed amounts to ineffective representation by counsel as stated in several cases such as:

Coles v. Peyton 389; McQueen v. Swenson, 498 F. 2d 20;
US V. Decoster, 487 F. 2d.


Trial attorney has a duty to make reasonably investigation to conduct adequate pretrial discovery as stated in "kimmelman v. Morrison (1986, US) 91 L Ed 2d 305, 106 S Ct 2574, Infra 10.

Supreme Court found that defense counsel's representation was constitutionally deficient in that he failed to timely move for suppression of certain evidence, which was ultimately due to his failure to conduct adequate pretrial discovery.

According to two enclosed letters from Attorney may the prosecutor had surviellance tapes and she did not get to reveiw before the trial and she had a duty to ensure that the all favorable evidence be presented to the court, as Petitioner husband had requested to review the tapes with Attorney May.

An attorney is expected to take professional responsibility for the conduct of a case after consulting with his client, the Supreme Court held, except for certain decisions which must be made by his client; the plea to be entered, to waive jury trial, whether the client will testify.

31.   Due Process of law requires fair notices that one's conduct is subject to a law or regulation as stated in Brooks v.Alabama State Bar, 574 So. 2d 33

IT IS THE RIGHT OF THE IMPERATIVE DUTY OF THE COURTS TO
SEE THAT THE RIGHTS OF AN ACCUSED ARE NOT TAKEN AWAY FROM
HIM.   Bradley v. State, 215 Ala. 140, 110 So. 162 (1926)

FROST V. STATE, 225 Ala 232, 142 S. 427 (1932)
A prisoner accused of felony, must be arraigned in person and
must plead in person; and in all subsequent proceedings, it
is required that he shall appear in person.

Trial Courts can be trusted to see that every man brought
before them, charged with crime, shall have that full measure
of protection guaranteed to him by Amend 6 of the Constitution
Gilchrist v. State, 234 Ala 73, 173 So. 651 (1937).
Wray v. State, 154 Ala. 36 45 So. 697 (1908)

Rule 4.4 Initial Appearance
(b) Felonies charged by complaint when a defendant's charged
by complaint with commission of a felony, the Judge or magistrate
in addition to the procedures required by section (a) shall:
(1) inform the defendant of the right to demand a preliminary
hearing and the procedure by which that right may be exercised
and (2) If so demanded, set tthe time for a preliminary
hearing in accordance with Rule 5.1 of Alabama Rules of Court
2006.

Herbert v. Louisana, 272 US 312, states the duty of the state
court to protect constitutional rights and and they are under
obligation to guard and enforce every right secured by the
Federal Constitution.

The Constitution of Alabama 1901, Section 6. Fair Trial
Procedures states  "That in all criminal prosecutions, the
accused has a right to be heard by himself and counsel, or
either, to demand the nature and cause of the accusation;
and to have a copy thereof, to be confronted by the witnesses
against him; to have compulsory process for obtaining
witnesses in his favor; to testify in all cases, in his own
behalf, if he elects so to do; and, inall prosecutions by
indictment, a speedy, public trial, by an impartial Jury
of the county or district in which the offense was committed;
and he shall not be compelled to give evidence against
himself, nor be deprived of life, liberty or property,
except by due process of law.."

Petitioner was denied Petitioner rights to a Fair Trial in
accordance to Alabama State Constitution of 1901, US
Constitution, Federal and Statutory Laws due to the acts
of the court appointed attorney, trial attorney, sentencing/
appeal attorney and final appeal attorney, the court,
prosecutor and the detective who handle the case.

Petitioner fourth, fifth, sixth fourteenth, etc., was violated

Prosecutor has a constitutional duty to volunteer matter to
the defense if the evidence would create a reasonable doubt
as to the guilt of the accused., Jones v. Shankland, 800
F 2d 77, 80 (6th Cir 1986)


Giglio v. United States (1972) 405, US 150 3L LFD 2d 104, 92
87 2d pg 802.. Prosecutor's duty under due process clause
of the fifth amendment to disclose evidence to the accuse.

People v. Nikollaj, 155 Misc. 2d 642, 589 N.Y. S 2d 1013
(sup Ct. Queens County 1997) Prosecution's withholding of
Rosario material prejudiced defendant's case and a reasonable
probability existed that the violation contributed to the
verdict.


Alabama Cr AP 1981 Photographs in nature of Mug shots should
not have been admitted in face of proper objection where they
indicated that defendant had a criminal record.  Attorney
May did object but her objection# as overruled.

The Prosecutor submitted to the court photographic line-up
from which eye witnesses initially identified the defendant
was impermissibly suggestive the burden was on the prose-
cution to show that the in-court identification had an independ-
ent basis of reliability.  The prosecution did not meet this
burden where the evidence regarding reliability of eye-
witness's identification was conflicting.  Where based on all
facts and circumstances involved, the suggestiveness of the
photographic  line-up coupled as it was, with evidence
indicating a lack of reliability, there was a very substantial
likelihood of irreparable misindentification; in-court
identification of the defendant should have been suppressed.


Error in law if the court rule that evidence is admissible
when it should have been ruled inadmissible.

All evidence the Prosecutor had was not provided to the
defendant such as the still shot photos, video tapes of the
crimes with the actual persons, DNA Detective Roberts stated
he had, original complaints filed by the victims, etc.,

Upon Prosecutor's witness mentioning the still shot photo
(enclosed) Prosecutor ignored her comment.

Dickerson V. Foss 692 F. 2D   Accuracy of the witness prior
description of the criminal the length of time between th crime
and the confrontation.  No confrontation was made available
#to Petitioner.

## POINTS AND AUTHORITIES IN SUPPORT OF
## PETITION FOR WRIT

Rena D. Stinson, Pro Se, the Petitioner in this case was indicted by a Montgomery County Grand Jury on July 9, and charged with three counts of first-degree theft of property in violation of Section 13A-8-3 of the Code of Alabama (1975) and one count of second-degree theft of property in violation of Section 13A-8-4 of the Code of Alabama (1975) on December 20, 2004, an arraignment was held. Petitioner was not notified. The court appointed Attorney Winston Durant represent Petitioner. Attorney Durant upon his appointment waived Petitioner presence to the arraignment on that same date. The court nor Attorney Durant notified the Petitioner of this action. Petitioner was not contacted to sign a waiver, etc., The result of this was Petitioner was not arraigned, entered a plea or had an opportunity to a Preliminary hearing.

On April 26, 2005, a court date was set for the Petitioner The Petitioner was picked up suddenly from Julia T. Prison where Petitioner was serving a 10 split 18 months sentence for writing checks due to a past gambling addiction on Petitioner on personal and business accounts. She was informed by the deputy she had a court date before the Judge. Petitioner never made it to that court date because Petitioner blanked out while at the county jail and hurt her shoulder, sprung her shoulder, dislocated her teeth, broke a tooth, and hurt her head. Petitioner was rushed back to Julia because the county refused to treat her or take her to the Emergency Room. Upon arriving back at Julia she was taken to the Montgomery, Baptist Hospital and treated. Petitioner husband at this point contacted Attorney Cynthianther May to represent Petitioner and to obtain information about what was Petitioner being charged with.

On May 2, 2005, Ms. Cynthianther L. May. entered a notice of appearance on behalf of Stinson.

on August 15, 2005, according to information contain on

Ms. May Motion to Continue that she submitted on August 10, 2005, there was another court date set for a trial on August 15, 2005, whereas Ms. May found out from a returned telephone to the Prosecutor Brandon Hughes; She had called him I am assuming in regards to reviewing the tapes he had regarding the crimes, since her enclosed letters mentioned Ms. May was waiting on the Prosecutor to get back with her, for a time for her to review them and Petitioner husband had requested to be present at the viewing.

August 18, 2005, Petitioner was suddenly picked up by the county to appear in court. Petitioner upon arrival contacted Petitioner husband to contacted Attorney May to find out what was the purpose of the court hearing. Ms. May came to the Montgomery County Jail, on Sunday, August 21, around 4:30, to informed Petitioner that she was having a trial the next day. Attorney May left word for the county to allow Petitioner to dress for court. Petitioner asked many questions but received few answers. Petitioner was informed not to worry, Ms. May had everything under control. Petitioner asked had she obtained the still shot phot that the detective had shown Petitioner during the interrogation, and Petitioner had informed the detective that the person he was pointed to if he would look at it, now that he had met me he could see it was not me. She said "no" it will more than likely be in court. But it was not!"

Petitioner had wrote Ms. May two letters after her initial visit on May 12, 2005, at Julia Prison concerning the charges, time, dates, places, etc. I had informed Ms. May of the interrogation Petitioner had and the communication that was exchanged, whereas I was threaten, cused even after telling the detective he had the wrong person and the picture was clear enough to see that of the offenders at the crime scene. As the detective stated the crime involved two black females and one black male. They wanted information that I did not know about or could give them. A couple of days later, Petitioner name appeared in the newspaper, on TV and on the radio being accused of the crimes of film flaming elderly ladies out of their money. Exhibt A, B,

Ms. May never got back with Petitioner after her initial visit at Julia Prison, regarding the charges, etc. Ms. May letters will confirmed as of August she had not finished her review of the files or done any investigation, file appropriate motions, got with Petitioner about the charges, prepared Petitioner for court by allowing Petitioner to give an alibi, have witnesse, evidence hearing, etc. *Exhibit A, B*

On August 22, 2005, the trial court granted the State's motion to nolle pros count three of the indictment.

On August 23, 2005, the jury found Petitioner quilty of the charges. Ms. May did not put up any defense. The jury wanted information about the still shot photo. Victim Carol Ray mentioned the still shot photo during her questioning. Petitioner attorney, the court or the prosecutor did not have the photo presented to the jury upon her mentioning the picture. The Prosecutor ignored her statement. The Jury wanted original descriptions that was given by the victims when the crimes took place. The Jury wanted more information about hearsay that was allowed regarding the detective statement" A fellow officer was at the county jail and saw Petitioner and called Petitioner name into him". Petitioner attorney did not object or asked any questions relating to this hearsay statement. The Jury was denied all their requests from the court, prosecutor, and Petitioner attorney.

Petitioner was sentenced to a 20 split 5 years and five

On August 24, 2005, Petitioner fired Ms. May immediately after the conviction.

On August 31, 2005, Petitioner obtained the service of of Attorney Thomas Goggans. He was hired to do an appeal, to attend sentencing hearing and file motions for a retrial, an acquattal, to obtain an appeal bond, to submit an appeal, etc. Attorney Goggans was also informed of the evidence at the police station. He did not do any investigation as he had agreed upon accepting the case or file a motion for retrial.

On October 24, 2005, a sentencing was set. Petitioner was not allowed to review the presentence report before the sentencing, as the Prosecutor was making changes to it during

the court hearing.  Judge Hobbs asked Attorney Goggans did he
want a formal hearing he quickly stated 'no' without consulting
Petitioner.  Upon reading Alabama Rule of Court 2005, this would
have been an opportunity to have the tapes, photo presented
to the court and identify all the ways the trial attorney was
ineffective; as well as Petitioner was denied her right to Due
Process of law could have been investigated as Mr. Goggans had
been informed about Petitioner was not allowed to testify,
have witnesses, give an alibi, never entered a plea, etc.

During the sentencing was Petitioner first opportunity
to speak to the court.  During the entire trial Petitioner
was not asked any questions by the court, the prosecutor, or
her attorney.  Petitioner had been informed to not say a word
unless asked during the trial.  Petitioner had wrote the court
called the court and was unsuccessful.  Petitioner informed
the judge during the sentencing that she had not been arraigned,
entered a plea, had a preliminary hearing, could not testify,
was not allowed to have witnesses, etc.

Judge Hobbs asked the prosecutor had Petitioner been
arraigned, he stated yes on December 20, 2004. The case action
summary sheet also showed Petitioner presence was waive and
only an attorney was apppointed.  He did not reveal that infor-
mation to the Judge.

Petitioner was not given an opportunity to review the
presentence report before the hearing.  Attorney Goggans stated
all during the sentencing he would file motions, we will deal
with that a a later date, etc.  He failed to file the motion
relating to Petitioner Due Process, Constitutional violations
 both U.S. and Alabama.  (enclosed documentation give details
of his errors.)  Exhibit E.

Petitioner was sentenced to 20 split five years in prison
and five years probation.  Petitioner was denied an appeal bond.

Attorney Goggans allowed Petitioner appeal to be dismissed
because he did not pay the docket fees, or prepare the forms
to the Court of Criminal Appeal.  He was paid his asking  fees
that included the fees for the transcript, and docket fees.
On November 16, 2005, the court of appeal dismissed the appeal.
 Exhibit F.

Judge Hobbs never asked Petitioner if she was satisfied
with her attorney representation!

Attorney Goggans failure to keep client abreast, failure to
file appeal and motions as promised resulted in him being
fired.

November 21, 2005, Petitioner obtained the service of
Attorney Keith by paying his asking fees for his personal
service, the transcript, docket fees, etc. He had agreed
agreed to take the appeal days before he was paid. He
contacted Attorney Goggans as well to let him know Petitioner
had obatined his service. On this date of November 21, 2005,
Attorney Goggans submitted his first and only motion. He filed
a motion of acquittal half heartedly to keep from having to
pay Petitioner money back. This motion for acquittal was
done 87 days after the conviction.

December 6, 2005, Attorney Keith motion to the Court of
Criminal Appeal to have the appeal reinstated, and paid the
fees and submitted his notice of appearance.

Attorney Richard Keith had been briefed and informed of
everything that had transpired regarding Petitioner cause.
He was advised of all the trial attorneys mistakes, as well
as the sentencing/appeal attorneys mistakes.

Attorney Keith was communicating with Petitioner husband
during this time on a regular basis. Petitionere did not get
to talk again with Attorney Keith after his initial visits at
the county jail. Petitioner wrote and forward case laws,
information Petitioner obtained from law books about cases
relating to her situation, Constitutional violations, etc.

Attorney Keith submitted the appeal without any regards
to Petitioner requests in writing to include ineffective
assistance of counselor, hearsay, still shot photos, no evidence
hearing, etc.   Even when asked to do so by Petitioner husband
he insisted he could not include them in the original appeal.

Attorney Keith stated after the appeal was filed that we was
going to file a Rule 32 next and it would require an additional
payment of $2,500 minimum.

According to Alabama Rule of Court 2005, Attorney Keith could have included all of the above items in the first appeal and it would have resulted in a different result.

Upon realizing this information, Petitioner contacted the court of Criminal Appeal and submitted a Motion for "Help and Mercy." The court of Criminal Appeal wrote Petitioner back and stated that Judge Hobbs had approved Petitioner indigent status and as long as Attorney Keith was Petitioner attorney, Petitioner needed to address Petitioner concerns to him. Exhibit F,

Attorney Keith submitted a fraudulent document to the court. He was paid his fees that included the cost of the transcript for the appeal, docket fees, and his personal service fees.

The Court of Criminal Appeal Affirm the conviction.

It was at this point that Petitioner wrote a letter to the court that Petitioner was Pro Se due to all the issues relating to ineffective assistant of counselors.

On October 3, 2006, Petitioner received a letter from the court of Criminal Appeal granting Attorney Keith motion to withdraw.

Petitioner submitted an application for rehearing and it was overruled.

Petitioner submitted a Petition for Writ of Certiorari it was dismissed due to untimely. Petitioner was not aware of the process for timely mailing. Petitioner request for reinstatement was denied.

Petitioner now comes before this court for mercy in this cause.

14

Wherefore, Petitioner Rena D. Stinson moves the Honorable court to grant the following relief:

a)  Accept jurisdiction over this case;

b)  Allow Petitioner an appeal bond to obtain the Discovery in this case and all the evidence that was collected such as the still shot photo, video tapes, DNA report that was not provided during the trial;

c)  Require Detective Jason Roberts to bring forth all the evidence that was obtained during the investigation, such as surviellance tapes, still shot photo, DNA report, original descriptions given when the crimes was committed, witnesses statements given at the crime scene, etc.

d)  Order an evidentary hearing;

e)  At the evidentary hearing, find that Petitioner was denied her rights under the U. S. Constitution, Alabama constitution Federal and Statutory Laws;

f)  Upon reviewing all evidence that was obtained and it confirm Petitioner innocent once reviewed and inspected Issue a conditional writ of Habeas ordering this court will grant a Writ of Habeas Corpus unless the State orders a new trial;

g)  Issue a Writ of Habeas Corpus freeing Petitioner from her unconstitutional confinement and probation.

Respectfully Submitted

*Rena D. Stinson*

Rena D. Stinson

Done This 28 Day of January 2007

NOTARY PUBLIC STATE OF ALABAMA AT LARGE
MY COMMISSION EXPIRES: Oct 25, 2009
BONDED THRU NOTARY PUBLIC UNDERWRITERS

Notary

15